1

1      UNITED STATES DISTRICT COURT

2         DISTRICT OF MINNESOTA

3    ------------------------------------------------

4    Jackson Mahaffy; Flora Mahaffy;
     Daniel Nelson; and Paul Von Arx,
5
           Plaintiffs,
6
     vs.                              Case File No. 08-cv-4992
7                                          JMR/SRN
     Robert J. Kroll; Wallace M.
8    Krueger, Christopher J. Bennett;
     Aaron C. Hanson; Christopher
9    Bishop; David Campbell; Toddrick
     Kurth; Brandon Kitzerow; James
10   Rugel; Clark Goset; and Mark
     Durand, all acting in their
11   individual capacity as
     Minneapolis Police Officers;
12   and the City of Minneapolis,

13         Defendants.

14   ------------------------------------------------

15            Videotaped Deposition of
16
              ROBERT J. KROLL
17
              November 6, 2009
18              9:00 a.m.

19              Volume I

20

21

22       Linda J. Trondson, RPR, MR
     Ask, Trondson & Smith Court Reporters
23     701 Fourth Avenue South - Suite 500
        Minneapolis, Minnesota  55415
24      612-332-2603 *** 800-332-2603
         ats@atscourtreporters.com
25

**K5**



SHEET 2  PAGE 2

**2**

```
1   Videotaped Deposition of Robert J. Kroll taken
    on the 6th day of November, 2009 commencing at
2   approximately 9:00 a.m. at the Offices Ask, Trondson &
    Smith Court Reporters, Suite 500, 701 Fourth Avenue South,
3   Minneapolis, Minnesota, 55415, before Linda J. Trondson,
    Notary Public, County of Hennepin, State of Minnesota, to
4   be used in the above-entitled matter.

5           APPEARANCES:

6           JAMES W. DELAPLAIN, Attorney at Law,
        2140 Fourth Avenue North, Anoka, Minnesota, 55303,
7   and,

8           DANIEL J. BRAZIL, Attorney at Law,
        2124 Dupont Avenue South, Minneapolis, Minnesota,
9   55405, appeared on behalf of the Plaintiffs.

10          C. LYNNE FUNDINGSLAND and DARLA BOGGS,
        Assistant City Attorneys, Office of the Minneapolis
11      City Attorney, Room 210, 350 South Fifth Street,
        Minneapolis, Minnesota, 55415, appeared on behalf of
12      the City of Minneapolis.

13          KARIN E. PETERSON, Attorney at Law, Rice,
        Michels & Walther, LLP, 10 Second Street Northeast,
14      Suite 206, Minneapolis, Minnesota, 55413, appeared on
        behalf of Robert J. Kroll and Wallace M. Krueger.

15

16

17

18

19

20

21

22

23

24

25
```

---

PAGE 4

**4**

```
1   A   I have an Associate of Arts degree from Lakewood
2       Community College, now it's Century College, in White
3       Bear Lake, Minnesota, and I have a Bachelor of
4       Science degree from St. Mary's University in
5       Minneapolis.
6   Q   In what year did you obtain the Associate of Arts
7       degree?
8   A   '87.
9   Q   And how about the Bachelor of Science?
10  A   2004.
11  Q   Beyond those degrees, do you have any other degrees
12      or certificates from an educational institution?
13  A   Several military, on Reserve. Other than that, no.
14  Q   Were you ever in the active military?
15  A   No.
16  Q   And did you say you're in the Reserve?
17  A   I was. I retired after 21 years.
18  Q   And I understand you work for the Minneapolis Police
19      Department. Prior to your employment with the
20      Minneapolis Police Department, have you worked for
21      any other law enforcement organization?
22  A   No.
23  Q   Do you teach any classes or give instruction
24      yourself?
25  A   Currently I just teach at the Citizens' Academy. In
```

---

PAGE 3

**3**

```
1           ROBERT J. KROLL,
2   being first duly sworn, testified as follows:
3           EXAMINATION
4   BY MR. DELAPLAIN:
5   Q   Good morning, Lt. Kroll. As I said on the record, I
6       represent the plaintiffs in regard to a case that has
7       been brought against the City of Minneapolis and
8       yourself as one of the defendants regarding an
9       incident that occurred on May 14th, 2004, in the area
10      of Dusty's Bar and the Old Science Renovation
11      Factory, and I'm going to try to move quickly through
12      this deposition for everybody's benefit, and I'm
13      hoping we can work together on just getting through
14      some background information.
15          Did you graduate from a Minnesota high
16      school?
17  A   Yes.
18  Q   And where was that?
19  A   Harding High School in St. Paul, Minnesota.
20  Q   And what year was that?
21  A   1983.
22  Q   And did you attend any education after high school?
23  A   Yes.
24  Q   And what type of education have you achieved since
25      high school?
```

---

PAGE 5

**5**

```
1       the past I've taught many classes.
2   Q   Can you describe to me what those many classes are
3       that you've taught in the past?
4   A   Well, in the military I was a Military Police
5       Instructor for nine years. I taught civil
6       disturbance, riot control, building clearing,
7       military operations in an urban terrain, leadership
8       courses. I've got a lengthy military file with
9       regard to instruction. I'm sure I'm missing quite a
10      bit.
11  Q   Have you ever taught classes within the Minneapolis
12      Police Department?
13  A   Yes, fairly extensive also.
14  Q   Can you name some of those classes that you've
15      taught?
16  A   Various courses in SWAT. Again, crowd control,
17      building clearing, civil disturbance. I've taught
18      various classes in SWAT operations, I've taught
19      various classes in union work. I assisted in
20      training many years ago in Officer Survival Week.
21      Again, SWAT courses through other agencies. It's
22      lengthy.
23  Q   And when were you first hired by the Minneapolis
24      Police Department?
25  A   1989.
```

SHEET 3   PAGE 6

6

1   Q   And can you just give me briefly an overview of how
2       your career progression has gone and what your
3       postings have been since 1989?
4   A   I was a recruit in '89. I worked the 4th Precinct,
5       the 5th Precinct and 3rd Precinct patrol. I then
6       worked undercover vice.
7           I was promoted to sergeant in '95. I
8       worked as an investigator in the Juvenile Division
9       and the Fraud Forgery Unit. I worked as a unit
10      supervisor in the Public Housing Unit, the Booking
11      Unit, the Waterworks Unit. I worked as a patrol
12      Supervisor in the 3rd Precinct, and STOP, which was
13      the full-time version of SWAT's strategic tactical
14      operations.
15          I was promoted to Lieutenant three and a
16      half years ago, so that would be 2005, May of -- or
17      June of 2005, promoted and detailed temporarily as a
18      Lieutenant in my current assignment in STOP or
19      full-time SWAT, then permanently promoted to
20      Lieutenant in the 2nd Precinct patrol, and about a
21      month ago reassigned to command the Domestic Assault
22      Unit.
23  Q   I'm sorry, command --
24  A   The Domestic Assault Unit.
25  Q   Is that within any certain precinct or is that --

PAGE 7

7

1   A   No, that's at headquarters in the Criminal
2       Investigation Division.
3   Q   And prior to May, 2004, did you know Wallace Krueger?
4   A   Yes.
5   Q   And when did you first meet Sgt. Krueger?
6   A   Approximately when I first got on SWAT, which was
7       '91.
8   Q   And did you become friends with Sgt. Krueger?
9   A   Yes.
10  Q   Is he still your friend presently?
11  A   Yes.
12  Q   And you were on SWAT together in 1991, is that
13      correct?
14  A   Yes.
15  Q   What other assignments have you had while you were
16      working together?
17  A   I don't think we've ever been assigned in the same
18      position department-wise. We've been on the union
19      board together.
20  Q   Are you still on the union board?
21  A   Yes.
22  Q   And what's your position?
23  A   Vice-president.
24  Q   And how long have you been vice-president of the
25      union?

PAGE 8

8

1   A   I think it's three to four years now.
2   Q   And was Sgt. Krueger the vice-president immediately
3       prior to you becoming vice-president, do you recall?
4   A   Yes. I was a director on the board, and he came on
5       the board as a vice-president, and a few years back
6       we switched roles, and he became a director and I
7       became the vice-president.
8   Q   Do you remember how many years ago it was that he
9       became a director -- I'm sorry, that you were a
10      director and he became vice-president?
11  A   I've been on the board 13 and a half years, so I
12      guess I got on in '96, and I think Wally came on
13      around '98 or '99.
14  Q   And with the Federation, the union, what is your role
15      currently? As vice-president, what do you actually
16      do?
17  A   There's various duties. We do contract negotiations.
18      We represent officers in internal statements,
19      internal investigations, disciplinary proceedings.
20      I'm on the IOD committee, I'm on the uniform
21      committee. There's several committees that we sit
22      on, oversee. I'm chair of the personnel committee,
23      which entails the grievance committee, the uniform
24      committee, the IOD committee.
25  Q   What is IOD?

PAGE 9

9

1   A   Injured on duty. We review cases that are submitted.
2   Q   And in the scope of those duties you've described, is
3       one of your duties with the Federation to sit with
4       officers in, for example, Civilian Review
5       investigation statements?
6   A   Correct, yes.
7   Q   And how many times would you estimate have you done
8       that?
9   A   Somewhere between a thousand and two thousand. I'm
10      estimating. I guess approximately a thousand. I
11      mean I've been doing it for 13 years. I probably do
12      50 a year, upwards of 50 a year.
13  Q   So you're familiar with the process.
14  A   Oh, yes.
15  Q   Do you also sit in Internal Affairs investigations,
16      do you represent officers?
17  A   Yes. I should clarify. That's a combination of
18      Civilian Review and Internal Affairs proceedings.
19  Q   Have you ever -- and the term you used, you used the
20      term representing an officer if you're sitting with
21      them?
22  A   Yes.
23  Q   Have you ever represented Sgt. Krueger in Civilian
24      Affairs or internal investigations?
25  A   I don't believe so, but that's not to say I haven't.

SHEET 4  PAGE 10

10

1  Again, with the volume of people I've represented, I
2  don't have a specific recollection of representing
3  him.
4  Q  How about one of the other co-defendants in this
5  case, Officer Bennett, do you know if you've
6  represented him in any Internal Affairs
7  investigations or Civilian Review investigations?
8  A  I can't say for sure.
9  Q  How about Officer Hanson?
10  A  I can't say for sure.
11  Q  Officer David Campbell?
12  A  I can't say for sure.
13  Q  How about Officer Bishop?
14  A  Again, the same, I can't say for sure.
15  Q  So you have no recollection of representing any of
16  those officers in Internal Affairs investigations or
17  Civilian Review investigations, right?
18  A  Correct. Nothing significant that sticks out. Not a
19  major deal where, you know, there was any substantial
20  disciplinary action taken on any of them.
21  Q  Now, do you know all of those officers, all four of
22  them?
23  A  Yes.
24  Q  And did you know all four of those officers prior to
25  May 14th, 2004?

PAGE 11

11

1  A  I guess I knew who they were, but very vaguely. We
2  had never worked in the same -- I had never worked in
3  the same assignments with any of those officers. And
4  I actually got to know all of them better because my
5  last assignment where I was a lieutenant was in that
6  2nd Precinct where most of those worked at that time.
7  So since this incident we're discussing, I've got to
8  know all of them better, and I would have known them
9  by face, possibly by name, at the time of the
10  incident, but I'm not certain.
11  Q  Now, at the time of the incident you were a sergeant
12  in the 2nd Precinct, is that correct?
13  A  No. I was a sergeant, and I don't remember what my
14  unit was at the time. I want to say I was either in
15  the Waterworks Unit or STOP patrol, I don't remember
16  specifically which assignment.
17  Q  What do you do on the Waterworks?
18  A  That was a unit that was developed for Homeland
19  Security, the threat of terrorist activity at the
20  water treatment facility. It was two-fold. It was
21  at the height of, you know, terrorist alerts where
22  they took measures to secure the water treatment
23  because we supplied it for, you know, three counties
24  and seven cities, the Minneapolis water treatment
25  facility. And in addition to that, it was a unit

PAGE 12

12

1  that was formed up as a job saving measure to avoid
2  layoffs. So we developed a unit that replaced
3  private security there, and I had about a dozen
4  officers that worked under me at that assignment.
5  There was a unit created for that.
6  Q  And how about STOP patrol?  Is STOP patrol
7  essentially SWAT?
8  A  Yes, it's a full-time patrol division, much like a
9  precinct, except its a citywide patrol and all the
10  officers assigned to it are members of the SWAT team,
11  and they can be pulled out of regular patrol to go
12  execute high-risk search warrants or to perform
13  other, you know, SWAT duties, a full-scale callout or
14  something like that, but they're a citywide uniformed
15  patrol function.
16  Q  When you're on STOP patrol, are you also still
17  assigned to some specific precinct?
18  A  No, you're citywide responsibility.
19  Q  Now, I understand on the night in question that you
20  were attending a party prior to the incident
21  involving Mr. Mahaffy.
22  A  Yes.
23  Q  And a party in Uptown somewhere, right?
24  A  Yes.
25  Q  Do you remember where that was?

PAGE 13

13

1  A  I know it was on Lagoon. I can't remember the name
2  of the establishment. It was on Lagoon, near
3  Hennepin.
4      MS. PETERSON:  If we're going to get into
5  the particulars of that incident like we did with
6  Mr. Krueger, Sgt. Krueger, I'd like this under the
7  confidential agreement that we had before, as this is
8  still a disciplinary measure that has not resulted in
9  the final disposition of a disciplinary measure, so
10  all of this should be under that protective order,
11  just as we did it for Mr. Krueger, or Sgt. Krueger.
12      MR. DELAPLAIN:  Okay, we'll acknowledge
13  that you've made a request that all of this be
14  protected by the protective order in the case.
15      MS. PETERSON:  What do you mean, you're
16  going to acknowledge that it will be protected by the
17  protective order?
18      MR. DELAPLAIN:  Well, that means that I
19  recognize that you're designating it as protected.
20  I'm not agreeing it is protected, but I am agreeing
21  that we have to abide by the order, whether it's
22  ultimately protected or not.
23      MS. PETERSON:  So you're saying that the
24  Court will decide whether this is under the
25  protective order or not?

SHEET 5   PAGE 14

14

1     MR. DELAPLAIN:   Yes.
2     MS. PETERSON:   You can raise your
3   objection, but under the Data Practices Act he has
4   the right, because it's not the final disposition of
5   this disciplinary matter, that everything that
6   revolves around this matter is private personnel data
7   and is not public, and is therefore subject to the
8   confidential order that we agreed to.  And if we need
9   go to court on that, we will go to court on that.
10     MR. DELAPLAIN:   Understood.
11     MS. PETERSON:   Before you start, all of
12   Lt. Kroll's answers from here on until we deem
13   otherwise I am putting under the confidential order
14   as private personnel data, and until such time as I
15   say that it is not protected by that, I want all of
16   his answers to be deemed to be under the
17   confidential, subject to the Court order.
18     COURT REPORTER:   Did you also want this
19   portion sealed?
20     MS. PETERSON:   I do.
21     MR. DELAPLAIN:   I'll state for the record
22   that I object to the sealing of any of the police
23   reports.  Particularly, for example, the supplemental
24   report, which I think already was public record and
25   doesn't contain any particular confidential

PAGE 15

15

1   information regarding Lt. Kroll and was actually used
2   as a part of the basis for charging Mr. Mahaffy with
3   a crime.
4           (The unprotected portion of the deposition
5           was concluded at approximately 9:20 a.m.
6           on November 6, 2009)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

16

1                   UNITED STATES DISTRICT COURT

2                      DISTRICT OF MINNESOTA

3      ------------------------------------------------------

4      Jackson Mahaffy; Flora Mahaffy;
       Daniel Nelson; and Paul Von Arx,
5
                      Plaintiffs,
6
       vs.                                 Case File No. 08-cv-4992
7                                                 JMR/SRN
       Robert J. Kroll; Wallace M.
8      Krueger, Christopher J. Bennett;
       Aaron C. Hanson; Christopher
9      Bishop; David Campbell; Toddrick
       Kurth; Brandon Kitzerow; James
10     Rugel; Clark Goset; and Mark
       Durand, all acting in their
11     individual capacity as
       Minneapolis Police Officers;
12     and the City of Minneapolis,

13                    Defendants.

14     ------------------------------------------------------

15
                   Continued Videotaped Deposition of
16
                          ROBERT J. KROLL
17
                        November 6, 2009
18                         9:20 a.m.

19     Volume II - Sealed as Private and Confidential
                 Pursuant to Protective Order
20                       Pages 16-87

21

22
                    Linda J. Trondson, RPR, MR
23            Ask, Trondson & Smith Court Reporters
              701 Fourth Avenue South - Suite 500
24             Minneapolis, Minnesota   55415
                612-332-2603 *** 800-332-2603
25               ats@atscourtreporters.com

SHEET 2   PAGE 2
Sealed as Private and Confidential Pursuant to Protective Order

17

1           Volume II of the Videotaped Deposition of
2    Robert J. Kroll taken on the 6th day of November, 2009
     commencing at approximately 9:20 a.m. at the Offices Ask,
3    Trondson & Smith Court Reporters, Suite 500, 701 Fourth
     Avenue South, Minneapolis, Minnesota, 55415, before
4    Linda J. Trondson, Notary Public, County of Hennepin,
     State of Minnesota, to be used in the above-entitled
5    matter.

6           APPEARANCES:

7           JAMES W. DELAPLAIN, Attorney at Law,
            2140 Fourth Avenue North, Anoka, Minnesota, 55303,
8    and,

9           DANIEL J. BRAZIL, Attorney at Law,
            2124 Dupont Avenue South, Minneapolis, Minnesota,
10   55405, appeared on behalf of the Plaintiffs.

11          C. LYNNE FUNDINGSLAND and DARLA BOGGS,
            Assistant City Attorneys, Office of the Minneapolis
12   City Attorney, Room 210, 350 South Fifth Street,
            Minneapolis, Minnesota, 55415, appeared on behalf of
13   the City of Minneapolis.

14          KARIN E. PETERSON, Attorney at Law, Rice,
            Michels & Walther, LLP, 10 Second Street Northeast,
15   Suite 206, Minneapolis, Minnesota, 55413, appeared on
            behalf of Robert J. Kroll and Wallace M. Krueger.

16          Also Present:  Sophie Mills

17          EXHIBITS MARKED

18   1    Street Map.............................20
19   2    Supplemental Report....................46
20   3    CRA Statement..........................47
21   4    CRA Printout...........................64
22
23
24
25

---

PAGE 3
Sealed as Confidential Pursuant to Protective Order

18

1         EXAMINATION (Continued)
2    BY MR. DELAPLAIN:
3    Q   Lt. Kroll, do you remember where you were prior to
4        going to the party?
5    A   No.
6    Q   Do you remember if you drove to the party?
7    A   I rode with Sgt. Krueger.
8    Q   Do you know, that night did you leave your vehicle at
9        another location or at home?
10   A   I believe it was in the SWAT garage.
11   Q   Was it your recollection that you left from work to
12       go to the party?
13   A   I was in the union office working earlier that day.
14   Q   And do you recall what time you arrived at the party?
15   A   No.
16   Q   Had you been drinking alcohol at all prior to the
17       party?
18   A   No.
19   Q   And at the party did you have some alcohol?
20   A   Yes.
21   Q   And do you recall how much you drank?
22   A   Not exactly.  Probably three beers.
23   Q   And then I understand you left the party and went to
24       Psycho Suzie's.
25   A   Yes.

---

PAGE 4
Sealed as Confidential Pursuant to Protective Order

19

1    Q   Did you have any alcohol at Psycho Suzie's?
2    A   I had one beer.
3    Q   So prior to encountering Mr. Mahaffy, your testimony
4        is you had three beers at those two parties.  Did you
5        have any other alcohol in addition to that that
6        evening prior to the incident?
7    A   No.  We went for dinner at Psycho Suzie's, or I had
8        dinner at Psycho Suzie's.
9    Q   And I understand that before you encountered
10       Mr. Mahaffy you were driving in Mr. Krueger's
11       vehicle, Sgt. Krueger's vehicle?
12   A   I was riding in his vehicle.
13   Q   Okay.  Can you describe to me what occurred as you
14       approached that area of 13th Avenue Northeast and
15       Marshall Street Northeast?
16   A   Wally was driving his Envoy.  His wife Cheryl was in
17       the front seat, I was seated in the back.  There was
18       a person later identified as Mr. Mahaffy in the
19       street, in the middle of the street like he was in
20       distress, putting up like a stop indication for us,
21       waving his arms, stopping us to stop, flagging us
22       down.
23            Wally slowed down, and it didn't appear to
24       be normal, he was acting -- he had bizarre behavior,
25       and he just decided to continue past.  We didn't know

---

PAGE 5
Sealed as Confidential Pursuant to Protective Order

20

1        if it was a stranded motorist, someone in distress,
2        why he was flagging us down, but it wasn't inclement
3        weather, there was people around, we just didn't
4        think it was a good idea to stop, or he didn't, he
5        was driving the car.  And he slowed, and as he
6        continued to pass, Mahaffy had some type of bag or
7        satchel that he swung and hit the rear driver's side
8        of Wally's truck.
9    Q   And then what happened after that?
10   A   Wally stopped the truck and got out and checked for
11       damage and detained the guy, and I did the same, I
12       got out of the passenger side and went around to see
13       what that was all about, and at that time we got
14       jumped by a mob of about 15 to 20 people that came
15       off the sidewalk to the east side of the road.
16            (Kroll Deposition Exhibit 1
17            marked for identification)
18   Q   I'm showing you what has been marked as Deposition
19       Exhibit No. 1.  I'll represent that this is a graphic
20       that was obtained by my office from the Minneapolis
21       Map Department.  They purport to represent a
22       schematic of that area, Marshall Street Northeast and
23       13th Avenue Northeast, along with an outline of the
24       buildings in that area.
25            Now, looking at what's been marked as

SHEET 3   PAGE 6

Sealed as Confidential Pursuant to Protective Order

21

```
1    Exhibit No. 1, do you recognize that as being the
2    area that you've been describing?
3  A  Yes.
4  Q  And looking at the markings of the buildings, would
5    you agree that what's indicated there as 1319 is the
6    location of what's been referred to as Dusty's Bar?
7  A  Yes.
8  Q  And 1317 is what's known as the Old Science
9    Renovation, Inc.?
10 A  Yes.
11 Q  And is this where the incident occurred that you're
12   talking about?
13 A  Yes, it is.
14 Q  And can I have you mark for me -- I'll give you a red
15   pen and ask, if you can, to draw in where it is that
16   Mr. Krueger's vehicle was stopped at the time he got
17   out of it.
18 A  (Indicating).
19 Q  And could you just put a 1 next to that so we can
20   keep track.
21 A  (Indicating).
22 Q  Thank you. And can you place on that diagram an M at
23   the location that you first saw Mr. Mahaffy or where
24   Mr. Mahaffy was when he struck the vehicle.
25 A  (Indicating).
```

PAGE 7

Sealed as Confidential Pursuant to Protective Order

22

```
1  Q  Now, you say you got out of the vehicle. Was there
2    any conversation or any words between you and
3    Sgt. Krueger prior to the two of you exiting the
4    vehicle?
5  A  No.
6  Q  So you both just got out and went around to see if
7    there was damage on the vehicle?
8  A  To stop him and see, you know, why he did it and,
9    yes, if there was damage, to check for damage and not
10   let him get away. It was a brand-new vehicle.
11 Q  Now, when you got out of the car, you were on the
12   passenger side so you had to come around the -- did
13   you come around the backside or the frontside?
14 A  Just got out of the back door and went behind the
15   vehicle.
16 Q  And what was Mr. Mahaffy doing when you came around
17   the backside of the vehicle?
18 A  Displaying bizarre behavior. He took up like a
19   karate fighting stance and was swinging a bag and
20   yelling vulgarities that were unintelligible, I
21   couldn't understand what he was saying.
22 Q  And this is as you were coming around the backside of
23   the vehicle?
24 A  Yes.
25 Q  And so you're saying he was standing there -- and
```

PAGE 8

Sealed as Confidential Pursuant to Protective Order

23

```
1    this is prior to either you or Sgt. Krueger
2    confronting him or coming in close proximity to him?
3  A  When we parked he was, yeah, acting very bizarre in
4    the middle of the street.
5  Q  And then what did you do?
6  A  Well, we looked at the vehicle and went to approach
7    him, and then he took up like a karate fighting
8    stance and started swinging and kicking, and then all
9    of the people that were in front of 1317 to 1319 came
10   off and tackled us and began punching us and kicking
11   us, and, you know, the next thing we knew -- the way
12   I've described it before is it looks like a
13   quarterback drops back to pass and the offensive line
14   lays down and the defense splits, that's exactly what
15   it looked like, like eleven-plus people tackling us.
16 Q  Okay, and you being the quarterback?
17 A  Yes.
18 Q  And so how many people were -- how big was the crowd
19   when you first got out of the vehicle?
20 A  I estimate it at 15 to 20.
21 Q  And they were located where on the diagram?
22 A  In this area here (Indicating).
23 Q  Okay. And you marked that, and maybe you can put
24   just a No. 2 next to that so we can keep track of
25   that spot.
```

PAGE 9

Sealed as Confidential Pursuant to Protective Order

24

```
1  A  (Indicating).
2  Q  And you've indicated an area in front of -- in the
3    curb area or the sidewalk area in front of Dusty's
4    Bar and the Old Science Renovation?
5  A  Yes.
6  Q  So when you first got out of the vehicle, was that
7    crowd up on the sidewalk or out on the street, or
8    where were they?
9  A  Both. I didn't pay particular attention to the crowd
10   at first, but along the sidewalk area there on the
11   edge of the street.
12 Q  All right. And you've indicated Mr. Mahaffy as being
13   out in the middle of the street. Was there anybody
14   else out in the middle of the street with him?
15 A  No.
16 Q  So he was in the middle of the street and the crowd
17   was over on the sidewalk area?
18 A  Yes.
19 Q  And you say that he took up a fighting stance?
20 A  Yes.
21 Q  And was taking swings and punching and swinging his
22   bag at you?
23 A  Yes.
24 Q  And did he at that time hit you?
25 A  I got hit by so many people all at once, I couldn't
```

SHEET 4   PAGE 10

Sealed as Confidential Pursuant to Protective Order

25

1   specifically -- other than the guy with a beard, a
2   tattooed beard, on top of me that I distinctively
3   remember because of it, punching me, I don't know who
4   exactly hit me.
5   Q   Do you recall seeing Mr. Mahaffy hit, kick or punch
6       Sgt. Krueger?
7   A   No. And I can't recall any of the specific hits and
8       punches because, again, there was just too many
9       people and it happened too quick.
10  Q   All right. So, as I understand your testimony, you
11      don't remember who specifically hit or kicked you, is
12      that right?
13  A   I'm guessing I was hit by Mahaffy early on, either by
14      his bag or a fist, but again when everyone was on
15      top, there was just a hog pile of people on top, all
16      hitting us, women, men.
17  Q   What would be the basis of your guess that you were
18      hit by Mr. Mahaffy?
19  A   He was swinging as we approached, and then when more
20      people got there and I got knocked down, I mean he
21      was in closest proximity to do so initially, and just
22      too many people to identify. So I'm guessing I was
23      hit by Mahaffy. I remember the guy with the tattooed
24      beard had clear shots at me.
25  Q   Okay. So as far as whether you were hit by Mahaffy

PAGE 11

Sealed as Confidential Pursuant to Protective Order

26

1   or not, you're making a guess, right?
2   A   Yes.
3   Q   And you don't have any specific recollection of being
4       hit by Mahaffy?
5   A   No.
6   Q   Do you have any specific recollection of Mahaffy
7       hitting anybody?
8   A   No.
9   Q   So when you approached Mr. Mahaffy, what were you
10      going to do to him or what was your intention in
11      approaching him?
12  A   Well, to detain him, find out why he hit the vehicle
13      and have police come, and if damage was done to the
14      vehicle, have him arrested for damage to property.
15  Q   And so it was your intent, at least initially, to
16      detain Mr. Mahaffy?
17  A   To see if there was damage to detain him, and, if so,
18      have police come and make an arrest.
19  Q   But I thought you had already looked to see if there
20      was damage.
21  A   We got out to look, and I came by the other side. So
22      we got out to look initially, but then we thought --
23      I thought, well, I'm going to hang onto this guy
24      before he takes off. So I initially didn't inspect
25      the vehicle, I didn't take that long. First we were

PAGE 12

Sealed as Confidential Pursuant to Protective Order

27

1   going to stop and check it out, but then I thought
2   this guy is either going to fight or flee, so detain
3   him. So I went towards him. I think Wally stopped
4   to look initially when he passed.
5   Q   Okay. So you went towards him to physically detain
6       him?
7   A   Yes.
8   Q   And were you the closest headed towards him and
9       Sgt. Krueger was behind you?
10  A   I don't remember.
11  Q   And did you say anything to Mr. Mahaffy as you
12      approached him?
13  A   No.
14  Q   Do you recall Sgt. Krueger saying anything to
15      Mr. Mahaffy when he approached him?
16  A   No.
17  Q   Is it fair to say that the two of you approached him
18      together?
19  A   Yes.
20  Q   And I understand you to say that, like the defensive
21      line coming through the offensive line, that right as
22      you approached Mr. Mahaffy you were tackled by a
23      crowd.
24  A   Yes.
25  Q   Was there any incident that preceded the crowd

PAGE 13

Sealed as Confidential Pursuant to Protective Order

28

1   tackling you or was that just some spontaneous event
2   that they charged out at you?
3   A   I thought we were going to get robbed or carjacked,
4       is what it seemed like to me, that this guy was out
5       there as a decoy to stop traffic, to do whatever. I
6       didn't understand the situation. It looked to me
7       like, you know, either it was a case of mistaken
8       identity with us or they wanted the vehicle or they
9       wanted to rob us. I didn't know.
10  Q   So as you're sitting here today, would you describe
11      that Mr. Mahaffy assaulted you personally?
12  A   Again, I can't say specifically, other than the
13      person with the tattoo who I saw punch me when I was
14      below him on the ground. It was just too fast with
15      too many people to describe who exactly beyond that
16      hit me.
17  Q   So you don't know for sure whether Mr. Mahaffy
18      assaulted you or not?
19  A   No.
20  Q   No, what? You're agreeing with the statement?
21  A   I don't know for sure. I think I've testified to
22      that several times now.
23  Q   So when the crowd assaulted you, did you see what
24      happened with Sgt. Krueger?
25  A   No. I know he was down too next to me, off to my

SHEET 5   PAGE 14

Sealed as Confidential Pursuant to Protective Order

29

1   right, which would have been south, in the street.
2   Q  I'll give you a purple pen now. Could I have you
3   mark with a No. 3 where it was that you say were
4   tackled to the ground by the crowd.
5   A  (Indicating).
6   Q  Okay. And you've indicated just about at the
7   centerline of the street in front of the gap between
8   Dusty's Bar and the Old Science Renovation,
9   approximately.
10  A  Yes.
11  Q  And so how far, do you know, were you from
12  Sgt. Krueger when that happened?
13  A  A little more than an arm's reach, I'm thinking.
14  Q  And then what happened?
15  A  Well, we were getting pounded and exchanging punches
16  with these people, and I kind of squirmed my way out
17  from beneath the crowd and got my phone out and
18  called 911. I called the nonemergency number because
19  I know that when you call on a cellphone -- I mean I
20  called the dispatch, I didn't call 911, because when
21  you call 911 it goes to the State Patrol, so I called
22  348-2345, which is the direct line to Minneapolis
23  Communications.
24  Q  Now, I know Sgt. Krueger described that he was
25  physically pinned down on the ground by members of

PAGE 15

Sealed as Confidential Pursuant to Protective Order

30

1   this crowd. Was the same true for you?
2   A  At one point.
3   Q  So you were actually pinned on the ground with your
4   back flat on the street?
5   A  Yes.
6   Q  Can you describe that for me in detail as to how that
7   happened and who was doing that to you?
8   A  It happened very quickly, and there was, again, 15 to
9   20 people that rushed out at the two of us, tackled
10  us to the ground, and I was down there briefly, and
11  there was just a lot of people on top of me punching,
12  etc., and I kind of turned and squirmed and pushed
13  out from underneath that. I thought, I'm going to
14  die under here if I don't get out of this crowd.
15  Q  And at that time as you were extricating yourself
16  from underneath the crowd, would you agree that you
17  punched and hit individuals?
18  A  Yes.
19  Q  Multiple individuals?
20  A  Yes.
21  Q  Do you recall any women?
22  A  No.
23  Q  And through that effort you managed to stand up?
24  A  Yes.
25  Q  And called the dispatch number?

PAGE 16

Sealed as Confidential Pursuant to Protective Order

31

1   A  Yes.
2   Q  And at that time where was Sgt. Krueger?
3   A  I don't recall specifically. I know when they hit us
4   he was off to my right.
5   Q  When you made your call to dispatch, had the crowd
6   moved away from you or were you still engaged with
7   the crowd?
8   A  They were getting Mahaffy -- they were trying to get
9   Mahaffy out of there, and I remember them saying,
10  "He's just drunk, he's just drunk," and they were
11  pulling him, trying to get him free, and I wanted to
12  maintain him there, so I called and said, "They're
13  trying to get a damage to property suspect away," or
14  something like that, and tried to describe what was
15  going on. And when I went back to try and hang onto
16  him more, I was assaulted again. There were several
17  exchanges like that as they were hustling him off
18  back to where he came from, back to the east side of
19  the street. There was a group of people assisting
20  him to leave.
21      I don't know if he was stunned from blows,
22  if he was intoxicated or what, but he wasn't in his
23  right mind from the very beginning of the incident.
24  So I don't know if it was alcohol, narcotics or what
25  was impairing his judgment to do this, and they were

PAGE 17

Sealed as Confidential Pursuant to Protective Order

32

1   trying to help him get out of there, I believe,
2   before the police came and arrested him.
3   Q  And I did see in one of your statements, and I think
4   you repeated it just now, is one reason that he may
5   have seemed groggy or in a stupor or unbalanced is it
6   might have been a result of you having hit him.
7   A  That's possible.
8   Q  And so you don't dispute that you did hit Jackson
9   Mahaffy?
10  A  No. Again, I can't say specifically who I hit, and I
11  can't say specifically who hit me. If it was a
12  one-on-one situation, obviously, but there was just
13  too many people on me.
14  Q  Now, I want to go back and just make sure I get all
15  the detail before you actually called the dispatch.
16      You had gotten up, and you say the crowd
17  was moving away and trying to drag Mahaffy away?
18  A  Yes.
19  Q  Or assist him to leave. Were they actually pulling
20  him on the street?
21  A  Yes.
22  Q  And he was having a hard time standing?
23  A  No, I think he was coming back at us and stuff too.
24  So he was kind of resisting their efforts to remove
25  him.

SHEET 6   PAGE 18

Sealed as Confidential Pursuant to Protective Order

33

1  Q  And you think he was resisting that partially because
2     he was trying to assault you some more?
3  A  I don't know what was going through his mind. I
4     think these are questions for Mahaffy, not me. I can
5     only describe what he was doing.
6  Q  Okay. But you're describing that he was attempting
7     to come back at you?
8  A  At some point, I believe so, yeah. And, again, it
9     happened very rapidly, there was a lot of people
10    involved. I knew they were trying to physically
11    remove him, and they're telling him, "Come on, come
12    on," you know. So I don't know what his motives were
13    in the first place, what they were through the
14    incident, but it appeared to be apparent to me that
15    the people that were around him were trying to get
16    him out of there.
17 Q  Now, prior to calling dispatch I had asked you
18    whether you knew where Sgt. Krueger was, and you
19    said, as I understand it, you didn't.
20 A  You know, he was off to my right initially, he was
21    down on the ground for a while, he was up, but in a
22    situation like this, you know, you don't have a
23    camera running, and my mind's not photographic to
24    remember specifically at this time when I dialed the
25    phone what this guy was doing. It was just too quick

PAGE 19

Sealed as Confidential Pursuant to Protective Order

34

1     of an incident involving too many people and too
2     violent of action at the time.
3  Q  So can you recall whether he had extricated himself
4     from the group that he was engaged with at that time
5     though?
6  A  At that time, no.
7  Q  But if he would have still been under a pile of
8     people that were beating up on him, you would have
9     made it a help call, right?
10    MS. PETERSON:  Objection, calls for
11    speculation.
12    THE WITNESS:  I called dispatch, and I
13    just said, "We're trying to hold one for damage to
14    property and they're getting away." So I don't know
15    if he was back on his feet at that time, I don't know
16    if the crowd was leaving. Because again after I got
17    on the phone, then people started leaving, and when
18    they saw lights and heard sirens coming, several of
19    these people fled the area. So timing is such that I
20    don't know where Krueger specifically was, if he was
21    back on his feet, if people had left and fled when
22    they saw I called, et cetera.
23 Q  Now, when you called, were you still out there near
24    the center of the street?
25 A  Somewhere in the street. I couldn't – again, was I

PAGE 20

Sealed as Confidential Pursuant to Protective Order

35

1     in the center, was I to this lane, to that lane? I
2     was still in the street.
3  Q  And when you made the call, how long of a time was
4     there between when you made the call and when you
5     could hear sirens or see any indication of officers
6     responding?
7  A  Again, it's just too tough to estimate under those
8     circumstances what the exact time of it was. I don't
9     know if it was thirty seconds or three minutes, I
10    really couldn't tell you.
11 Q  So you called dispatch on your cellphone?
12 A  Yes.
13 Q  And you say that the crowd was trying to get Mahaffy
14    out of the area. Then what happened next?
15 A  Several people had fled through buildings and
16    whatever in an easterly direction, and then officers
17    arrived. I seem to remember those squads arriving
18    from the south and parked, and we pointed out Mahaffy
19    who had initially did the damage to the vehicle that
20    the whole incident started over, and I was looking
21    for the guy with the beard that assaulted me, and he
22    had fled.
23 Q  I thought you said earlier that there was another --
24    that the crowd assaulted you again after you made
25    your initial call to dispatch.

PAGE 21

Sealed as Confidential Pursuant to Protective Order

36

1  A  Yes, there was -- when I got up and got out of there,
2     I backed up and called – I called communications,
3     and then they were trying to get Mahaffy over, and
4     when I went back and tried to maintain him again, I
5     got assaulted again.
6  Q  Okay. So after you called dispatch the first time,
7     then you went towards the curb and sidewalk area?
8  A  I kind of went over here where the squads were
9     arriving in the northbound lane.
10 Q  Okay. So were you still in the street?
11 A  Again, at that time I believe I was, but it's just
12    too difficult to remember in that chaotic situation
13    specifically where my feet were planted. It wasn't
14    something that I thought I'd be giving a detailed
15    description of in a deposition five and a half years
16    later.
17 Q  And as you sit here today, can you actually recall
18    the incident?
19 A  Yes, I recall the incident.
20 Q  And did you review some material in preparation for
21    your deposition today?
22 A  I had looked over my CRA statement that I had
23    provided several years ago.
24 Q  And did you look over your supplemental report that
25    you provided?

SHEET 7   PAGE 22

Sealed as Confidential Pursuant to Protective Order

37

1  A  Not recently.
2  Q  And you say you were trying to -- when you moved
3     over, that you were trying to prevent Mr. Mahaffy
4     from leaving.  Is that a fair characterization of
5     what you said?
6  A  Yes.
7  Q  And how did you do that?
8  A  Well, I attempted to hang onto him, but then when
9     that would happen, I would get hit.
10 Q  Okay.  So which part of him were you attempting to
11    hang onto?
12 A  Wherever I could.
13 Q  So your testimony is that Mr. Mahaffy was trying to
14    move away in between your first call to dispatch and
15    your second call to dispatch?
16 A  I don't remember specifically when the calls came in.
17    Again, I know that I had called 911 twice or
18    communications twice, but, again, what Mahaffy's
19    specific actions were at that time when I was on the
20    phone, it's just too difficult to put into correct
21    order and placement.
22 Q  So you were trying to hold onto him, any part of him
23    you could get?
24 A  Yes.
25 Q  And what do you recall holding onto?  Did you have

PAGE 23

Sealed as Confidential Pursuant to Protective Order

38

1     him by the legs, by the arms?
2  A  I don't recall what area, if any.  Shirt, arm, I
3     don't know.
4  Q  And you're saying that as you were trying to hold
5     onto Mr. Mahaffy, there were people assaulting you?
6  A  Yes.
7  Q  Was Mr. Mahaffy assaulting you?
8  A  His behavior, I don't -- he was, again, just acting
9     very bizarre.  He was yelling unintelligible things,
10    swinging.  I mean I described it earlier with the
11    Civilian Review as being on PCP or something like
12    that.
13 Q  And he was continuing to do that at this time --
14 A  Yes.
15 Q  -- when you were trying to grab him and detain him?
16    MS. PETERSON:  Mr. Kroll, make sure he's
17    done before you start.  Go ahead.
18 BY MR. DELAPLAIN:
19 Q  And he was continuing to exhibit that same behavior
20    at the time that you were trying to grab him after
21    you had made the call to dispatch?
22 A  Yes.
23 Q  So is that to say he was taking swings at you at that
24    time?
25 A  Yes, yes.  He did not -- well, I think I've already

PAGE 24

Sealed as Confidential Pursuant to Protective Order

39

1     described his behavior as best I could.  It was just
2     very bizarre behavior of a person under the influence
3     of maybe angel dust, PCP, acid, I don't know,
4     yelling, swinging, flaying his arms, swinging the bag
5     that he had.  So whether it was -- you know, if it
6     was an assaultive behavior, you go right for one
7     person and punch and kick, and specifically you may
8     use boxing or wrestling techniques to overtake that
9     person.  He wasn't doing that.  He was, again,
10    jumping around, acting bizarre, swinging, in a karate
11    stance and looking around, and he had a crazed look
12    about him.  So it wasn't a very calculated assault on
13    his part.
14 Q  But you understand I'm asking you to describe what
15    his demeanor and what his actions are after you had
16    made the first call to dispatch and when you're
17    trying to detain him.  So that description you just
18    gave is a description of what behavior he was engaged
19    in when you were trying to detain him after you had
20    made your first call to communications?
21 A  The demeanor and behavior and actions that I've
22    described for Mr. Mahaffy, he exhibited that
23    throughout our encounter with him.
24 Q  And beyond what you've described as swinging and
25    swinging his backpack, did he actually make physical

PAGE 25

Sealed as Confidential Pursuant to Protective Order

40

1     contact with you by punching you or hitting you or
2     kicking you?
3        MS. PETERSON:  Objection, asked and
4     answered.  You can answer again.
5        THE WITNESS:  I believe my prior answer
6     and answer again is I can't say specifically if he
7     made contact, but I assume so.
8  BY MR. DELAPLAIN:
9  Q  At that time?
10 A  At which time are we talking about now?
11 Q  When you're trying to detain him there by grabbing
12    onto him when you say that other people were trying
13    to get him away from the scene.
14 A  I can't say specifically if he struck me at that
15    time.
16 Q  But you do recall other people striking you at that
17    time?
18 A  Yes.
19 Q  And who do you specifically recall striking you at
20    that time?
21 A  Any one of the 15 to 20 other people that were
22    assaulting us, some of which had fled.
23 Q  Well, I'm asking you about a specific point in time
24    when you say they were trying to remove him from the
25    area.  And at that time are you saying there were

SHEET 8   PAGE 26

Sealed as Confidential Pursuant to Protective Order

41

1 still 15 to 20 people assaulting you personally?
2 A There was 15 to 20 people in the entire group that
3   assaulted myself and Wally Krueger, and now whether
4   some had already fled at this point, some stuck with
5   it, I don't know the whole time duration of the whole
6   incident, but at some point people started running
7   and leaving the scene.
8 Q So as you were grabbing and trying to keep
9   Mr. Mahaffy from departing or being departed by
10   members of the group, was that when the squad cars
11   arrived?
12 A Yes.
13 Q And so when the squad cars arrived, were you still
14   grabbing onto Mr. Mahaffy?
15 A No. I don't know specifically what I was doing, but
16   I remember seeing the lights and sirens coming from
17   the south, and I thought, oh, finally they're here,
18   and then many more people fled. The group that was
19   15 to 20 was down to probably five now.
20     And then we identified Mahaffy, he was
21   still there, he didn't leave. He was in his own
22   world, so to speak. I don't know what he was doing.
23   I don't know if any of us had ahold of him or
24   whatever, but we eventually, and I don't recall
25   specifically how it was officers ended up being

PAGE 27

Sealed as Confidential Pursuant to Protective Order

42

1   directed to him, I thought I pointed him out or Wally
2   pointed him out, one of the two or both of us, and
3   then we identified him as the person that struck the
4   vehicle and started the whole incident, and one of
5   the officers detained him then.
6 Q Did you also identify him to the arriving officers,
7   meaning Mahaffy, did you identify Mahaffy to the
8   arriving officers as the person who had struck
9   Sgt. Krueger?
10 A I don't recall.
11 Q Before we move on too far from that, can I have you
12   mark on Deposition Exhibit No. 1 by maybe putting a 4
13   at the location where you said you were grabbing
14   Mr. Mahaffy, trying to keep him from being removed
15   from the area.
16 A (Indicating).
17 Q So, again, it's on the street but near the sidewalk
18   area on the northwest corner of the Old Science
19   Renovation, Inc., approximately?
20 A Sure.
21 Q In that area approximately in front of where the gap
22   is that exists between Dusty's Bar and Old Science
23   Renovation?
24 A Somewhere in that area.
25 Q Now, were you ever up on the sidewalk, that you

PAGE 28

Sealed as Confidential Pursuant to Protective Order

43

1   remember?
2 A I don't know.
3 Q Not that you remember?
4 A I don't know.
5 Q Were you ever up on the northwest corner of Dusty's?
6 A Specifically -- these are all approximates of where I
7   was, so I can't say specifically throughout the whole
8   incidents where I was.
9 Q Now, when you say you were trying to grab Mr. Mahaffy
10   to keep him from being departed, do you know where
11   Sgt. Krueger was?
12 A No, not specifically.
13 Q Generally were you keeping track of where he was, or
14   at that time were you just --
15 A Through most of the incident he was off to my right,
16   which was a little bit south of me on Marshall.
17 Q Okay. So actually further down in front of the Old
18   Science Renovation Factory as opposed to north in
19   front of Dusty's?
20 A Sure.
21 Q Now, in your supplemental report, if you recall,
22   there's a reference that the individuals who were
23   trying to remove Mahaffy were trying to get him into
24   a vehicle. Do you recall that?
25 A No.

PAGE 29

Sealed as Confidential Pursuant to Protective Order

44

1 Q In that time between when it was that you made the
2   call to dispatch and when the officers arrive, the
3   squad cars and uniformed officers arrived, at any
4   time do you have a specific recollection of where
5   Sgt. Krueger was or what he was doing?
6     MS. PETERSON: Objection, asked and
7   answered. You can answer again.
8     THE WITNESS: Just to the right of the
9   assault on Marshall Avenue throughout the incident
10   was where he was.
11 BY MR. DELAPLAIN:
12 Q And so you're pretty sure that you knew his location
13   during that time.
14 A Yes.
15 Q Now, when is it that you made the second call to
16   dispatch?
17 A I'm guessing within a minute of the first one.
18 Q But is that after you were trying to grab and prevent
19   Mr. Mahaffy from being removed?
20 A My memory is cluttered with regard to this. I know
21   that I called initially and then later into it, but
22   again, specifically what Mr. Mahaffy's -- you know, I
23   didn't know who Mr. Mahaffy was at the time, I didn't
24   know who any of these people were at the time, and
25   who specifically was doing what, including where



SHEET 9   PAGE 30

Sealed as Confidential Pursuant to Protective Order

45

1   specifically I was when I made the calls, I'm
2   incapable of determining that.
3   Q   I'm not asking you to specifically determine where
4   everybody was, I'm asking you whether you recall
5   whether your second call to dispatch was after the --
6   back where you just described you were trying to
7   detain Mr. Mahaffy from being removed.
8   A   I don't know specifically what actions were taken
9   before, during or after the calls.
10  Q   Now, I've reviewed your statement with the Civilian
11  Review Board, and I know you said that you've
12  reviewed that at some time, correct?
13  A   Yes.
14  Q   And in that statement, is it true that in the course
15  of this incident of trying to detain Mr. Mahaffy that
16  you did indeed kick one of the other persons in the
17  area?
18  A   I think what I described in my CRA was I punched and
19  kicked at many people during the process, and at one
20  point when Mr. Mahaffy was being escorted away and I
21  was trying to hang onto him, I kicked at another
22  person who was trying to drag him from me.
23  Q   And is that in that same area where you've marked
24  a 4?
25  A   In between in here. At some point he was in the

PAGE 31

Sealed as Confidential Pursuant to Protective Order

46

1   middle of the street or even the southbound lane, and
2   then as this incident progressed, he moved easterly
3   through the northbound lane. Can we take just a
4   short restroom recess?
5           MR. DELAPLAIN:   Sure.
6           (Recess)
7           (Kroll Deposition Exhibit 2
8           marked for identification)
9   BY MR. DELAPLAIN:
10  Q   Lt. Kroll, I'm handing you what has been marked as
11  Exhibit No. 2. Can you identify that document for
12  me?
13  A   Yes, it's a statement that I made after the incident
14  at the direction of the investigator,
15  Sgt. Christiansen.
16  Q   And is this what is commonly referred to as a
17  supplemental report?
18  A   Yes.
19  Q   And is this a report that's prepared in regard to an
20  incident that happens -- that Minneapolis police
21  officers prepare to report on incidents that happen?
22  A   Yes.
23  Q   And is everything in there true and correct?
24  A   Yes.
25  Q   How long after the incident was it that you made up

PAGE 32

Sealed as Confidential Pursuant to Protective Order

47

1   that supplemental report, if you know?
2   A   Within a couple days. It was on 5/17, and I'm not
3   sure of the incident date.
4   Q   I believe it's 5/14, for the record, May 14th was the
5   day of the incident. So the next day you think you
6   made up this supplemental report?
7   A   Yes.
8   Q   So at that point everything would have been fresh in
9   your mind?
10  A   Yes.
11  Q   And so everything in this report would have been
12  true?
13          MS. PETERSON:   I believe he said it was
14  5/17, not the day after. You said the incident was
15  5/14. The document says 5/17.
16          MR. DELAPLAIN:   Okay, I misheard him. I
17  thought he said 5/15.
18          MS. PETERSON:   The document says it right
19  at the top.
20          THE WITNESS:   5/17/04.
21          MR. DELAPLAIN:   So three days afterwards.
22          THE WITNESS:   Correct.
23          (Kroll Deposition Exhibit 3
24          marked for identification)
25  BY MR. DELAPLAIN:

PAGE 33

Sealed as Confidential Pursuant to Protective Order

48

1   Q   I'm showing you what's been marked as Exhibit No. 3.
2   Can you identify that document for me?
3   A   That's the Civilian Review statement I provided.
4   Q   And do you recall what date you provided that
5   statement?
6   A   That says December 5 of '05.
7   Q   And if I could ask you to turn to the last page of
8   what's been marked as Exhibit No. 3, is that your
9   signature on the last page?
10  A   Yes, it is.
11  Q   And when did you sign this document?
12  A   2/15 of '06.
13  Q   And you've had a chance to review this transcript
14  since the time you made the statement?
15  A   The CRA document?
16  Q   Yes.
17  A   Yes.
18  Q   And do you agree that the transcript is a true and
19  correct transcript of the statement that you gave to
20  the investigator?
21  A   Yes.
22  Q   And I notice there are a couple corrections here and
23  there in the document. I just want to direct your
24  attention to it.
25          MS. PETERSON:   Page four.

SHEET 10  PAGE 34

Sealed as Confidential Pursuant to Protective Order

49

1  BY MR. DELAPLAIN:
2  Q   For example, on page four of Exhibit No. 3, if I
3      could have you turn to page four, do you see there on
4      the first answer from the top where there's some
5      handwriting and some words crossed off?
6  A   Yes.
7  Q   Is that your handwriting on there?
8  A   Yes, it is.
9  Q   So are those corrections you made to the transcript?
10  A   Yes, it is.
11  Q   So you had a chance to review this and make
12      corrections to anything that you think may not have
13      been correct.
14  A   Yes.
15  Q   And is everything within this statement true and
16      correct?
17  A   Yes.
18  Q   I want to direct your attention to page No. 10.
19      Earlier I was asking you about whether you had kicked
20      one of the individuals that was present that night.
21      And I want you to review, if you would, about the
22      last half of this page No. 10 of the statement you
23      gave to the Civilian Review Authority, and then I'll
24      ask you again about that.
25  A   Okay.

PAGE 35

Sealed as Confidential Pursuant to Protective Order

50

1  Q   The third answer up from the bottom here, I
2      understand that what you told the investigator was
3      that, "There was a guy trying to drag Mahaffy out of
4      there, and when I pulled back I kicked a guy once or
5      twice to get him to kick down." Now, do you see
6      where it says that?
7  A   Yes.
8  Q   Okay. So does that refresh your recollection as to
9      whether you actually did kick someone that night?
10      MS. FUNDINGSLAND:  Excuse me, counsel,
11      but I believe it says, "kick him down," not, "kick
12      down."
13      MR. DELAPLAIN:  Okay. If I misspoke --
14      MS. FUNDINGSLAND:  Yes. Maybe you just
15      want to read it again.
16      MR. DELAPLAIN:  I'll read it again.
17      Well, maybe I'll read this and the next paragraph.
18  BY MR. DELAPLAIN:
19  Q   So that paragraph actually starts at the end of the
20      answer to the fifth question, or at the end of the
21      fifth question is your fifth answer.  "There was one
22      guy that was trying to drag --" and then the
23      investigator says, "Mahaffy?" and your answer is,
24      "Mahaffy out of there and when I pulled back I kicked
25      a guy once or twice to get him to get him to kick him

PAGE 36

Sealed as Confidential Pursuant to Protective Order

51

1      down.  He was picking him up and he was -- we kind of
2      struggled over --" and the investigator says,
3      "Mahaffy?" then your answer continues, "Mahaffy, and
4      I was pulling him away, I didn't have a free hand.  I
5      was trying to hang onto Mahaffy because the squads, I
6      could hear 'em coming.  And I kicked this guy back
7      away from me a couple times.  Kick him back because
8      my hands were tied up.  So there was somebody and I
9      couldn't identify who that was."
10      So does that refresh your recollection as
11      to actually whether you did kick someone that night?
12  A   Yes.
13  Q   Okay.  And now you agree that indeed you did kick
14      someone that night.
15  A   Yes.
16  Q   And after reading that, can you give me a description
17      of what happened when that incident occurred, or are
18      you just relying on having read the questions and
19      answers to the questions there?
20  A   There was a struggle.  This person was trying to get
21      Mahaffy out of there.  I was trying to keep Mahaffy
22      there.  We both had ahold of him, there was a
23      struggle, and he came towards me, and in the struggle
24      over Mahaffy I didn't want to lose my hold of Mahaffy
25      because apparently at this time I had ahold of him, I

PAGE 37

Sealed as Confidential Pursuant to Protective Order

52

1      don't know specifically how, and in order to get this
2      other person away, I kicked at him, kicked at him
3      once or twice.
4  Q   Do you recall which part of Mahaffy you were holding
5      onto at that point?
6  A   No.
7  Q   Do you recall where you were other than where you've
8      indicated the No. 4 on Exhibit No. 1?  Do you think
9      you were there or some other location?
10  A   Somewhere near 4 there.
11  Q   And so when you say he was trying to get Mahaffy
12      away, you were holding onto Mahaffy, and was he also
13      grabbing at Mahaffy and pulling him?
14  A   Between that and striking at me.
15  Q   And do you recall what part of his body you kicked
16      him upon?
17  A   No.
18  Q   So as you're holding onto Mahaffy, he's coming --
19      MS. PETERSON:  Objection. You keep using
20      these gestures as to a hold. He's never said -- with
21      your gestures, I don't want your gestures to be on
22      this video at all. He has never said he had a hold
23      on Mahaffy like you are demonstrating for the camera.
24      MR. DELAPLAIN:  I'm not demonstrating
25      anything for the camera because I clarified before

SHEET 11   PAGE 38

Sealed as Confidential Pursuant to Protective Order

53

```
1    the deposition that the camera is not actually
2    recording me.
3          MS. PETERSON:  All right.  If the camera
4    is not recording you and if you did not have a hold
5    on Mr. Mahaffy like he is demonstrating, please
6    clarify.
7    BY MR. DELAPLAIN:
8    Q   Can you clarify for me by making arm gestures as
9        to --
10   A   I'm not understanding.
11         MS. PETERSON:  My objection is it says
12   that, "I was trying to hang onto Mahaffy because the
13   squads, I could hear 'em coming." I think what he
14   wants to know is how you had or were trying to hang
15   onto Mahaffy.
16         THE WITNESS:  I don't remember
17   specifically how.  I think I testified earlier that
18   wherever I could, whether it was clothing, arm,
19   torso, whatever I could hang on to, and I don't
20   recall the specifics of how I grasped anything.
21   Q   But right at that moment, according to your
22   statement, you didn't have a hand free.
23   A   That is what it says, right.
24   Q   Okay.  So is it safe to assume that you were using
25   two hands to hold onto Mahaffy at that point?
```

PAGE 39

Sealed as Confidential Pursuant to Protective Order

54

```
1    A   Yes.
2    Q   And do you recall as you were using your two hands to
3        hold onto Mahaffy what direction the person you
4        kicked was coming at you from?
5    A   I seem to recall them trying to get him to the east
6        side of the street away, like towards the buildings,
7        towards the Old Science Restoration and Dusty's Bar.
8    Q   And so you're to the west of that?
9    A   Yes.
10   Q   So that I understand your positioning, you're to the
11       west of -- on Marshall Street Northeast facing
12       towards the east, approximately, and you're trying to
13       hold onto Mahaffy with two hands, and then there's
14       someone else trying to pull Mahaffy to the east.
15   A   Correct.
16   Q   And at the same time you say coming towards you.
17   A   Correct.
18   Q   Well, when you were kicking at that individual then,
19       were you standing up?
20   A   Yes.
21   Q   So does that mean that Mahaffy also was standing up?
22   A   Yes.
23   Q   And does that mean that the individual who you kicked
24       was standing up?
25   A   Yes.
```

PAGE 40

Sealed as Confidential Pursuant to Protective Order

55

```
1    Q   Now, do you recall if that individual fell down?
2    A   I don't recall.
3    Q   Is it possible that they fell down and you continued
4        to kick them?
5          MS. PETERSON:  Objection, calls for
6    speculation.
7          THE WITNESS:  I don't believe that
8    occurred.
9    BY MR. DELAPLAIN:
10   Q   And that individual that you kicked, is that the
11       gentleman who you described in your report as with a
12       beard tattoo, if you remember?
13   A   I don't remember, and there was more than just one
14       person there also, so I can't specifically say.  I
15       know that he was the one that I -- only because of
16       the significance of the facial tattoo, that he was
17       one of those parties that was involved in trying to
18       get Mahaffy away, and I remember him on top of me in
19       the crowd earlier.
20   Q   Now, on the very bottom of page ten, it says -- I
21       guess it's the same question.  The investigator asked
22       you, "You don't know if it was the tattooed guy or
23       not?" and you say -- the transcription says, "M-mmm."
24       Is that a negative, that at that time you didn't know
25       who it was?
```

PAGE 41

Sealed as Confidential Pursuant to Protective Order

56

```
1    A   Yeah, I didn't -- yeah, I didn't know who any of the
2        people were.
3    Q   And so after that occurred, after you kicked this
4        individual, do you recall whether then Mahaffy was
5        removed from your holding onto him?
6    A   I don't remember if he was removed or free.  I think
7        I answered this earlier.  When the squads arrived, I
8        specifically don't know where I was and where Mahaffy
9        was on the arrival of the first squad.
10   Q   So could it be that the arrival of the first squads
11       were at the time or prior to the incident that you
12       were just describing where you kicked someone?
13         MS. PETERSON:  Objection, calls for
14   speculation.  You can answer if you know.
15         THE WITNESS:  I don't know the answer to
16   that.
17   BY MR. DELAPLAIN:
18   Q   So the squad cars may have already been there when
19       you kicked that individual?
20   A   Oh, I should rephrase that.  I don't believe there
21       was any punching or kicking going on after the squads
22       arrived.
23   Q   And do you recall when the squads arrived whether you
24       still had your hands on Mr. Mahaffy?
25         MS. PETERSON:  Objection, asked and
```

SHEET 12  PAGE 42

Sealed as Confidential Pursuant to Protective Order

57

1 answered. You can answer again.
2        THE WITNESS:  I don't remember
3 specifically, again. It's getting kind of redundant,
4 but I'll say it again for the record. I don't
5 remember specifically where I was, if I had ahold of
6 Mahaffy when they came, and where in the
7 street/sidewalk we were again.
8 Q  Do you remember when the first officers arrived?
9 A  No.
10 Q  Do you remember who the first officers that you
11    recognized were?
12 A  No. And, again, to spin the clock back to that
13    incident, I didn't know any of those officers
14    specifically. I mean I knew names and faces.
15 Q  Do you have any recollection of Mr. Mahaffy being
16    arrested?
17 A  Later on, yeah, they arrested him.
18 Q  Do you recall identifying Mr. Mahaffy to officers?
19 A  I know that he was taken into custody there, and I
20    can't recall if it was specifically me that told one
21    of the officers or Wally that told one of the
22    officers, and, if so, which officer was told that he
23    was the one that did this.  As I sit here today, I
24    don't recall which one that was. But I know Mahaffy
25    was booked, he had thrown up in the back of the squad

PAGE 43

Sealed as Confidential Pursuant to Protective Order

58

1 car and stuff.
2 Q  Now, when you're actually holding onto Mahaffy, in
3    your mind is that detaining him?
4 A  I don't think I had that control over him because,
5    again, I had several people interfering with my
6    efforts to detain him. I was being assaulted by
7    several people while I was attempting to detain him,
8    and, you know, unfortunately I wasn't that big enough
9    or strong enough to have complete control over a
10    person while I was being assaulted by several others.
11 Q  So do you think -- did you ever detain Mr. Mahaffy,
12    you, yourself?
13 A  Well, he didn't get away before the arrival of
14    officers, and he was booked, so I guess in hindsight
15    he was successfully detained from leaving the area
16    before officers arrived.
17 Q  And I want to direct your attention to near the next
18    to the last paragraph of your supplemental report,
19    which is marked as Exhibit No. 2, and this goes back
20    to a question I asked you recently.
21        What the supplemental report says is, "When
22    uniformed officers arrived, I identified AP-1 Mahaffy
23    as the person who did damage to Sgt. Krueger's
24    vehicle and initiated the assault on us." Do you see
25    where it says that?

PAGE 44

Sealed as Confidential Pursuant to Protective Order

59

1 A  What paragraph are we in here?
2 Q  It's right near the bottom, right there (indicating).
3 A  Okay. Yes.
4 Q  So does that refresh your recollection as to whether
5    it was you who identified Mahaffy?
6 A  Well, it does, and it's important to note that this
7    supplemental report that I gave at the direction of
8    Sgt. Christiansen occurred three days after the
9    incident, so everything was much more fresh in my
10    mind.
11        So, in my mind, this would probably trump
12    the statement and my testimony today because of the
13    fact that it was three days, and then we go to the
14    CRA statement, that's a year and a half after the
15    incident, and now we're five and a half years later.
16 Q  Okay. So you'd agree, I guess in general, that if
17    there's a statement in Exhibit No. 2 that contradicts
18    some later statement you made, that Exhibit No. 2
19    would be more likely to be correct because it was
20    made closer in time to the incident?
21        MS. PETERSON:  Objection, asked and
22    answered. He just answered that.
23        THE WITNESS:  The answer to the question
24    is yes. I would think the most accurate of anything
25    would have been Exhibit No. 2, my supplement of the

PAGE 45

Sealed as Confidential Pursuant to Protective Order

60

1 incident.
2 BY MR. DELAPLAIN:
3 Q  After uniformed officers arrived, do you recall
4    specifically speaking to any of the uniformed
5    officers beyond identifying Mr. Mahaffy?
6 A  No.
7 Q  Do you recall going down and meeting with some of the
8    officers in the parking lot of the Grain Belt
9    Brewery?
10 A  There was a parking lot -- I don't remember the
11    specific lot, but I think like a block to the south
12    and east of there is where we met the paramedics and
13    the officers met.
14 Q  And did you give a statement to any of the officers
15    that night?
16 A  I didn't take a -- you know, what would be a formal
17    statement. I spoke with a couple of them, and I
18    don't remember who or what other than, you know,
19    identifying the person that did -- you know, we
20    identified Mr. Mahaffy. I said we were assaulted by
21    several that got away. I gave them a general
22    overview of what happened, but there was no -- we
23    have statements in the police department and, you
24    know, they're formal question/answer statements, and
25    that didn't occur here.

SHEET 13   PAGE 46

Sealed as Confidential Pursuant to Protective Order

61

1  Q  So, as I understand it, you didn't give a formal
2     statement to any of the officers, but you talked to
3     them in essence informally and told them your version
4     of the events.
5  A  Sure.
6  Q  And identified Mr. Mahaffy, who they already had in
7     the squad car, but you further identified him as
8     being the one who had hit Wally Krueger or
9     Sgt. Krueger's car?
10 A  Yes.
11 Q  Now, referencing your supplemental report, in the
12    second paragraph there, I guess in the second
13    sentence, you describe when you approached
14    Mr. Mahaffy, you say, "He approached us, punching and
15    swinging his bag at us, and at one point struck
16    Sgt. Krueger in the eye, causing severe swelling."
17    Do you see where it says that?
18 A  Yes.
19 Q  Now, I know I asked about that earlier, and I think
20    earlier you had said that you don't recall
21    specifically seeing Mr. Mahaffy strike Sgt. Krueger.
22 A  **Today, no. And after reviewing my supplement here,**
23    **which has been quite sometime since I've seen it,**
24    **again I would have to place more credence in this**
25    **than five and a half years later on today's date.**

PAGE 47

Sealed as Confidential Pursuant to Protective Order

62

1     **So, yes, in my supplement it appears that after the**
2     **incident I identified him as the one that struck**
3     **Wally Krueger.**
4  Q  In your supplement you describe that he had struck
5     Wally Krueger when you approached him initially,
6     right?
7           MS. PETERSON:  I'm going to object.
8     That's not actually what the document says. It
9     mischaracterizes it.
10          THE WITNESS:  Can you ask the question
11    again, please?
12          MR. DELAPLAIN:  Can you read back my
13    question, please.
14          (The requested portion was read)
15          THE WITNESS:  No, it looks like he struck
16    the truck when we approached him initially, and then
17    in the next paragraph, "As we approached, he was
18    screaming very bizarre obscenities and took up a
19    fighting stance with the bag he was carrying which
20    appeared to have a heavy object inside. He
21    approached us, punching and swinging this bag at us,
22    and at one point struck Sgt. Krueger in his eye
23    causing severe swelling."
24 Q  Now, in reading that, would you interpret that as
25    being that it was when you initially were approaching

PAGE 48

Sealed as Confidential Pursuant to Protective Order

63

1     Mr. Mahaffy that he struck Sgt. Krueger in the eye?
2  A  Yes.
3  Q  At any point do you recall Sgt. Krueger's wife being
4     out of the vehicle involved in the melee?
5  A  **I think she was out of the vehicle. I don't know if**
6     **she was involved. I was just occupied with too many**
7     **people myself to pay attention to the specifics of**
8     **what was occurring around me in other areas.**
9  Q  Do you recall whether Sgt. Krueger tried to go into
10    the Old Science Renovation, Inc.?
11 A  **I don't recall that.**
12 Q  Do you recall Sgt. Krueger having any loud verbal
13    altercations with specific individuals in the crowd?
14 A  **No.**
15 Q  I know in your supplement, in the statement you gave
16    to the Civilian Review Authority, you emphasized in
17    there that if on that night you would have had a
18    weapon, that you would have used it.
19 A  **Yes.**
20 Q  Do you still stick with that?
21 A  **Yes.**
22 Q  And can you describe that to me or your justification
23    for saying that?
24          MS. PETERSON:  Objection, calls for
25    speculation. You can answer.

PAGE 49

Sealed as Confidential Pursuant to Protective Order

64

1           THE WITNESS:  Well, being assaulted by a
2     group of 15 to 20 people, assaulting two after damage
3     to a vehicle took place, for all I knew we were being
4     victimized in a robbery of person or a carjacking and
5     it's a felony being committed against us at that
6     point, and then if I would have had a firearm on me,
7     the chances of me being assaulted by so many people,
8     if I would have been knocked unconscious, that
9     firearm could have been removed from me and used
10    against me.
11          So I think as the questioning went in the
12    CRA statement, he was trying to compare me to being
13    on duty, and if I were on duty with a firearm, being
14    assaulted by a crowd of that many people, I would
15    have pulled my firearm out to secure it, and if I
16    felt in this situation in fear for my life, I would
17    have used it.
18 Q  Now, as part of your answer you said something about
19    a carjacking, but there wasn't actually a carjacking
20    that occurred, right?
21 A  **No.**
22          (Kroll Deposition Exhibit 4
23          marked for identification)
24          MS. PETERSON:  Before you look at
25    Exhibit 4, these are your Civilian Review Police

SHEET 14  PAGE 50
Sealed as Confidential Pursuant to Protective Order

65

1   Authority, to the extent that none of these or any of
2   these did not result in any final disposition of a
3   disciplinary matter, this is all private personnel
4   data that is protected by the confidential agreement.
5   BY MR. DELAPLAIN:
6   Q  Lt. Kroll, do you recognize this document?
7   A  Yes.
8   Q  And have you seen this before or a similar printout?
9   A  Yes.
10  Q  And what is this document?
11  A  It's an officer's record within the Civilian Review
12     Authority.
13  Q  And is this your record?
14  A  Yes.
15  Q  And each of these case numbers on the left-hand
16     column underneath where it says badge, do each of
17     those separate case numbers represent a complaint
18     that was filed against you with the Civilian Review
19     Authority?
20  A  I don't know how the Civilian Review does their
21     coding. It's a case number that -- whether it was
22     against me -- I don't know if it's against me or I
23     made statements in them. I'm not familiar with their
24     reporting policies and procedures.
25  Q  Do you know how many complaints have been filed

PAGE 51
Sealed as Confidential Pursuant to Protective Order

66

1   against you with the Civilian Review Authority?
2   A  No.
3   Q  But if a complaint is filed against you at the
4      Civilian Review Authority, do you become aware of
5      that?
6   A  Not all the time. Sometimes you'll find out later
7      that, you know, you were misidentified, and in the
8      course of the investigation they don't even notify
9      you, you know. There could be a misidentification
10     through badge number, photo lineup, and, you know,
11     maybe they determine that you were off duty or in a
12     different precinct on a different call at that time,
13     and a generation of the case number and the incident
14     will still be there, and they won't even notify you
15     if during the course of the investigation they
16     determine this couldn't have been him because he was
17     here. So not necessarily, no.
18  Q  So it might happen that there's actually a complaint
19     filed with the Civilian Review Authority against you
20     and you wouldn't know about it?
21  A  Yes.
22  Q  Since this incident with Mr. Mahaffy, do you know
23     whether there have been any additional complaints
24     filed against you with the Minneapolis Civilian
25     Police Review Authority?

PAGE 52
Sealed as Confidential Pursuant to Protective Order

67

1   A  I don't know.
2   Q  You don't remember whether there have been any
3      complaints that you know of within the past five
4      years?
5         MS. PETERSON:  Objection, asked and
6      answered. You can answer again.
7         THE WITNESS:  I don't know.
8   BY MR. DELAPLAIN:
9   Q  I want to run through these real quickly and see if
10     you can tell me whether you even remember what these
11     refer to. The first now is badge number. Up there
12     in the upper left-hand it says badge number, and
13     underneath that is 03874. Is 03874 your badge
14     number?
15  A  Yes.
16  Q  And it has your name. The first entry under that is
17     02-1799. Do you see what I'm talking about?
18  A  Yes. And I might be able to speed it up because all
19     of these case numbers, allegations, findings that
20     we're looking at are going to mean nothing to me
21     unless you've got some specific cases with it.
22     Rather than take the time -- if you want
23     to, you're entitled, obviously, but if you want to go
24     through every one of these and ask me if I know what
25     this is and that is, the answer is going to be the

PAGE 53
Sealed as Confidential Pursuant to Protective Order

68

1   same for all of what I'm looking at, and that is by
2   what I'm provided here, I don't know what any of it
3   means.
4      I can take the chart and graph and tell you
5   what the findings and allegations mean by going
6   through the chart. If you would like to do that, I
7   guess that's your entitlement, but I can spare you a
8   lot of time because they mean nothing to me case
9   number wise.
10  Q  Do you know, have you had any cases, complaints
11     against you filed with the Minneapolis Civilian
12     Police Review Authority where there has been a
13     sustained finding?
14  A  I'd have to look through on this. I can tell you
15     that in the case that we're here about they sustained
16     it against me and discipline was imposed, but it's
17     not final yet, it's still being disputed. There's an
18     arbitration, I'm told, this coming year on that. So
19     there was a sustained finding. Now, whether those
20     findings in the end will be overturned, we don't
21     know. And I don't know if there was anything
22     sustained where discipline was not imposed.
23        And CRA findings are not final disposition.
24     It comes to the Police Department, and then they
25     review it and you have a panel there, and sometimes

Sealed as Confidential Pursuant to Protective Order

69

1  they don't sustain. So it's a very confusing
2  situation between the Civilian Review Authority and
3  how it relates to your final record within the MPD.
4        But I can tell you that I don't believe I
5  have anything sustained where they imposed discipline
6  other than the case that we're here about.
7        MS. PETERSON:  Can we just shortchange
8  this for a minute?  If you look at the badge number
9  and you look at the number, you've got 42153, and if
10  you look at the CRA case, which we're just using,
11  which is Exhibit 3, it has that same number on it.
12  So that is what we were talking about.
13        THE WITNESS:  42153?  I don't see that
14  in here.  Oh, okay, 04-2153.
15  BY MR. DELAPLAIN:
16  Q  And when you're referring to that in the left-hand
17     column, the number 04-2153, that's referring to the
18     complaint with the Civilian Police Review Authority
19     that was made in this case, is that right?
20  A  That's what it says on Exhibit 3, yes.
21  Q  And in regard to this case, there was a sustained
22     finding, at least for now?
23  A  Yes.
24  Q  And it was a finding of excessive force?
25        MS. PETERSON:  Objection, the document

Sealed as Confidential Pursuant to Protective Order

70

1  speaks for itself.  Go ahead and answer.
2        THE WITNESS:  An allegation of excessive
3  force, findings sustained at hearing.  And then an
4  allegation, inappropriate conduct, and findings
5  sustained at hearing.
6        MS. PETERSON:  May we have the record
7  reflect that all Lt. Kroll did was look at the
8  document and line up the codes with the numbers in
9  the document.
10        MR. DELAPLAIN:  And was any discipline
11  imposed upon you as a result of there being these
12  sustained findings?
13        MS. PETERSON:  Objection, asked and
14  answered.  You can answer again.
15        THE WITNESS:  Yes, there was.
16  BY MR. DELAPLAIN:
17  Q  And what was that discipline?
18  A  A 160-hour suspension.
19  Q  Was there any discipline imposed beyond that?
20        MS. PETERSON:  Objection, asked and
21  answered.
22        THE WITNESS:  No.
23        MR. DELAPLAIN:  So was that the
24  discipline that initially was imposed or was it some
25  discipline announced that was later not imposed?

Sealed as Confidential Pursuant to Protective Order

71

1        MS. PETERSON:  Objection. Announced by
2  whom?  Vague.
3        MR. DELAPLAIN:  Well, I'm asking him.
4        THE WITNESS:  Well, I don't know if you
5  could call initially several years after the
6  incident, but the discipline was imposed -- it would
7  be two years ago in January that it was imposed.  So
8  it was imposed, what, three years after the incident.
9        MR. DELAPLAIN:  Well, maybe you can just
10  run through the procedure with me.
11        MS. PETERSON:  Objection. If you would
12  like the procedure, he is just an officer in the
13  fleet force, he's a Lieutenant, and if you would like
14  the disciplinary procedure for an officer, he is the
15  wrong person to ask for that.  He is just a person
16  that can be disciplined and that is subject to the
17  grievance procedure under the collective bargaining
18  agreement.  Even though he is an officer of the
19  union, that document and the collective bargaining
20  agreement speaks for itself, as do the CRA rules, as
21  do the rules for the police department.
22        So all he can give you is a general
23  understanding, and actually this is not the right
24  witness, other than what he has experienced in his
25  own discipline, and it's not going to get you where

Sealed as Confidential Pursuant to Protective Order

72

1  you want.  If you want to ask those questions, you
2  have the wrong person.
3        MR. DELAPLAIN:  Do you have an objection?
4        MS. PETERSON:  I do.  The objection is
5  that this is irrelevant from this person, and he has
6  no direct knowledge other than his own discipline.
7        MR. DELAPLAIN:  He certainly has direct
8  knowledge of his own discipline.  He's already
9  testified that he's sat in on thousands of hearings
10  regarding this.
11        MS. PETERSON:  Lack of foundation.
12        MR. DELAPLAIN:  Okay.  So let me run
13  through the procedure with you a little bit.  At the
14  conclusion -- I don't know, how many phases would you
15  say there are in this Minneapolis Civilian Police
16  Review Authority proceeding from the point that a
17  complaint comes in until it's ended?
18        MS. PETERSON:  Objection.  Again, lack of
19  foundation.  You can answer if you know.
20        THE WITNESS:  The Civilian Review
21  Authority is such a complicated endeavor, I think
22  there's people there that don't understand it.
23  There's certainly people within the police
24  administration that don't understand it, within the
25  City Council that don't understand it.  It's a monkey

Sealed as Confidential Pursuant to Protective Order

73

1   on their back that they just can't seem to shed and
2   they can't figure out.
3          But my experience in the Civilian Review
4   Authority is a person makes a complaint and the
5   investigator interviews them, much like an
6   investigator would interview on the MPD side of the
7   house in Internal Affairs. The investigator
8   interviews all witnesses and parties involved, the
9   complainant, witnesses, subject officers.
10         When that is done, it goes before some type
11  of panel hearing at the Civilian Review Authority and
12  they make a determination of some type, and when that
13  is done, it's forwarded over to the police
14  administration for review, and I don't know if that
15  goes to Internal Affairs or to higher ranking
16  officers within the officers' chain of command, and
17  then they review it and they determine -- they have a
18  panel hearing, and then they call the officer in and
19  determine if they're going to impose discipline, and
20  then the department has the final authority of
21  discipline, but the department does not have the
22  authority to change a finding of Civilian Review.
23         So what they do in many cases is we'll
24  leave the finding whatever it's deemed to be at the
25  Civilian Review side of the house and not impose

Sealed as Confidential Pursuant to Protective Order

74

1   discipline on the MPD side if they don't agree. I
2   don't think they have the legal authority to change
3   it.
4          If in a case they impose discipline with an
5   officer, an officer is entitled to a grievance
6   procedure in the collective bargaining agreement, and
7   that is union officials meeting with city officials
8   in the police department through the steps, and then
9   the ultimate finding being binding arbitration and
10  the case is presented before an arbitrator. That's
11  about the best way I can nutshell the whole process
12  for you.
13  Q   Thank you for that explanation. As I understand it,
14  in the procedure regarding this case, you're at the
15  stage where there's going to be an arbitration.
16  A   Yes.
17  Q   And do you know when that is scheduled for?
18  A   It's not scheduled. The City has been delaying
19  for years.
20  Q   Do you know why the City has been delaying for years?
21         MS. PETERSON: Objection, calls for
22  speculation. You can answer if you know.
23         THE WITNESS: In most discipline cases,
24  in my experience on the Union Board, the City
25  excessively delays in all of them, trying to impose

Sealed as Confidential Pursuant to Protective Order

75

1   punishment off on the officer, first and foremost,
2   whether they're terminated or suspended, and, you
3   know, in cases of termination they keep putting it
4   back and putting it back, and generally we don't get
5   in for -- when they fire an officer, I usually tell
6   them nine months before we get it. It's an
7   excessively long process.
8          On the union side of the house, we try to
9   expedite the process, obviously in favor of the
10  officer to get him before a hearing, and my theory is
11  that's the way that the City chooses to impose
12  discipline before the ultimate overturning of the
13  finding for inappropriate discipline.
14  Q   Now, in regard to this case you said there's a second
15  panel that's impaneled where there's a determination
16  of discipline after a finding by the Civilian Review
17  Authority. Is that what I heard you say?
18         MS. PETERSON: Objection, lack of
19  foundation with regard to all of this. You can ask
20  as many irrelevant questions as you want, but this is
21  not relevant to what is going on here.
22         MR. DELAPLAIN: You've made your
23  objection.
24         MS. PETERSON: You can answer if you
25  know.

Sealed as Confidential Pursuant to Protective Order

76

1          THE WITNESS: There was a separate panel
2   within the Minneapolis Police Department that
3   convened a panel hearing in this case.
4   BY MR. DELAPLAIN:
5   Q   And is that the panel that announced or made a
6   determination of what discipline would be imposed?
7   A   Yes.
8   Q   And the discipline that was recommended by that
9   panel, is that the discipline that ended up being
10  imposed?
11  A   I don't recall if it changed. I knew that during the
12  panel they changed the finding. During the panel
13  hearing they changed it from one finding to another,
14  and I don't know if the initial recommendation was
15  160 hours or it was changed by an administrator
16  higher. I think it was the initial recommendation,
17  but I'm not positive.
18  Q   And then do you know if that initial recommendation
19  was changed by a later on process?
20  A   The finding had been changed several times throughout
21  the process, and I think -- my understanding of the
22  finding is that the City sustained it for on duty
23  excessive force, when I was off duty through the
24  whole incident, and they imposed time. And now at
25  the time of this lawsuit they say, no, you were off

SHEET 17  PAGE 62

Sealed as Confidential Pursuant to Protective Order

77

1    duty and you have to pay your own attorney's fees and
2    you're subject to your own liability.
3         So the City has successfully twisted it to
4    manipulate it to discipline me as on duty and then
5    leave me on my own on the lawsuit as off duty, and my
6    theory is it's because of my union work. So I don't
7    know. The finding had been changed several times.
8  Q  And can you describe to me how the finding was
9    changed and what it was changed from and to?
10 A  You'd have to go through the entire file and talk
11   with our attorney that's been handling this, but at
12   one point it was excessive force, and then at another
13   point it was inappropriate conduct, and at another
14   point discretion. And there's been meetings
15   throughout the arbitration process prior to the
16   actual arbitration, negotiated settlements to change
17   it, and then the City Attorney had backed away from
18   that. So it's gotten very complex with regard to how
19   they've changed the findings and into what category
20   they've placed it in.
21 Q  Now, after the next step in the proceeding, an
22   arbitration, does the result of that arbitration have
23   finality or is there anything that happens after
24   that?
25 A  Arbitrators' decisions are final.

PAGE 63

Sealed as Confidential Pursuant to Protective Order

78

1  Q  Have you ever in the past gone yourself all the way
2    through an arbitration --
3  A  Oh, yes.
4  Q  -- on a complaint to the Civilian Review Authority?
5  A  Oh, no.
6  Q  When you said, "Oh, yes," about going through the
7    arbitration, what were you referring to?
8  A  Oh, we've arbitrated over when a Federation board
9    member is entitled to do Federation days, when the
10   City -- how much notice they have to give the City,
11   how long they can go work inside the union office
12   for, etc., we've got a finding on that.
13 Q  Okay, so just union issues.
14 A  Sure.
15 Q  Having nothing to do with this case.
16 A  No.
17 Q  Now, since we've been discussing this, does that
18   refresh your recollection at all as to whether each
19   of these case numbers indicated here do represent
20   complaints that were filed against you with the
21   Minneapolis Civilian Review Authority?
22 A  Their coding, I don't know if I was the complaint
23   against an officer or if I was an officer that may
24   have been a witness to an officer involved. I don't
25   know how the Civilian Review Authority categorizes

PAGE 64

Sealed as Confidential Pursuant to Protective Order

79

1    these cases.
2  Q  And it looks to me like there's 18 what look like
3    case numbers over in that left-hand column.
4         MS. PETERSON:  We'll stipulate that the
5    document speaks for itself, there are 18 case
6    numbers.
7         MR. DELAPLAIN:  Would you dispute that
8    there has been 18 complaints against you that have
9    been filed with the Minneapolis Civilian Police
10   Review Authority?
11        MS. PETERSON:  Objection, asked and
12   answered. He has already answered that question.
13   Can we take a break, please?
14        MR. DELAPLAIN:  I'd like him to answer
15   the question.
16        MS. PETERSON:  Oh, sure.
17        MR. DELAPLAIN:  I don't think he has
18   answered that question.
19        THE WITNESS:  I don't know their coding.
20   So I don't know if these are a witness or I was the
21   accused officer.
22 BY MR. DELAPLAIN:
23 Q  I understood that answer. My question was whether
24   you dispute that there has been 18 complaints filed
25   against you with the Minneapolis Civilian Police

PAGE 65

Sealed as Confidential Pursuant to Protective Order

80

1    Review Authority.
2         MS. PETERSON:  Objection, asked and
3    answered.
4         THE WITNESS:  I don't know, so I really
5    can't dispute it. I'd have to look at what the cases
6    were specifically in order to go there. So I don't
7    know what their codings are. The case numbers are
8    irrelevant. I don't know how they categorize it. I
9    wouldn't have any evidence to say otherwise, if that
10   helps.
11        MR. DELAPLAIN:  So do you want to take a
12   break now?
13        MS. PETERSON:  Yes, please.
14        (Recess)
15 BY MR. DELAPLAIN:
16 Q  Lt. Kroll, when we took our break I was asking you
17   about what's been marked as Deposition Exhibit No. 4,
18   some questions about what appears to be a printout
19   from the Minneapolis Civilian Police Review Authority
20   referencing your badge number and name and certain
21   case numbers. And I understand from your testimony
22   that you don't know whether these are complaints that
23   were made against you or not.
24 A  That's correct.
25 Q  Now, where would the records be that showed whether

SHEET 18   PAGE 66

Sealed as Confidential Pursuant to Protective Order

81

1 these were complaints that were made against you, if
2 you know?
3 A  I would just assume still under the Police Review
4    Authority.
5 Q  Is there anything that's placed in your personnel
6    file when there's a complaint made against you with
7    the Civilian Review Authority?
8 A  I don't know.
9        MR. DELAPLAIN:  Counsel, now this is a
10   document that was provided to us in response to a
11   discovery request, and we asked for -- I don't have
12   the discovery request in front of me, but my
13   recollection is records of all prior complaints that
14   had been filed against the defendants. And as I
15   understand Lt. Kroll's testimony and your objections,
16   you're now indicating that --
17       MS. PETERSON:  I believe we've fully
18   complied with your discovery request. I believe you
19   have a complete copy of his personnel file, and that
20   was provided to you. I believe you have a complete
21   copy of everything we have, and we have provided you
22   everything you asked for.
23       MR. DELAPLAIN:  Regarding any complaints
24   that have been filed with the Civilian Review
25   Authority?

PAGE 67

Sealed as Confidential Pursuant to Protective Order

82

1        MS. PETERSON:  If we have a copy of any
2    of that, you have it. And I believe the City has
3    also complied with all of your requests.
4        MR. DELAPLAIN:  Counsel, would you be
5    willing to -- we have discovery closing I think on
6    the 15th of this month. In regard to this particular
7    document, I have a question, the same question I was
8    asking Lt. Kroll, whether this represents an
9    itemization of the complaints that have been made
10   against him with the Civilian Police Review
11   Authority. Would you agree to respond to a request
12   for admission if I sent it to you at this time
13   regarding this specific document?
14       MS. PETERSON:  No. I've responded to all
15   of your discovery on behalf of defendants Kroll and
16   Krueger, and we have answered everything to the best
17   of our knowledge that we have. With regards to his
18   answers on this, I have no understanding of how the
19   Civilian Review Authority works or whether there are
20   other -- anything other than what I have that says at
21   the top of this document Minneapolis Civilian Police
22   Review Authority. This is all that we have. That's
23   all that we have from it.
24       MR. DELAPLAIN:  This is the only document
25   that you have from the Civilian Police Review

PAGE 68

Sealed as Confidential Pursuant to Protective Order

83

1    Authority?
2        MS. PETERSON:  This is the only document
3    that I believe I have from the Police Review
4    Authority. I believe we have given you copies of
5    every document you have asked for. You have had
6    copies of their personnel files. And I don't believe
7    that you had any objections to any of the discovery
8    that we provided.
9        MR. DELAPLAIN:  Well, in regard to this
10   particular item, my request was that you provide me
11   copies of the complaints that were made against him
12   with the Minneapolis Civilian Police Review Authority
13   and you gave me this document. I wouldn't have
14   objected to it, with the understanding that you were
15   actually providing me the document that was
16   responsive to my request.
17       MS. PETERSON:  I do not -- all I can do
18   for you is ask the Civilian Police Review Authority
19   for copies of what they can give me, that's all I can
20   do, and then I can provide those to you, and I have
21   done that.
22 BY MR. DELAPLAIN:
23 Q  Now, as a separate matter, Lt. Kroll, I'm going to
24   ask you, and I'm not going to mark it as an exhibit
25   at this time, but could I just ask you to look at

PAGE 69

Sealed as Confidential Pursuant to Protective Order

84

1    that document and tell me whether you recognize it.
2 A  No, I don't recognize it.
3 Q  Do you recognize the form of the document?
4 A  It's some type of communications printout.
5 Q  Isn't that something that you work with in your --
6 A  No.
7 Q  -- position with the department?
8 A  You know, it looks like -- well, it says MDC. Maybe
9    it's MDC printouts of the incident that we're talking
10   about.
11       MR. DELAPLAIN:  I'll take it back. I
12   don't have any further questions.
13       MS. PETERSON:  We'll read and sign. Oh,
14   I'm sorry, you may have some.
15       MS. FUNDINGSLAND:  I just have one
16   question, Lieutenant, and that is -- and I know you
17   probably absolutely answered this question, but I'm
18   going to try it anyway.
19           EXAMINATION
20 BY MS. FUNDINGSLAND:
21 Q  Do you have any idea from the time that you and
22   Sgt. Krueger got out of Sgt. Krueger's vehicle to the
23   time that the uniformed squads first arrived how much
24   time would have elapsed?
25 A  No, I don't know. I'm sure dispatch records would

SHEET 19  PAGE 70

Sealed as Confidential Pursuant to Protective Order

85

1    have when the call was made and the arrival of the
2    squads.
3  Q  We have that, but I'm trying to fill in prior to when
4    your call was made.
5  A  From when we got out to when the call was made?
6  Q  Okay, can you answer that?
7  A  Within a minute or two.
8  Q  Okay. What do you think it's closer to?
9  A  It's too tough to answer.
10        MS. FUNDINGSLAND:   All right.  That's all
11   I have.
12        MS. PETERSON:   Do you have anything else?
13        MR. DELAPLAIN:   Nothing.
14        MS. PETERSON:   We'll read and sign.
15        (The mater was adjourned at 11:21 a.m.
16         on November 6, 2009)
17
18
19
20
21
22
23
24
25

PAGE 72

87

1   STATE OF MINNESOTA      )
                            ) ss:
2   COUNTY OF HENNEPIN      )
3      BE IT KNOWN THAT I, Linda J. Trondson, the
4   undersigned, a duly commissioned and qualified Notary
5   Public within and for the County and State aforesaid, do
6   hereby certify that before the giving of his/her
7   deposition, the said witness was by me first duly sworn
8   upon his/her oath to depose the whole truth and nothing
9   but the truth; that the foregoing is a true and correct
10  transcription of the stenotype notes taken by me at said
11  deposition; that I am not an employee, attorney, or
12  relative of any of the parties to the cause; that I am not
13  an employee, attorney or relative of any counsel to the
14  cause; that I have no interest whatever in the result of
15  the action nor am I financially interested in the action;
16  that I do not have a contract with any of the parties,
17  counsel for any of the parties or any person with an
18  interest in the action that affects or has a substantial
19  tendency to affect my impartiality.
20          WITNESS MY HAND AND SEAL this 16th day
21  of November, 2009.
22
23          _____
            Linda J. Trondson
            Notary Public,
24             Hennepin County, Minnesota
            My commission expires January 31, 2010
25

PAGE 71

86

1   SIGNATURE OF WITNESS:
2       BE IT KNOWN THAT I, the undersigned deponent,
    have read the within transcript of my deposition testimony
3   and believe the same to be true and correct, except as
    follows:
4
5   Robert J. Kroll              Dated      _____
6
        Page: Line: Correction and Reason Therefor:
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  LT
25    Please return to: Ask, Trondson & Smith Court Reporters
            701 Fourth Avenue South - Suite 500
                Minneapolis, Minnesota  55415