## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jackson Mahaffy; Flora
Mahaffy; Daniel Nelson;
And Paul Von Arx,                          Case File No. 08-CV-4992 JMR/SRN

                    Plaintiffs,

vs.                                        **MEMORANDUM IN SUPPORT OF
                                           MOTION FOR SUMMARY
                                           JUDGMENT OF DEFENDANTS
Robert Kroll; Wallace Krueger;             BENNETT, HANSON, BISHOP,
Christopher Bennett; Aaron                 CAMPBELL, KURTH, KITZEROW
Hanson; Christopher Bishop; David          AND THE CITY OF MINNEAPOLIS**
Campbell; Toddrick Kurth; Brandon
Kitzerow and City of Minneapolis,

                                           **ORAL ARGUMENT REQUESTED**
                    Defendants.

### INTRODUCTION

This case arises out of a May 14, 2004, altercation between Plaintiffs Jackson

Mahaffy, Flora Mahaffy, Daniel Nelson and Paul Von Arx and Defendants Robert Kroll

and Wallace Krueger.  Kroll and Krueger are Minneapolis police officers who were off

duty at the time. Defendants Minneapolis Police Officers Christopher Bennett, Aaron

Hanson, Christopher Bishop, David Campbell, Toddrick Kurth and Brandon Kitzerow

responded to a 911 call, later toned to indicate that an officer needed help, arising out of

that altercation.

Plaintiffs plead four counts against the City Defendants:[1] Section 1983

unreasonable seizure; Section 1983 conspiracy in unreasonable seizure; failure to protect

[1] Robert Kroll and Wallace Krueger were off duty and not acting in the performance of
the duties of their positions during the incident at issue.  The Minneapolis City Attorney's

and state created danger; and, civil rights violations.  Because there are no genuine issues of material fact and Plaintiffs cannot establish essential elements of their claims, the City Defendants respectfully request that this Court grant their motion for summary judgment.

## STATEMENT OF FACTS[2]

### I.    Incident.

#### A.  Plaintiffs and Their Friends Arrive at Old Science Renovation.

On May 14, 2004, Plaintiffs Jackson Mahaffy, his sister Flora Mahaffy, Daniel Nelson, and Paul Von Arx attended the "Art-A-Whirl" event, an art crawl involving local galleries in Northeast Minneapolis.  (Fundingsland Aff., Ex. B, Am. Cmplt. ¶¶ 5, 15-16).[3] Plaintiffs went from each of the participating galleries on bicycles with a number of their friends, including, in part, Danica Walton, Ellen Redshaw, Zoe LeStout, Britta Shernock, and Luke Holden.  (Ex. C, F.Mahaffy Depo. 9; Ex. D., Von Arx Depo. 37; Am. Cmplt. ¶ 18).   According to Flora Mahaffy, Plaintiffs and their friends arrived at the event at approximately 7:00 p.m.  (F.Mahaffy Depo. 10).   All of the Plaintiffs and their friends were consuming alcohol that evening.  (Ex. E, J.Mahaffy Depo. 40; F.Mahaffy Depo. 10; Ex. F, Nelson Depo. 34; Von Arx Depo. 38).   Jackson Mahaffy admitted he had six or seven glasses of wine and was "a little drunk."  (Ex. R, J.Mahaffy CRA Stmt. 3, 7).   Flora

Office is not representing them in this civil action. (Fundingsland Aff., Ex. A). Hence, the "City Defendants" consist of Defendant Officers Bennett, Hanson, Bishop, Campbell, Kurth, Kitzerow, and the City of Minneapolis.

[2] While the facts as stated are most favorable to the Plaintiffs, these Defendants have included facts from other witnesses to explain and clarify the events.

[3] Except where otherwise noted, all references to "Exhibits" in this memorandum refer to exhibits to the Affidavit of C. Lynne Fundingsland.

Mahaffy admitted that she had been drinking, and confirmed that her brother, Jackson, was "a little intoxicated." (F.Mahaffy Depo. 10, 20). Plaintiffs Daniel Nelson and Paul Von Arx both admitted that they were drinking that night. (Nelson Depo. 34; Von Arx Depo. 38).

A little before 10:00 p.m., the group arrived at the Old Science Renovation, a furniture gallery located on 13th Street and Marshall Avenue Northeast next to Dusty's Bar in Minneapolis. (Am. Cmplt. ¶ 18; Von Arx Depo. 38). Matthew Rolfe, who helped out at the Old Science Renovation that evening, noticed Plaintiffs and their friends, and stated that they appeared "unruly" and "intoxicated." (Ex. H, Rolfe Depo. I, 7-9). Rolfe recalls that, shortly after he saw the group arrive, two males were specifically asked to leave the Old Science Renovation due to their intoxication and conduct. (*Id.*).

One of the artists present, Matthew Lennon, noticed Plaintiffs' group and noted that they looked like they had been drinking. (Ex. I, Lennon Depo. 9). He also noted that at one point, one male, Jackson Mahaffy, was standing in the street and swung his satchel at a black SUV that drove by. (*Id.* at 10). Defendant Krueger and his wife, along with Defendant Kroll riding in the back seat, occupied the SVU. (Ex. Y, Krueger CRA Stmt. 2). The SUV stopped and Kroll and Krueger got out. (Lennon Depo. 10).

An altercation then ensued between Plaintiff Jackson Mahaffy and Defendants Robert Kroll and Wallace Krueger. (*Id*. at 10). As it unfolded, witnesses describe the confrontation as a "brawl."

**B.  Events prior to the arrival of uniformed officers.**

Kroll states that when he and Krueger approached J.Mahaffy after he struck their vehicle, J.Mahaffy became assaultive as did a whole mob of some twenty other angry people.  (Ex. L, Kroll CRA Stmt. 3-4).  Kroll feared that he and Krueger might be potential victims of a robbery or a car jacking.  (*Id.* at 4).  Kroll was knocked down to the ground and was under a pile of attackers and feared for his safety.  (*Id.* at 5).  Kroll got away from the fight and called 911.  (*Id.*).

Krueger was knocked to the ground and then punched and kicked by several people.  (Krueger CRA Stmt. 3).  Once he was able to get back up, Krueger was struck in the face and knocked back down to the ground, leaving him dazed.  (*Id.* at 4).  Krueger was injured and bleeding under his eye, (*Id*. at 4), and tried to enter the Old Science Renovation. (Ex. G, Fritz Depo. 9-10).  Eeris Fritz, owner of the Old Science Renovation, denied him access.  (*Id.*).  In Fritz's words, "Everybody was drunk," and she did not want them in her gallery.  (*Id.* at 9-10).

Fritz characterizes the entire encounter as "a drunken brawl."   (*Id*. at 42).  According to Lennon, a group came to aid J.Mahaffy in the street and a pile of people "looked like they were punching, hitting, wrestling" on the ground.  (Lennon Depo. 10-11).

Doreen Johnson was driving north on Marshall Avenue, coming home from work that night, saw the fight, stopped and called 911.  (Ex. J, Johnson Depo. 6-8; Ex. O, Transcript of 911 calls).  Johnson viewed the fight along with at least a dozen other people gathered on the sidewalk.  (Johnson Depo. at 9).

Lennon estimated that there were 20 people on the sidewalk.  (Lennon Depo. 33).

Von Arx saw a "pretty good sized crowd" gathering to observe the fight. (Von Arx Depo.

46).   According to Plaintiffs' friend, Luke Holden, there were more than ten people

outside.  (Ex. K, Holden Depo. 13).  Fritz saw about ten other people who appeared to be

friends of the kid that was down; they were yelling and screaming.  (Fritz Depo. 36).

### C.  Events after the arrival of the uniformed officers.

#### 1.  Uniformed Officers' account of events.

While on routine patrol that evening, Officers Aaron Hanson and Christopher

Bennett heard a call dispatched for a fight in progress nearby.  (Ex. M, Hanson Depo.10;

Ex. N, Bennett CRA Stmt. 2).   While en route, Hanson and Bennett heard a tone and

were advised off-duty officers were being assaulted.  (Hanson Depo. 10-11; Bennett CRA

Stmt. at 2).  Hanson and Bennett were the first uniformed officers on the scene. (Bennett

CRA Stmt. 2).

When they arrived, Bennett describes the scene as "a big melee."  (*Id*. at 2).

Hanson saw Kroll in the street, running backwards, with at least three people attacking

him.  (Hanson Depo. 11).  Hanson ran to stop the assault on Kroll and "tackled" one

individual, an unidentified woman.  (*Id.*).  Bennett ran to the crowd and started physically

moving people back.  (Bennett CRA Stmt. 3).  Hanson describes the scene as "complete

chaos" with Kroll and the crowd exchanging words.  (Hanson Depo. 12).

Hanson then "tackled" J.Mahaffy, who was approaching Kroll while Kroll was

looking the other way.  (Hanson Depo. 12).  Kroll identified J.Mahaffy to Hanson as

being the person who damaged Krueger's SUV and assaulted Krueger and Kroll.  (Kroll

CRA Stmt. 7; Hanson Depo. 29).  Hanson and Bennett handcuffed J.Mahaffy and placed him in their squad car.  (Hanson Depo. 12-13).

Officer Christopher Bishop also responded to the call.  (Ex. W, Bishop Depo. 14, 21).  When Bishop arrived, he saw that Bennett and Hanson had one person in custody. (*Id.* at 27).  He noted that both Kroll and Krueger appeared distressed and Krueger appeared disoriented. (*Id.* at 28). Bishop saw 15-30 people at the scene; some were agitated and would not move out of the street and back onto the sidewalk.  (*Id*. at 28-29). Bishop tried to contain the crowd and keep them from interfering with Hanson and Bennett.  (*Id.* at 83).

Officer David Campbell also heard the call and responded.  (Ex. X, Campbell CRA Stmt. 2).  Other uniformed officers were already on the scene when he arrived. (*Id.* at 3).  He saw Kroll and Krueger with a crowd around them and one man, later identified as Von Arx, screaming in Kroll's face.  (*Id.* at 2, 7).

After Hanson and Bennett put J.Mahaffy in the back of their squad car, they tried to get the chaotic situation under control and make it safe, but the crowd remained unruly and taunted the officers.  (Hanson Depo. 13-14; Bennett CRA Stmt. 6-7).  Because the crowd was so angry and the uniformed officers were outnumbered, they changed locations. (Bennett CRA Stmt. 7).  Bishop moved Kroll, Krueger and Krueger's wife to the Grain Belt Brewery parking lot around the block.  (Bishop Depo. 29; Hanson Depo. 15-16).  Hanson and Bennett moved their squad car, with J.Mahaffy inside, as well. (Hanson Depo. 13).  An ambulance met them there and paramedics examined Krueger. (Ex. T, Ambulance record).  Hanson had the paramedics also take a look at J. Mahaffy,

because he had vomited.   (*Id*. at p. 16; Bishop Depo. 40).   Krueger spoke to the uniformed officers and explained what had happened.  (Krueger CRA Stmt. 5).  Bishop observed damage to Krueger's vehicle and photographed it.  (Bishop Depo. 31).

Campbell stayed on scene when the others left and gathered contact information for a possible later investigation.  (Campbell CRA Stmt. 3; F. Mahaffy Depo. 56; Nelson Depo. 39; Von Arx Depo. 62).   Campbell told one man who did not agree with J.Mahaffy's arrest that he could call the precinct or make a complaint with the Civilian Police Review Authority or the Internal Affairs Unit.  (Campbell CRA Stmt. 4).

Witness Doreen Johnson claims she tried to approach the uniformed officers with her contact information, and they threatened to arrest her.   (Johnson Depo. 12). However, she identified Officer Campbell as being the uniformed officer who took down her contact information.   (*Id*. at 22-23).   During her deposition, when viewing photographs of all officers at the scene, Johnson was not able to identify any City Defendant officer besides Campbell as ever being present at the scene.  (*Id.*).

Officers Brandon Kitzerow and his partner, Toddrick Kurth, also responded to the call. (Ex. AA, Kitzerow Depo. 5).  By the time they arrived, multiple squads were there, and the situation was under control.  (*Id*. at 5, 9).  Kitzerow and Kurth did some crowd control and then left.  (*Id*. at 10).

J.Mahaffy was booked at the Hennepin County Adult Detention Center ("HCADC") for assault in the Fourth Degree.  (Ex. BB).  Records of the HCADC evidence that J.Mahaffy was involved in an altercation prior to arrival, that he was hit in the head, and that he had too much to drink.  (Ex. DD, J.Mahaffy Medical Screening

Form). J.Mahaffy did not claim any injury upon admission to the jail. (*Id.*) He denied visual disturbance or nausea. (*Id.*) The nurse offered J.Mahaffy Tylenol, but J.Mahaffy did not take them. (*Id.*; J.Mahaffy Depo. 26). HCADC's Tracking Records indicate that J.Mahaffy was unable to continue with the booking process because he was still too intoxicated shortly after midnight. (Ex. CC, J.Mahaffy Tracking Record).

### 2. Plaintiffs' and other witnesses' account of events.

When the uniformed officers arrived, it was "very crowded out on the sidewalk and chaotic." (Von Arx Depo. 65). According to Von Arx, when he heard sirens approaching, he went to retrieve his bike. (*Id.* at 50). As the first squad cars were pulling up, he claims he was punched in the face and fell on the bikes. (*Id.* at 53, 56). He did not see who hit him, but states he saw Krueger backing away. (*Id.* at 53). Von Arx believes that the uniformed officers had exited their squads when he was hit, but does not know if any of the officers witnessed this alleged punch, as he was looking down and did not see which direction the uniformed officers were facing. (*Id.* at 70).

Before being arrested J. Mahaffy stated he had wanted to apologize to Kroll and Krueger. He told his cousin, "Zoe, let's find those guys. Let's say sorry." (J.Mahaffy CRA Stmt. 3). J.Mahaffy stated he "… just assumed because there were two of them and eight of us [.] …They must be hurting." (*Id.*).

Daniel Nelson alleges that, while sitting on the curb of the street, he was kicked in the head, but is unsure who kicked him. (Nelson Depo. 27-28, 57). His friends, however, told him that it was Kroll. (*Id.* at 29). Zoe LeStout alleges she saw one of the men from the SUV run past unidentified uniformed officers and kick Nelson. (Ex. S,

LeStout Aff. ¶ 11).  F.Mahaffy alleges she saw Kroll kick Nelson in the face, (Ex. U, F.Mahaffy CRA Stmt. 3), but can identify no uniformed officer who observed this. (F.Mahaffy Depo. 58).  Johnson also claims she saw a "kid" get kicked in the head but is not sure who kicked him.  (Johnson Depo. 67). [4]

At his initial deposition, Matthew Rolfe testified, "I remember specifically seeing a gentleman handcuffed, put onto the ground, and a uniformed officer kicked him in the face after he was arrested. I specifically remember that."  (Rolfe Depo. I, 14).  Rolfe could not identify the uniformed officer who allegedly kicked J.Mahaffy or any of the uniformed officers on the scene that night.  (*Id*. at 21).  None of the Plaintiffs in this case, including J.Mahaffy, allege that a uniformed officer kicked J.Mahaffy in the head.

After giving his deposition, later that same day, Rolfe called both Plaintiffs' and Defendants' counsel, requesting to come in again.  (Ex. V, Rolfe Depo. II, 4).  At his second deposition, Rolfe changed his testimony. He claimed that he saw one of the men from the truck (Kroll or Krueger) kick J.Mahaffy or one of the other young men in the face when he was handcuffed and lying on the ground. (*Id*. at 6, 16).  He could not identify any uniformed officers who were aware of the alleged kicking while a young man was in custody.  (*Id*. at 7).  Again, none of the Plaintiffs in this case, including

---

[4] Dylan Ryan, an Art-A-Whirl participant, believes he saw the "blue shirted man" (Kroll) kick someone.  (Ex. P, Ryan IAU Stmt. 4).  This "someone" was not J.Mahaffy as he was in the squad car when this alleged kick occurred.  (*Id.*).  Ryan never says that any of the uniformed officers witnessed this alleged kicking.  Peter Thomas, an Art-A-Whirl artist, believes he saw the blue shirted man (Kroll) run around uniformed officers and kick a guy on the ground in the head, who may have been handcuffed.  (Ex. Q, Thomas IAU Stmt. 3).  Thomas never claims that any of the uniformed officers witnessed the alleged kick.

J.Mahaffy, allege that Kroll or Krueger kicked J.Mahaffy while he was in police custody. None of the other Plaintiffs were in police custody.

Holden saw his friends yelling at the uniformed police officers.  (Holden Depo. 25).   Even though the brawling stopped with the uniformed officers on scene, verbal confrontation and shouting continued. (Rolfe Depo. I, 16).   Witnesses saw uniformed officers speaking with Kroll and Krueger.  (*Id.* at 59).   According to Rolfe, because Kroll and Krueger "didn't get arrested, there didn't seem to be any consequences of them having been involved."  (*Id.* at 64).

## II.   Investigation by Minneapolis Civilian Police Review Authority and Minneapolis Police Internal Affairs Unit

Lieutenant James Rugel was the Watch Commander on the night of May 14, 2004. (Ex. Z, Rugel CRA Stmt. at 1).   Rugel arrived at the scene after the conflict was over. (*Id.*  at 2).   He spoke with Officer Campbell about the events that had transpired. (Rugel CRA Stmt. 1; Campbell CRA Stmt. 12).   Rugel recorded the incident in the Watch Commander Log which is circulated to the chief, deputy chiefs, precinct inspectors and lieutenants each morning. (Rugel CRA Stmt. 2-3).   Rugel sent a memo to Deputy Chief Sharon Lubinski so that she could review the matter.  (*Id.*; Lubinski Aff. ¶ 15).   Lubinski notified the Internal Affairs Unit ("IAU"), which started an investigation into the incident. (Lubinski ¶ 17).[5]

---

[5]  The Internal Affairs Unit of the Minneapolis Police Department investigates complaints of police misconduct.

Nelson subsequently filed a complaint with the Minneapolis Police Civilian Review Authority ("CRA"), on June 11, 2004. (Ex. EE, CRA Cmplt.; Nelson Depo. 41).[6] The complaint included allegations of excessive force, inappropriate conduct and failure to provide adequate or timely police protection.  (CRA Cmplt.).  Both the IAU and CRA investigated the incident.

### III.   Causes of Action Alleged by Plaintiffs in This Lawsuit

Plaintiffs filed the Amended Complaint on February 27, 2009, and allege the following five causes of action:

| Count | Basis | Against Defendants |
|-------|-------|--------------------|
| One | 42 U.S.C. § 1983 – Fourth Amendment – excessive force and unreasonable seizure | Kroll and Krueger |
| Two | 42 U.S.C. § 1983 – Fourth Amendment – unreasonable seizure | Bennett, Hanson, Bishop, Campbell, Kurth and Kitzerow |
| Three | 42 U.S.C. § 1983 – Fourth Amendment – conspiracy in use of excessive force and unreasonable seizure | Kroll, Krueger, Bennett, Hanson, Bishop, Campbell, Kurth and Kitzerow |
| Four | Negligence – deliberate indifference to safety, failure to protect, state created danger | Bennett, Hanson, Bishop, Campbell, Kurth, Kitzerow and City of Minneapolis |
| Five | Civil Rights Violation | City of Minneapolis |

[6]   The Minneapolis City Council created the CRA to investigate allegations of misconduct against Minneapolis Police Officers.  (Mpls. Code of Ordinances § 172.10). It is a body independent of the Minneapolis Police Department.  (Fundingsland Aff. ¶ 36).

## ARGUMENT

**I.      Summary Judgment Standard.**

Summary judgment shall issue if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the court may not allow a case to go forward to trial on the mere chance that a jury will disregard all evidence and accept the unsupported speculation of a party.  *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992), *cert. denied*, 507 U.S. 913 (1993).

The moving party bears the burden of proof in a summary judgment inquiry. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).  Rule 56(c) "mandates the entry of summary judgment… against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A sufficient showing is not made by the "mere existence of a scintilla of evidence in support of the plaintiff's position…  [T]here must be evidence on which the jury could reasonably find for the plaintiff."  *Liberty Lobby*, 477 U.S. at 252. Opponents of summary judgment must point to specific facts showing there is a *genuine issue for trial*.  *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Any fact alleged to be in dispute must be outcome determinative under prevailing law.  *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992).

The test for whether there is a genuine issue of a material fact is two-fold.  *Liberty Lobby*, 477 U.S. at 248.  First, the materiality of a fact is determined on the substantive law governing the claim; only disputes over facts that might affect the outcome of the suit

are relevant on summary judgment.  *Id*.  Second, any dispute over a material fact must be genuine.  *Id*.  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  *Id*.  It is the non-moving party's burden to demonstrate that there is evidence to support each element of his claim.  *Celotex*, 477 U.S. at 323.  A non-moving party may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial.  *Id*. at 324.

There are disputed factual issues in this case.  However, they are not material facts that would affect the outcome.  Plaintiffs cannot establish essential elements with regard to their claims against the City Defendants.  Because Plaintiffs' claims against the City Defendants fail, they should be dismissed.

## II.     Defendant Officers Kurth and Kitzerow Should Be Dismissed.

Defendant Officers Toddrick Kurth and Brandon Kitzerow should be dismissed. At Kitzerow's deposition in this case, Plaintiff's counsel stated,

> I've now had a chance to review [Officer Kurth's CRA statement], and knowing what your testimony is about what happened that night, I don't think it's appropriate that you are a named defendant in this case, and so I'm going to talk to the City Attorney and request that we stipulate to your dismissal.

(Kitzerow Depo. 11-12).  Plaintiff's counsel also agreed to Kurth's dismissal.  (*Id*. at 12).

As such, City Defendants respectfully request that this court dismiss Defendants Kurth and Kitzerow. [7]

---

[7] No Plaintiff or witness identifies Kurth or Kitzerow as being involved in any way in the incident at issue.

### III.   City Defendants Are Entitled to Qualified Immunity.

When defendants raise qualified immunity, a court considers two questions in whatever sequence it deems fit. *Pearson v. Callahan*, 129 S.Ct. 808, 181 (2009).  First, taken in the light most favorable to the person alleging injury, do the facts alleged show that the officers' conduct violated a constitutional right? *Saucier v. Katz,* 533 U.S. 194, 201 (2001), overruled in part by *Pearson*, 129 S.Ct. at 818.  If no constitutional right has been violated, there is no necessity for further inquiry concerning qualified immunity.  *Id.* Second, the court may also examine whether the constitutional right allegedly implicated was clearly established at the time of the events in question.  *Id.*

The Eighth Circuit has stated that the applicability of qualified immunity is analyzed in three parts: first, has plaintiff asserted a violation of a constitutional right; second, was the applicable law pertaining to the constitutional right in question clearly established at the time of the violation; and, third, if defendants violated the clearly established law, has plaintiff established that no material issues of fact remain as to the objective reasonableness of defendant's actions in light of the law and information they possessed at the time.  *Mettler v. Whitledge*, 165 F.3d 1197, 1202-3 (8th Cir. 1999); *Lawson v. Hulm*, 223 F.3d 831, 834 (8th Cir. 2000).

The doctrine of federal qualified immunity applies to shield municipal officials from personal liability for federal claims "unless the officials' conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known."  *Cornell v. Woods,* 69 F.3d 1383, 1390 (8th Cir. 1995) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   The inquiry into whether the alleged

constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201.

> For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent.'

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A precedential case need not be on all fours to clearly establish a constitutional violation, but it must be sufficiently analogous to put a reasonable officer on notice that his conduct was unconstitutional. *Meloy v. Bachmeier*, 302 F.3d 845, 848 (8th Cir. 2002).

The City Defendants did not violate any of the Plaintiffs' constitutional rights. Defendant Officers Hanson, Bennett, Bishop and Campbell rushed into a chaotic scene. They knew they were responding to fight call which was toned to indicate an officer was involved. (Hanson Depo. 10-11; Bennett CRA Stmt. 2). Plaintiffs themselves describe the scene as chaotic or a melee. (J.Mahaffy CRA Stmt. 3). Hanson saw Kroll being attacked by a group and rushed to aid him. (Hanson Depo. 11). When Kroll identified J.Mahaffy as the initiator of the incident, Hanson and Bennett took him into custody. (*Id.* at 29). The crowd was unruly even following J.Mahaffy's arrest. Plaintiffs and others were screaming at the uniformed officers. (F.Mahaffy Depo. 32; Von Arx Depo. 65). The crowd refused to get out of the street and back to the sidewalk. (Bishop Depo. 28-29).

City Defendants did not witness any violence by Kroll or Krueger against Plaintiffs. Hanson did not see Kroll or Krueger strike anyone.  (Hanson Depo. 13). Bennett did not see Kroll kick anyone or Krueger punch F.Mahaffy.  (Bennett CRA Stmt. 12-13).  Bishop does not recall seeing Kroll or Krueger interact with anyone on the scene. (Bishop Depo. 38).  Campbell did not see Kroll or Krueger punch, strike or kick anyone. (Campbell CRA Stmt. 8-9).  None of City Defendants' actions amount to a violation of Plaintiffs' constitutional rights.

Further, the City Defendants' actions were objectively reasonable in light of the law and information they had at the time.  Defendant Officers arrived with the mindset of aiding an off-duty officer who had called 911 for help.  When on a fight call, an officer's first priority is to make the scene secure and safe, and then ascertain what happened. (Bishop Depo. 41-42).

The crowd was large, boisterous, and out-of-control; the Defendant Officers were far outnumbered.  Defendant Officers felt unsafe and decided to meet the ambulance a few blocks away at another location because it was necessary to defuse the situation.  The City Defendants dealt with a rapidly evolving and dangerous situation based on what they knew at the time.  During the entire encounter, neither Hanson, Bennett, Campbell nor Bishop saw Kroll or Krueger strike anyone.  (Hanson Depo. 13; Bennett CRA Stmt 9-10; Campbell CRA Stmt. 7; Bishop Depo. p. 38).

Other than knowing that Hanson and Bennett arrested J. Mahaffy, Plaintiffs cannot identify any specific officer who they allege violated their constitutional rights. (Von Arx Depo. 40).  The only Defendant Officer who Plaintiffs recognize besides

Hanson and Bennett is Campbell.  Plaintiffs recognize Officer Campbell only because he stayed on the scene and got contact information from potential witnesses.  (F.Mahaffy Depo. 56; Nelson Depo. 36-37; Von Arx Depo. 60-62).  None of the Plaintiffs identify Campbell as participating in the alleged unreasonable seizure, conspiracy, or failure to protect.  As such, Campbell should be dismissed from this action.

When multiple defendants raise a qualified immunity defense, the district court should "examine each of the claims carefully [and] determine who is involved in each claim, to what extent, and whether those officials who were involved are entitled to qualified immunity."  *Jones v. Coonce*, 7 F.3d 1359, 1365 (8th Cir. 1993).  None of the Plaintiffs or witnesses testified that they observed any City Defendant physically harm any of the Plaintiffs during this incident.  Even after showing Plaintiffs and other witnesses a photo array of officers, no one has identified any City Defendant as striking any of the Plaintiffs in this matter.  Plaintiffs or witnesses merely identified Hanson and Bennett as having arrested J.Mahaffy, Bishop as being on the scene, and Campbell as having taken statements from witnesses and bystanders.

Plaintiff Flora Mahaffy was shown a photo array of police officers' pictures, which included the City Defendants and others potentially present at the scene.  The photos included each officer's name.  F.Mahaffy testified that she recognized Officer Bishop, Officer Campbell, and potentially Officer Goset (who has been dismissed from these proceedings).  (F.Mahaffy Depo. at 55-56).  She identified Campbell as the officer "that stayed and took the statements at the end."  (*Id.* at 56).  She recognized the officers who arrested J.Mahaffy by their names and did not remember their faces.  (*Id.* at 56).

She denied that any of the officers depicted in the photo array ever struck her, or had any physical contact with her whatsoever. (*Id*. at 55-57). F.Mahaffy denied seeing anyone punch Von Arx. (*Id.* at 57). She did not observe any of the uniformed officers witness Kroll attack J.Mahaffy. (*Id.* at 58).

Plaintiff Jackson Mahaffy could not identify any of the City Defendants in his deposition. (J.Mahaffy Depo. 23). He denied that the uniformed officers caused him any physical harm and denied that any of the City Defendants caused physical harm to any of the people with him. (*Id.* at 23-24).

Plaintiff Daniel Nelson, when shown a photo array of City Defendants, identified only Campbell as the uniformed officer who stayed and took statements. (Nelson Depo. 36-37, 39). He never saw anyone hit or have any physical contact with F.Mahaffy; could not identify who kicked him; and did not see anyone use physical force against Von Arx. (*Id.* at 38-40). He did not know if any of the City Defendants saw him being kicked. (*Id*. at 40, 73). He could not identify any City Defendant who allegedly increased the level of violence at the scene. (*Id*. at 70).

Von Arx identified Bennett and Bishop as the first officers who arrived on the scene, but did not know if they observed him getting hit. (Von Arx Depo. 59-60, 63). Von Arx recognized Campbell; did not recall seeing him at the scene, but stated he spoke with him after the incident. (*Id.* at 60-62). When shown a photo array of multiple officers, Von Arx could not recall seeing any of the officers depicted other than Bennett, Bishop and Campbell. (*Id.* at 60-61).

Witness Doreen Johnson denied seeing any of the uniformed officers hit J.Mahaffy, and denied seeing any of the uniformed officers have any physical contact with anyone at the scene. (Johnson Depo. 21). After reviewing a photo array of multiple officers (without names), Johnson identified Campbell as the officer who gathered her contact information. (*Id.* at 22-23). Johnson stated she recognized Sergeant Darah Westermeyer, an officer who was not present at the scene and took no part in this incident. (*Id.* at 23). Johnson was unable to identify any other City Defendant Officers.

Luke Holden, Plaintiff's friend, could not identify any of the City Defendant officers present at the scene of the incident. (Holden Depo. 22-23). Witness Matthew Lennon, after being shown a photo array of multiple officers, could not identify any of the City Defendants. (Lennon Depo. 26). Matthew Rolfe also could not recognize any of the City Defendant officers after being shown a photo array. (Rolfe Depo. I, 21).

Viewing the facts as most favorable to Plaintiffs, they simply cannot factually establish which City Defendant officers violated their constitutional rights. Plaintiffs cannot identify Defendant officers or what the officers observed. It is insufficient for Plaintiffs to allege that these officers were simply present. Because the City Defendants did not violate Plaintiffs' clearly established constitutional rights and the City Defendants' actions were objectively reasonable, they are entitled to qualified immunity with regard to all of the federal claims against them.

## IV.    Plaintiffs' Claims for § 1983 Unreasonable Seizure Fail.

Plaintiffs allege unreasonable seizure against the City Defendants, but make no claim of excessive force against Hanson, Bennett, Bishop or Campbell. Plaintiffs only

allege excessive force by Kroll and Krueger.  J.Mahaffy makes no excessive force claim against Hanson and Bennett, the officers who took him into custody.  For the reasons detailed below, Plaintiffs' unreasonable seizure claim against the City Defendants should be dismissed as a matter of law.

Whether an arrest violates the Fourth Amendment's right to be free from unreasonable seizures turns on whether the arresting officer had probable cause.  If probable cause was present, it is not necessary to consider an immunity defense.  *Garionis v. Newton,* 827 F.2d 306, 309 n. 5 (8th Cir. 1987); *Foster v. Metro Airports Comm'n,* 914 F.2d 1076, 1079 (8th Cir. 1990).

Probable cause is a "fluid concept -- turning on the assessment of probabilities in particular factual contexts."  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

> In dealing with probable cause ... as the very name implies, we deal with probabilities.  These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*Brinegar v. United States*, 338 U.S. 160, 175 (1949).

Probable cause exists "if the totality of facts based on reasonable trustworthy information would justify a prudent person in believing the individual arrested had committed … an offense."  *Smithson v. Aldrich,* 235 F.3d 1058, 1062 (8th Cir. 2000).  The question of whether an officer had probable cause to make an arrest must be examined in terms of what was known to the officer.  *Garionis*, 827 F.2d at 309.  This is an "objectively reasonable" standard.  *Foster*, 914 F.2d at 1079, n. 4.  Probable cause

may exist even though an officer believes otherwise or is mistaken about its basis. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

### A.     F.Mahaffy, Nelson and Von Arx Were Not Seized.

Plaintiffs F.Mahaffy, Nelson and Von Arx were not seized on May 14, 2004. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). No Plaintiff other than J.Mahaffy claims that any of the City Defendants arrested them, detained them, or in any way restricted their movement.

None of these Plaintiffs make any allegation that they were seized. As such, no claim for unreasonable seizure by Plaintiffs F.Mahaffy, Nelson or Von Arx against City Defendants will lie. Therefore, this claim as it pertains to these Plaintiffs should be dismissed.

### B.     Defendant Officers Campbell and Bishop Did Not Seize Anyone.

It is undisputed that Hanson and Bennett alone took J.Mahaffy into custody and arrested him. (Hanson Depo. 12; Bennett CRA Stmt. 4). Plaintiffs make no allegation to the contrary. (Am. Cmplt. ¶ 57). J.Mahaffy was in custody when Bishop arrived. (Bishop Depo. 27). Because Defendants Campbell and Bishop did not seize anyone on May 14, 2004, they should be dismissed on Plaintiffs' claim of unreasonable seizure.

**C.     The Arrest of J.Mahaffy by Defendant Officers Bennett and Hanson Was Supported by Probable Cause.**

Bennett and Hanson's seizure of J.Mahaffy was proper because they had probable cause to arrest him. Courts evaluate whether probable cause exists based on the totality of the facts. *Smithson,* 235 F.3d at 1062.  Bennett and Hanson acted reasonably in seizing J.Mahaffy because the totality of the facts based on reasonably trustworthy information would justify a prudent person in believing that J.Mahaffy had committed an offense.

Hanson and Bennett were the first ones on scene in response to a 911 help call by an off-duty officer. (Hanson Depo. 10-11; Bennett CRA Stmt. 3).  Plaintiffs did not call 911; only Defendant Kroll and other non-party witnesses unaffiliated with Plaintiffs did. (Ex. O, Transcript of 911 Calls).

Before any of the uniformed officers arrived, the dispatcher toned the call a "help" call to indicate that an officer was in danger.  (Hanson Depo. 10-11; Bishop Depo. 21). When Hanson and Bennett arrived at the scene, Hanson observed Kroll being attacked, confirming the reported assault.  (Hanson Depo. 11).  Kroll identified J.Mahaffy as the perpetrator of damage to property and assault upon himself and Krueger. (Hanson Depo. 29; Kroll CRA Stmt. 7).

Hanson and Bennett took J.Mahaffy into custody.  (Hanson Depo. 12; Bennett CRA Stmt. 5).  Because the crowd outnumbered the uniformed officers and was screaming, unruly and refusing to comply with officers' commands, Hanson, Bennett and Bishop went around the block with Kroll, Krueger and J.Mahaffy.  (Bishop Depo. 28-29).

Bennett observed the damage to Krueger's SUV and photographed it while at the Grain Belt parking lot.  (Bennett CRA Stmt. 11).

Ample probable cause existed to merit J.Mahaffy' arrest; his seizure was reasonable and proper.  Consequently, J.Mahaffy's unreasonable seizure claim should be dismissed.

Even if the Court finds that J.Mahaffy's arrest lacked probable cause, Hanson and Bennett are protected under the doctrine of qualified immunity because they, at a minimum, had arguable probable cause.  Law enforcement officials who reasonably, though mistakenly, believe probable cause existed are protected by qualified immunity. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  Application of qualified immunity transforms the standard for determining liability of the officers from "probable cause" to "arguable probable cause."  *Gorra v. Hanson*, 880 F.2d 95, 97 (8th Cir. 1989).  Under this standard, all but the "plainly incompetent" are protected.  *Id.*

Here, Hanson and Bennett had arguable probable cause to arrest J.Mahaffy. As argued above, based on the facts and circumstances as they unfolded, Hanson and Bennett only knew they were going to a fight and to aid an off-duty officer.  The scene was a chaotic brawl.  When Kroll, a fellow officer, identified J.Mahaffy as the perpetrator, Hanson and Bennett took J.Mahaffy into custody, handcuffed him and placed him in their squad car.  This factual development certainly supports arguable probable cause.  Hanson and Bennett's actions in taking J. Mahaffy into custody were not "plainly incompetent."  As such, they are protected by official immunity for seizing J.Mahaffy.

Thus, the City Defendants are entitled to summary judgment with regard to J.Mahaffy's unreasonable seizure claim.

In sum, F.Mahaffy, Nelson and Von Arx were never seized on May 14, 2004. Defendants Bishop and Campbell did not seize any of the Plaintiffs. Defendants Hanson and Bennett's arrest of J.Mahaffy was supported by probable cause and was, therefore, reasonable. At a minimum, J.Mahaffy's arrest was supported by arguable probable cause and Hanson and Bennett are protected by qualified immunity. Therefore, Plaintiffs' claim for unreasonable seizure should be dismissed in its entirety.

## V.     Plaintiffs Cannot Substantiate a § 1983 Conspiracy Claim.

To prove a conspiracy under 42 U.S.C. § 1983, plaintiffs must show: (1) defendants conspired to deprive them of a constitutional right; (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and, (3) the overt act injured the plaintiffs. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). To survive summary judgment, plaintiffs must "identify specific facts suggesting that there was a mutual understanding among the conspirators to take actions directed towards an unconstitutional end." *Meyers v. Becker County,* 833 F.Supp. 1424, 1435 (D. Minn. 1993).

Here, Plaintiffs cannot establish facts suggesting an understanding among the City Defendants to violate their constitutional rights. First, there was no deprivation of a constitutional right. Second, there is simply no evidence of a meeting of the minds. *See Barstad v. Murray County,* 420 F.3d 880, 887 (8th Cir. 2005) ("A conspiracy claim

24

requires evidence of specific facts that show a 'meeting of minds' among conspirators"). City Defendants simply did not conspire against Plaintiffs.

City Defendants did not see Kroll or Krueger attack anyone. (Hanson Depo. 13; Bennett CRA Stmt. 9-10; Bishop Depo. 38; Campbell CRA Stmt. 7). The City Defendants followed proper procedure when off-duty officers are involved in a fight. (Lubinski Aff. ¶ 13). Campbell reported the underlying facts to the watch commander, Rugel. (Campbell CRA Stmt. 12; Rugel CRA Stmt. 1; Lubinski Aff. ¶ 14). Rugel included the incident in his watch log and sent Deputy Chief Lubinski a memorandum. (Rugel CRA Stmt. 2-3; Lubinski Aff. ¶ 15). Lubinski reviewed the matter and referred it to IAU, which then conducted an investigation. (Lubinski Aff. ¶¶ 16-18).

According to Von Arx, Plaintiffs' conspiracy claim hinges on the fact that it was inappropriate for the uniformed officers not to arrest Kroll and Krueger. (Von Arx Depo. 74). However, it is a fundamental part of our criminal justice system that officers have discretion about when to arrest. *See Ricketts v. City of Columbia*, 36 F.3d 775, 780 (8th Cir. 1994), *cert. denied* 514 U.S. 1103 (1995). Indeed, in this case, it would have been inappropriate for City Defendants to arrest Kroll and Krueger. (Lubinski Aff. ¶ 13). Kroll and Krueger's behavior was properly investigated by the IAU.

According to F.Mahaffy, Plaintiffs' conspiracy claim is based on her perception that an unidentified uniformed officer stopped her friend, Britta Shernock, from aiding Nelson when he was being kicked. (F.Mahaffy Depo. 39-40). This theory does not support a conspiracy charge because it does not factually support the required element that a meeting of the minds occurred. Moreover, none of the City Defendants saw Kroll

assault anyone.  (Hanson Depo. 13; Bennett CRA Stmt. 9-10; Bishop Depo. 38; Campbell CRA Stmt. 7).

While the uniformed officers may have spoken with Kroll or Krueger in the street in front of the Old Science Renovation, gathering information from a 911 caller simply does not amount to a conspiracy even if the caller is an off-duty officer.  Further, the fact that Officers Hanson, Bennett and Bishop (along with J.Mahaffy), as well as Kroll and Krueger drove over to the Grain Belt parking does not establish a conspiracy claim.  The officers were attempting to protect their safety as well as de-escalate the scene in front of the Old Science Renovation by leaving.  Campbell told members of the crowd they could dispute J.Mahaffy's arrest by calling the precinct and he informed the bystanders how to contact CRA to file a complaint.  (Campbell CRA Stmt. 4).  These facts do not evidence the existence of a conspiracy.

Plaintiffs cannot show any facts supporting the second or third elements of a §1983 conspiracy.  There is no factual support that one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy or that the overt act harmed any of the Plaintiffs.  Plaintiffs simply cannot establish facts that show the required elements of a § 1983 conspiracy and that claim should be dismissed.

## VI.    Plaintiffs' Claims of Failure to Protect, State Created Danger and Deliberate Indifference Fail as a Matter of Law.

In count four, Plaintiffs allege state-created danger, failure to protect, and deliberate indifference against the City Defendants.  (Am. Cmplt. ¶¶ 92-96).  States and municipalities have no general affirmative duty to protect individuals against private

26

violence.  *See DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 197 (1989).  Under the substantive due process clause of the Fourteenth Amendment, the state owes a duty to protect people who are "in custody" or who are subjected to danger created by the state.  *Avalos v. City of Glenwood*, 382 F.3d 792, 799 (8th Cir. 2004).

### A.      J.Mahaffy Suffered No Harm When in Custody

The state owes a duty to protect those in its custody.  *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992).  It is undisputed that J.Mahaffy was in custody and F.Mahaffy, Nelson and Von Arx were not in custody.  J.Mahaffy makes no allegation that he was subjected to any harm while in the custody of the City Defendants.

Neither J.Mahaffy nor any other Plaintiffs claim J.Mahaffy was harmed while in police custody.  (J.Mahaffy Depo. 23; F.Mahaffy Depo. 33; Nelson Depo. 38; Von Arx Depo. 27-29).  Indeed, J.Mahaffy's booking photos show no facial injury and he received no medical treatment for any injuries.  (Ex. BB, J.Mahaffy Booking Photos; Ex. DD, J.Mahaffy Medical Screening Form).

In short, J.Mahaffy, the only plaintiff who was in police custody, did not suffer any harm while in custody.  Therefore, J.Mahaffy's failure to protect claim should be dismissed as a matter of law.

### B.      Plaintiffs' State-Created Danger Claim Also Fails as a Matter of Law

The state owes a duty to protect individuals if the state created the danger to which the individuals are subjected.  *Gregory*, 974 F.2d at 1010.  To overcome summary judgment on a state-created danger theory, Plaintiffs must prove: 1) membership in a limited, precisely definable group; 2) that the City Defendants' conduct placed them at

significant risk of serious, immediate, and proximate harm; 3) that the risk was obvious or known to the City Defendants; 4) that City Defendants acted recklessly in conscious disregard of the risk; and, 5) that the City Defendants' conduct shocks the conscience. *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005), *cert. denied,* 547 U.S. 1207 (2006) (*citing Avalos,* 382 F.3d at 798).

The Due Process Clause's "guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm[,] and does not transform every tort committed by a state actor into a constitutional violation." *Id.* (citations omitted). Thus, to prevail on a state-created danger theory, a plaintiff must show that the defendant affirmatively placed her in a position of danger that she would not have otherwise faced *and* that the defendant, in doing so, behaved in a manner that was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* (citations omitted).

Mere negligence, and even gross negligence, is not conscience-shocking and therefore, does not support a substantive due process claim. *Id.* Rather, the plaintiff must show "a level of abuse of power so brutal and offensive that it does not comport with traditional ideas of fair play and decency." *Id.* at 806; *see Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (Substantive due process violations involve conduct "so severe… so disproportionate to the need presented, and … so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience").

Plaintiffs cannot show that the City Defendants violated their substantive due process rights.   First, City Defendants did not affirmatively place Plaintiffs into a dangerous situation. *See Avalos*, 382 F.3d at 798-800; *Hart,* 432 F.3d at 805.   When the uniformed officers arrived on the scene, they attempted to break up a brawl and aid Kroll. (Hanson Depo. 11).   Defendant officers did not create any additional danger that was not already present in the brawl.   Because the City Defendants did not create the danger, Plaintiffs' claim for state-created danger fails as a matter of law.

The City Defendants did not fail to protect Plaintiffs because none of the uniformed officers saw any violence by Kroll or Krueger against Plaintiffs.   (Hanson Depo. 13; Bennett CRA Stmt. 9-10; Bishop Depo. 38; Campbell CRA Stmt. 7). Defendant Officers were doing crowd control and facing the crowd.   (Hanson Depo. 14). Plaintiffs offer no facts to contradict the City Defendants' sworn testimony that they did not see any assault by Kroll or Krueger.   City Defendants could not have stopped something they did not see.   In fact, each Plaintiff admits that they did not see each act that they allege transpired on the scene that night.[8]   Although Plaintiffs did not see each piece of what they allege occurred, they summarily conclude that Defendant officers must have seen everything the Plaintiffs allege.

Even if the Court finds that the City Defendants did somehow create danger for Plaintiffs, Defendant officers' actions do not rise to the level of conscience-shocking. Whether the alleged conduct shocks the conscience is a question of law.   *Terrell v.*

---

[8] For instance, F.Mahaffy did not see anyone attack Von Arx. (F.Mahaffy Depo. 57). Nelson did not see any attack on Von Arx. (Nelson Depo. 39). Von Arx did not see anyone kick Nelson. (Von Arx Depo. 27).

*Larson*, 396 F.3d 975, 981 (8th Cir. 2005) (en banc).   "Shocks the conscience of the court" is an extremely high standard.  *See Cruz-Erazo v. Rivera-Montanez*, 212 F.3d 617, 623-24 (1st Cir. 2000) (No substantive due process violation where police officers, after months of allegedly engaging in acts of harassment and intimidation, pushed a plaintiff, who then suffered a miscarriage days later); *Pittsley v. Warish*, 927 F.2d 3, 9 (1st Cir. 1991) (No substantive due process violation when police officers allegedly threatened more than once to kill a plaintiff and told her young children that if the police took away their father they would never see him again). The City Defendants' actions simply do not meet this high standard.

There is no evidence that City Defendants acted with the requisite intent for their actions to be conscience-shocking.  In *County of Sacramento v. Lewis*, the Supreme Court stated that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." 523 U.S. 833, 849 (1998).  Deliberate indifference will sometimes rise to the conscience-shocking level.  *Id*. at 849.  However, to prove deliberate indifference, a plaintiff must show that a defendant was both aware of the facts from which the inference could be drawn that a substantial risk of serious harm existed and that the defendant actually must have drawn the inference.  *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (analyzing deliberate indifference under the Eighth Amendment).  Plaintiffs cannot factually support their allegation that City Defendants either had a purpose to cause them harm or that City Defendants acted with deliberate indifference.

In *Schaefer v. Goch*, the court, relying on *Lewis,* found that the officers "were faced with a dangerous, fluid situation, in which they were forced to make decisions 'in haste, under pressure, and… without the luxury of a second chance.'"  153 F.3d 793, 798 (7th Cir. 1998).  As in *Schaefer*, City Defendants here dealt with a rapidly-evolving situation that was potentially dangerous for all parties involved.  Their actions do not even remotely approach the conscience-shocking level.  As such, Plaintiffs' failure to protect and state-created danger claims should be dismissed.

**VII.  Defendant City of Minneapolis Should Be Dismissed on Summary Judgment for Plaintiffs' § 1983 *Monell* Claim.**

The City Defendants interpret Plaintiffs' fourth and fifth counts to include a §1983 *Monell* Claim against the Defendant City of Minneapolis.  (Am. Cmplt. ¶¶ 90, 98-103).  Plaintiffs cannot factually substantiate this claim and it fails as a matter of law.

Under § 1983, it is well-established that a municipality cannot be held liable for its employees' alleged unconstitutional acts under a theory of respondeat superior.  *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978).  A municipality may be liable only if the plaintiff can show that an official policy of the government is the "moving force" of the alleged constitutional violation.  *Id*. at 694.  In a § 1983 suit against a municipality, the court must determine "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."  *Collins v. City of Harker Heights,* 503 U.S. 115, 121 (1992).

A municipality is only liable under § 1983 "when it can be fairly said that the city itself is the wrongdoer." *Id.* at 122.  To impose liability on a city, the plaintiff must prove

that a municipal custom or policy caused their injury.  *Stauch v. City of Columbia Heights*, 212 F.3d 425, 432 (8th Cir. 2000).   A municipality may be held liable for unconstitutional acts of its officials or employees when those acts *implement or execute* an unconstitutional municipal policy or custom.  *Mettler*, 165 F.3d at 1204.

### A.  Plaintiffs Cannot Show a Constitutional Violation.

When the municipality is sued on the theory that it is responsible for the actions of the individual defendants by adopting a policy condoning the conduct of the defendants and there is a determination that the individual defendants committed no constitutional violation, the municipality is not liable.  *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).   If the officers "inflicted no constitutional injury on [the plaintiff], it is inconceivable that [the city] could be liable to the [plaintiff]."  *Id.*

Plaintiffs have not established a constitutional violation by the City Defendants as a result of the incident on May 14, 2004.  J.Mahaffy's seizure was reasonable.  Plaintiffs do not factually support their conspiracy claim.  None of the Plaintiffs can maintain a substantive due process claim against the City Defendants for failure to protect or state-created danger.  No liability can attach to the City of Minneapolis as Plaintiffs have failed to establish a constitutional violation on the part of Defendant Officers.

### B.      There Is No Municipal Liability for Constitutional Claims by Plaintiffs.

The Supreme Court held that "a municipality cannot be held liable *solely* because it employs a tortfeasor."  *Monell*, 436 U.S. at 691.   For a municipality to be liable, a plaintiff must prove that a municipal policy or custom was the "moving force [behind] the constitutional violation," *Id.* at 694.   Only deliberate actions by a municipality can

meet the "moving force" requirement. *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997).

The Eighth Circuit held in *Rogers v. City of Little Rock,* 152 F.3d 790 (8th Cir. 1998), that even if a City had a policy of ruling citizen complaints "not sustained" when there was no supporting evidence besides the complainant's account, the City could not be held liable for the rape of a citizen by a police officer unless that policy *caused* the constitutional violation. *Id.* at 799.  In other words, to survive summary judgment, the plaintiff had to make a showing that the policy "led officers to believe that they could violate citizens' constitutional rights without fear of punishment." *Id.*

The Supreme Court has held that "the inadequate training of police officers could be characterized as the cause of the constitutional tort if--and only if--the failure to train amounted to 'deliberate indifference' to the rights of persons with whom the police come into contact." *Collins*, 503 U.S. at 123-24.  When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departure from them, are the act of the municipality.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

### C.    Plaintiffs Fail to Show a Policy, Custom or Practice of the City

When asked to identify the policy, custom or usage under which the Defendant Officers acted, Plaintiffs merely responded, "[a]mong others, the policies, customs, and usage of the City of Minneapolis Police Department" and referred City Defendants to Plaintiffs' Expert Report.  (Ex. FF, Pltfs.' Answers to City Defs.' Interrogs. No.7, 14). Plaintiffs' expert report concludes that "the MPD was on notice that Sergeants Kroll and

Krueger had repeatedly demonstrated a propensity to use excessive force and engage in inappropriate conduct." (Ex. GG, Pltfs.' Expert Report 5).

Plaintiffs seem to allege a Minneapolis Police Department custom of accepting acts of excessive force or inappropriate conduct by Kroll and Krueger.  However, Plaintiffs' generalizations simply do not amount to a municipal custom.

In order to establish a municipal "custom" or "usage" under § 1983, a plaintiff must show:

> (1)    The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> (2)    Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3)    The plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

*Mettler v. Whitledge*, 165 F.3d at 1204 (internal citations and brackets omitted).  The pattern of misconduct in element one must be so pervasive, among non-policymaking employees of the municipality that it constitutes a "custom or usage" with the force of law. *See Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998).

Plaintiffs' expert bases his conclusions on the general facts of this case, Kroll's CRA history, Krueger's CRA history, and Kroll and Krueger's ranks.  (Pltfs.' Expert Report 5).  None of the facts cited by Plaintiffs or their expert shows a widespread and persistent pattern of unconstitutional misconduct.  Plaintiffs' expert considers the number of complaints against Kroll and Krueger without regard to the number of years they have

served as police officers, the validity, or merit of the complaint, the type of complaint, or the outcome of those complaints.

J.Mahaffy contends that the City of Minneapolis' unconstitutional policy arises out of this incident alone. (J.Mahaffy Depo. 30). However, it is established that proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985).

Von Arx claims that the Minneapolis Police Department has a policy of intimidation based on one prior incident with police officers in South Minneapolis. (Von Arx Depo. 77). In that incident, sometime around 2002-2003, Von Arx alleges that officers sprayed chemical irritant and assaulted his friends who were having a campfire in their yard. (*Id*. at 20-21). He further alleges that weeks after that event, squad cars parked in front of the house and shined spotlights into the windows after dark. (*Id*. at 21).

F.Mahaffy believes that the Minneapolis Police Department has a policy or custom of allowing officers to misuse authority because a CRA employee showed her a list of allegedly sustained complaints against either Kroll or Krueger. (F.Mahaffy Depo. 60). She also believes that the City fails to supervise officers because, while she was a student at South High School in Minneapolis, twice she heard from other students that a Minneapolis Police liaison beat up other students. (*Id*. at 62-63). She did not see the alleged incidents, know who the liaison officer was, or know whether the incidents were ever reported to the IAU or CRA. (*Id*.). Plaintiffs do not come close to substantiating the first element of a "custom or usage" that equates to the force of law.

Moreover, Plaintiffs cannot show deliberate indifference on the part of the City of Minneapolis. Both Kroll and Krueger were disciplined based upon this incident. (Lubinski Aff. ¶ 19). Indeed, Plaintiffs' expert fails entirely to consider or evaluate the level of discipline Kroll and Krueger received with regard to other complaints that he cites as "notice" of excessive force. (*See* Pltfs.' Expert Report 5). Plaintiff's expert's conclusory statement that the City had "notice" is insufficient. The CRA is not an internal department of the City that rubber stamps or dismisses allegations of police misconduct.

Plaintiff's expert states: "Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, … the … MPD officers … more probably than not failed to intervene in Sergeant Krueger's assault of Paul Von Arx … and Daniel Nelson …" (Expert Report p. 5). This conclusion is totally unsupported by any facts and is nothing but a bare supposition. The expert goes on to show his confusion over the role of the Civilian Review Authority by saying "they failed to conduct an objective investigation of the entire incident." (*Id.*). Apparently, Plaintiff's expert believes the CRA is part of the police department as opposed to being an independent department. (Fundingsland Aff. ¶ 36).

###    D.    Plaintiffs Fail to Show a Causal Link.

"The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation." *City of Oklahoma City v. Tuttle*, 471 U.S. at 824 n.8. Without showing that the policy was the "moving force," Plaintiffs' claim must fail.

Plaintiffs have no evidence to establish any affirmative link between any allegedly deliberately indifferent practice of the City of Minneapolis and the conduct of Defendants Kroll and Krueger or City Defendant Officers.   J.Mahaffy's arrest was made upon probable cause and does not support a *Monell* claim. Nelson and Von Arx's alleged assaults/incidents of excessive force by Kroll and Krueger are not linked to the City of Minneapolis or its policies.

Plaintiffs do not establish a *Monell* claim against the City of Minneapolis.   They establish no pattern or practice or custom or usage which supports a finding of a "moving force".

## VIII.   City Defendants Are Entitled to Official Immunity on Any Remaining State Law Claims.

To the extent that Plaintiffs attempt to plead a state law claim against the City Defendants, they are protected by official immunity.   State law immunity rests on the same rationale as federal qualified immunity:   courts must insure that the threat of suit does not inhibit public officials' exercise of discretion in discharging their duties. *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991).   Official immunity is broadest when police act in emergency situations and high-risk circumstances.   *Pletan v. Gaines*, 494 N.W.2d 38 (Minn. 1992).

Only proof that the officer committed a willful or malicious wrong can defeat official immunity.   *Elwood v. Rice County*, 423 N.W.2d 671, 679 (Minn. 1988); *Susla v. State*, 247 N.W.2d 907, 912 (Minn. 1976).   The measure of proof of "malice" to defeat official immunity resembles the measure of proof necessary to defeat federal qualified

immunity. *Rico*, 472 N.W.2d at 107.  Once the official immunity is extended to the police officer, the immunity is vicariously applied to the municipal employer. *Pletan, supra*.

The City Defendants are entitled to summary judgment on any remaining state law claim of negligence.  Plaintiffs cannot factually support the notion that City Defendants' actions were willful or malicious wrongs.  As such, Plaintiffs' negligence claim should be dismissed.

## CONCLUSION

Because no genuine issues of material fact exist and Plaintiffs cannot prove essential elements of their claims, the City Defendants respectfully request that this Court grant this motion for summary judgment.

Dated:  January 15, 2010

                                        SUSAN L. SEGAL
                                        City Attorney
                                        By

                                        s/C. Lynne Fundingsland
                                        C. LYNNE FUNDINGSLAND
                                        Assistant City Attorney (Reg. No. 32712)
                                        DARLA J. BOGGS
                                        Assistant City Attorney (Reg. No. 314912)
                                        Attorneys for Defendants Bennett, Hanson, Bishop, Campbell, Kurth, Kitzerow and the City of Minneapolis
                                        City Hall, Room 210
                                        350 South 5th Street
                                        Minneapolis, MN  55415
                                        (612) 673-3339