**STATEMENT OF  Sergeant Robert Kroll**
**PLACE:**             Minneapolis Civilian Police Review Authority Offices
**DATE:**              December 5, 2005
**TIME:**              10:16 AM
**CASE NO:**           04-2153
**INVESTIGATOR:** Adam Richardson

REC'D FEB 2 1 2006

QUES:        Sergeant, please state your full name for the record.
ANS:         Robert Joseph Kroll.

QUES:        And your badge number?
ANS:         3874.

QUES:        And you're a Sergeant. What's your duty assignment with Minneapolis?
ANS:         The STOP Division.

QUES:        How many-- Do you remember when you were sworn in? How many years you have
             been working?
ANS:         January 16 of '89. Almost seventeen years.

QUES:        Okay. As a sworn officer.
ANS:         Yes.

QUES:        And have you been ordered by the Chief to appear here and give a statement
             regarding matters pertaining to the scope of your employment and fitness for duty as
             provided by the *Garrity Decision*?
ANS:         Yes sir.

QUES:        And you're aware that under *Garrity* any statement you provide in this investigation
             can not be used against you in criminal proceedings except in cases of alleged
             perjury are you not?
ANS:         Yes.

QUES:        Okay. And you're going to proceed without Federation Representation today, I
             assume? No one's here.
ANS:         Yes.

QUES:        Okay. And are you aware that should any of your answers in this statement be found
             to be untruthful, department disciplinary proceedings may be taken against you?
ANS:         Yes.

QUES:        Okay. Alright, referring back to now, we're going back to May 14, 2004, it looks

EXHIBIT

L

**Sergeant Robert Kroll**
**CRA Case #04-2153**

|        |   |
|--------|---|
|        | like it was approximately 10:00 PM on a Friday. This incident is alleged to have occurred over at Marshall and 13th Street Northeast. And the complainant in this matter is Daniel Nelson. Now do you remember going down, I guess, southbound on Marshall that night over by Dusty's Bar and having a run in with like a pedestrian etcetera? |
| ANS: | Yes. First, just one thing for the record. |
| QUES: | Yeah. |
| ANS: | I am here due to the fact that we are ordered by the Chief and subject to discipline for not appearing. However, I believe that this is beyond the scope of the Civilian Review Authority in that I was off duty. I never proclaimed to be on duty in any way, shape or form. The only reason there is a CAPRS Statement entered by me on this is because I was ordered to the following Monday by the Sergeant investigating the case. I never proclaimed to be on duty. I never put in for comp time, compensation for acting on duty. I never told parties involved my legal authority in the city at all. And I'm familiar with the rules of the Civilian Review Authority and I believe that this is outside the scope in that it pertains to on duty conduct by Minneapolis Police officers. When this incident occurred, again, I was not on duty and I don't believe that that falls within the guidelines or rules of the Civilian Review Authority. I just want to put that on the record. However, I will cooperate due to the fact that I'm subject to discipline if I'm not here. |
| QUES: | Alright. Very good. Okay. Would you be able to–If you want to give me account of what you remember happening that night when you first encountered this pedestrian out in the middle of Marshall? |
| ANS: | He was standing in the middle of Marshall and he put his hand up motioning like a stop motion for Wally to stop his Envoy. And he just kind of slowed as he went passed him and just continued past. The individual had something heavy in like a book bag he was carrying and struck Wally Krueger's truck. |
| QUES: | Okay. So what happened after that? What did you two, you and Sergeant Krueger do? |
| ANS: | Sergeant Krueger pulled his truck to the side, to the side of the road and got out of the vehicle. |
| QUES: | Okay. Did you get out at the same time? |
| ANS: | Probably a little bit after. I was on the passenger side. He parked and got out. I went |

2

**Sergeant Robert Kroll**
**CRA Case #04-2153**

around and then we were just– I was confused as to what was happening. At first, I thought the guy had some type of emergency that he needed us to stop and help or something.

QUES:     Right.
ANS:       And then when we approached him, he became assaultive as did a whole angry mob of like twenty people and I thought then that we were– I thought that they were really– Going to be potential robbery victims or car jacking with the way that– And I'm familiar with what happens and in that area that's not unusual to have car jackings. And for whatever circumstance they use to get you out of the vehicle that's what I thought was possible going to occur when we got attacked by a group.

QUES:     What do you remember doing when you came around, I guess, I'm trying to envision it but come around the back end of the vehicle, I'm guessing? Does that–
ANS:       I think so, yes.

QUES:     Okay. And did you see this guy with the book bag then?
ANS:       Yeah, we approached him.

QUES:     Okay.
ANS:       To see what was–what he was doing, why he hit the vehicle. To see if there's any– We were going to look at the vehicle and see if there's any damage and detain him, obtain identification but as we approached he was in a fighting stance. He was punching, kicking. For me, in my experience it seemed like he might have been on PCP or something like that.

QUES:     He was acting–
ANS:       Very bizarre.

QUES:     Okay. Do you recall if either of you officers made physical contact with him?
ANS:       I think we were just going to grab him when he was swinging his bag and we kind of kept a distance and then we just got rushed from this whole crowd that came out that were apparently with him. They were like anarchist types. I didn't know.

QUES:     Now I've seen that, I think, in your report.
ANS:       They had facial piercings and they were tattooed. Facial piercings and tattoos and they were dressed in Gothic like clothing so I– You know, I didn't know what to

3

**Sergeant Robert Kroll**
**CRA Case #04-2153**

think.

QUES:      Okay. So did you recall if either of you officers actually got a hold of Mr. Mahaffey
           now we're talking about.

ANS:       Yeah, at some point, I believe we did but we had taken-- The best way I can describe
*cRops* →   is if a quarterback ~~draws~~ back to pass and the offensive line ~~is a ways~~ down and the    ← *Lays*
           defensive blitzes. We got hit by a crowd of that many people coming at us.
               *e*

QUES:      How many would you say it was?
ANS:       At least fifteen probably twenty.

QUES:      Okay. I just want to move ahead perhaps. How did-- Did you see Sergeant Kroll get
           the injury inflicted upon him under his eye?
ANS:       You mean Sergeant Krueger.

QUES:      I'm sorry.
ANS:       No. There was so many people that I did not see-- I saw his injury after.

QUES:      Okay.
ANS:       But I had many people on top of me punching and kicking me too. So--

QUES:      Were you actually on the ground?
ANS:       Oh yes.

QUES:      How close were you to Sergeant Kroll? Krueger, pardon me.
ANS:       We were at least arms reach apart. There was that many of people that there was a
           pile on top of him and a pile on top of me.

QUES:      Alright. And I'm going to jump ahead again about this Sergeant Krueger. So did you
           see who assaulted him or gave him the injury to his eye?
ANS:       I don't remember. I know that we were able to hold the one guy, the initial one.

QUES:      Okay.
ANS:       And that's when the on-duty officers arrived at-- The initial guy with the bag I
           remember who he was. Others had fled when lights and sirens came in.

QUES:      Okay.

4

Sergeant Robert Kroll
CRA Case #04-2153

ANS:     So we wanted to detain the initial one because he had assaulted us both. I didn't
         see– I don't– I know that we were getting hit and I didn't see the actual injury. I
         thought it came from the guy with the book bag to Wally. I don't– And this is a year
         and half old and I did print the report so just a minute ago but I didn't even read 'em.
         So, and again we're going back to May of '04 so I don't recall all the specifics.

QUES:    Alright. And the assault thing that he did you're saying Jack Mahaffey now is this,
         we know, was the pedestrian, according to the police reports and some of the
         statements from witnesses etcetera, but– So, Mahaffey, how was me assaulting you
         officers? I know you mention he was swinging his book bag.

ANS:     He was swinging a bag that had a heavy object in it and he was– He was swinging
         that wildly and he was punching also. But we– I don't know exactly who. There was
         too many people to identify who actually hit me. I was covered up and on the
         ground, on my back and I was just getting hit and I think there was so many of 'em
         that they were possibly even hitting one another to get at– It was like an angry
         crowd. And it, to me it was like they were– Like I said at first they were– I thought it
         was a car jack situation and then it was like– I said they were anarchists and maybe
         they were just attacking normal people. I don't know.

QUES:    So how did you get out from under pile?
ANS:     I just– I pushed. I thought if I'm– if I don't get these guys off, I'm going to die
         underneath here. So I turned, I was hitting people and basically I got a couple shots
         into one guy and I turned to my side and pushed out of the crowd and kind of I
         pushed, snaked my body out from underneath and then I got up and I still had my
         phone and I called 9-1-1.

QUES:    Okay. Did you ever consider using a firearm?
ANS:     If I would have had my firearm I would have.

QUES:    You didn't? Oh.
ANS:     Right. Oh yes. This was a deal where I would have been killed if I– if I relayed it to
         being on duty if I was attacked by a crowd like that, I would have pulled my firearm
         and at least got a shot off to get the crowd back. So, yes, if I would have been armed,
         I would have used it in this situation.

QUES:    Now, what else do you remember, you said the crowd dispersed or ran away mostly
         at least–

5

**Sergeant Robert Kroll**
**CRA Case #04-2153**

ANS:        When--

QUES:        --lights and sirens?
ANS:        When I called, a lot of 'em had left. Then there was several that were trying to get the original guy out of there. I don't know if he was drunk, if he was under the effects of narcotics or if he was stunned by blows from us, either Wally or myself. But he was having difficulty getting to his feet and getting out of there and others were trying to aid him in this.

QUES:        Did you see where he was trying to go to?
ANS:        They were trying to get him off to the east side of the street and I was trying to hang onto him and then as I did that I got assaulted again by others that were giving hits from different sides. But they were trying to get him away.

QUES:        So, did you take-- This is a good question to ask because I don't know if I have it clear. Who arrested actually, took him into custody. Was it you or was it the uniformed officers?
ANS:        Uniformed officers.

QUES:        Then what else do you remember occurring? Did you see any after this was-- I'll try to phrase it this way; When did you first notice that Sergeant Krueger was injured or had been injured in the face?
ANS:        I don't know. I don't remember when.

QUES:        Alright. Did you see Sergeant Krueger after the lights and sirens, just the other officers came in, this is in mind's eye, I don't want to put words in here, but was there bit of a break then where you guys weren't like still struggling with the people?
ANS:        Right. When I got up to my feet I called and when they saw me on the phone a lot of them fled and they were trying to aid the ones. So there was a break when they were off of us. And then when I tried to hang onto the one guy, the initial one, and I got hit by a barrage again I backed up into the street again, a second time and then at the time, I could see lights and sirens coming and a lot more had left.

QUES:        Alright. Now--
ANS:        There was kind of two breaks.

QUES:        Okay. After the second break did you ever see and after you saw the lights and sirens

6

**Sergeant Robert Kroll**
**CRA Case #04-2153**

ANS:       coming, did you have a sense of what Sergeant Krueger was doing at that point?
           No. I was so focused on keeping people off of me, keeping the one from getting
           away. He was off to my right somewhere and he was in the same situation. He was
           dealing with an angry crowd.

QUES:      Did you see him strike anybody after the sort of second pause you talked about?
ANS:       No.

QUES:      Did you see him get struck after that?
ANS:       No. Pretty much after the first barrage when we both got struck, I didn't pay a lot of
           attention to him. I was more concerned with defending myself.

QUES:      Alright. Then how--how long did you remain on the scene after?
ANS:       I don't know. Time estimates in situations like that are difficult.

QUES:      Okay. So what occurred next then after the officers arrived?
ANS:       They arrived. I think I pointed or we identified, I don't know whether it was myself
           or Wally, I believe it was me, who pointed out the initial guy that started it. I said,
           you know, he assaulted us. He's Damage to Property on Wally's truck and assaulted
    *point →*  us. And I was trying to take out who assaulted me. There was one guy that had a
           tattoo on his face that was distinguishable and he was one of the guys on top, I
           believe, like close proximity to me and feeding me punches when I was on the
           ground. And he was one that was primarily trying to get this first guy away from us.
           And they took-- They wanted to cuff him and I looked for him and he was gone.

QUES:      The tattooed guy?
ANS:       Yeah.

QUES:      Okay. That's probably the only guy I ever saw of the people I talked to who had a--
           Can you describe the tattoo?
ANS:       I don't remember. A facial tattoo.

QUES:      Facial tattoo.
ANS·       And the whole mob was, an aura, on top of us, they had a very distinctive order. That
           was the other thing.      *Odor*

QUES:      Okay.

7

**Sergeant Robert Kroll**
**CRA Case #04-2153**

ANS:       All of them.

QUES:      Yeah. Do you want to describe that at all? The odor? Was it a certain cologne or?
ANS:       No. It was profound body odor.

QUES:      Okay. Alright. So that tattoo facial guy is most likely, almost certainly the complainant in this matter. That's how it works. There's– With us, we can only have one complaint, as an aside here, and we have people that are listed as so-called victims. So, that tattoo guy, just so you know who we're talking about here, I'm going to start saying complainant or victim but I'll try to identify him and keep them straight.
ANS:       Okay.

QUES:      So–
ANS:       I don't believe he was identified in any of these reports or I didn't see him on the scene but that one was one who should have gone for an assault on me.

QUES:      He's the one who came in and made the complaint.
ANS:       Okay. So we can identify him later or the investigator's can.

QUES:      Well, yeah, it's public knowledge or public information, the complainant, I believe etcetera so– Okay. So, I'm going to look at this. And then how did you leave the scene? I guess we're going to wrap it up as what– Did you– And from what I heard, I mean, did you leave in Wally's vehicle again?
ANS:       I don't even remember if it was there or a squad car.

QUES:      Where did you officers go right after that?
ANS:       Just like a block east and a block south of there and they had EMS come and check us out, Wally particularly because he had a significant eye injury.

QUES:      Right. Did you suffer anything?
ANS:       I had several– They looked at me. I had several bumps and bruises but nothing that you know that I needed medical treatment for. I was beat up but nothing.

QUES:      Okay.
ANS:       I didn't feel like– I didn't lose consciousness during it. I mean, I took a couple– I got my bell rung, I guess for lack of a better term. But nothing that I needed medical

8

**Sergeant Robert Kroll**
**CRA Case #04-2153**

attention for. I didn't think I had any breaks or any significant head trauma or anything like that.

QUES: Alright. I'll refer to the allegation that's against you and Sergeant Krueger now and we can get those taken care of. "A" is you got this by you here, right?

ANS: Mhmm.

QUES: Paragraph "A" Excessive Force, that's the first allegation. It reads that-- "It's alleged that Sergeant Kroll and Sergeant Krueger used excessive force in the following ways. " And then number one, "Sergeant Kroll and Sergeant Krueger punched Victim #1 multiple times. Now, this Victim #1 is Mahaffey that we're talking about.

ANS: That's the initial person that was arrested?

QUES: Right.

ANS: Okay.

QUES: And he alleges that it was–that you officers basically got out and grabbed a hold of him and forced him to the ground and started punching him. Or started punching him and knocked him to the ground and were kind of wailing on him and then the crowd came him. That's his version. But, the allegation– But what about that? Did you get in–did you officers throw any punches before he did?

ANS: No.

QUES: Okay.

ANS: But I did it and I think it's contained in the statement that I was punching people and to get, you know, to defend myself and it's very likely that him being the initial one that I did hit him.

QUES: He also alleges you went down on the ground pretty quickly onto his back and that you guys were more like on top of him. That's definitely a different version. Were you either– Did you see either– Were you or– Well, first of all, were you ever on top of him?

ANS: No. I was never on top of anybody. I think if anything he got taken–taken down with Wally and myself.

QUES: Okay.

ANS: And there was a crowd of people on top of us all.

9

**Sergeant Robert Kroll**
**CRA Case #04-2153**

QUES:     Alright. So, you say it's possible that you might have punched him and what would
          the reason have been for that?
ANS:      Self defense.

QUES:     Okay. Then there's number two, did you see Sergeant Kroll punch Mr. Mahaffy?
ANS:      Again, I'm Kroll.

QUES:     Sorry about that. I really do. I do apologize maybe I should just say Wally—
ANS:      You confuse us a lot.

QUES:     I did. It's the "K" names. Pardon me. Did you see Sergeant Krueger punch Mr.
          Mahaffey?
ANS:      No. Again, I was too focused on defending myself. It was one of these things where
          I couldn't identify who was doing what beyond their crowd to us.

QUES:     Alright. This is you. "It's alleged that Sergeant Kroll," you "kicked the
          complainant," now that's the tattooed face man, Daniel Nelson, the complainant.
          That you kicked him in the face and head multiple times and here's what he alleges.
          He was sitting on the curb after sort of initial melee had died down and that officers
          had already arrived, uniformed officers and that you came up either from the side or
          something and gave him a kick or two in the face.
ANS:      There was one guy in this that I— that was trying to drag—

QUES:     Mahaffey?
ANS:      Mahaffey out of there and when I pulled back I kicked a guy once or twice to get
          him to kick him down. He was picking him up and he was—we kind of struggle over—

QUES:     Mahaffey?
ANS:      Mahaffey and I was pulling him away, I didn't have a free hand. I was trying to hang
          onto Mahaffey because the squads, I could hear 'em coming. And I kicked this guy
          back away from me a couple times. Kick him back because my hands were tied up.
          So there was somebody and I couldn't identify who that was.

QUES:     You don't know if it was the tattooed guy or not?
ANS:      M-mmm.

10

Sergeant Robert Kroll
CRA Case #04-2153

QUES:    Where did you kick him? Do you know?
ANS:     I don't recall.

QUES:    And then, finally, I might as well ask you again, did you see Sergeant–Oh no.
         Number three, did you see Sergeant Krueger-- Now Victim #2, I haven't said. That's
         a young woman named Flora Mahaffey. She's blonde haired. Anyway, did you see
         Sergeant Krueger punch a blonde haired woman or any woman in the head?
ANS:     No.

QUES:    Okay. Alright. So did you– I've asked you this but can you recall, I know I could just
         give a description. It's taller, thinner blonde hair guy, one of these artist people, was
         in this crowd. That would have been Mr. Von Arx and he alleges that after he was
         unlocking his bike and things really had died down, he gone over to the bike rack
         that Wally, Sergeant Krueger, came up and hit him blind-sided in the jaw and
         knocked him down. Did you see anything like that?
ANS:     No.

QUES:    It would have occurred on the sidewalk, I guess.
ANS:     No.

QUES:    So, what was your intention? What did you do when you got out of the truck? Did
         you guys say, "Geez, let's go do this." See each other?
ANS:     No. There was no time. It was just kind of reactionary. It's like the guy damaged the
         truck and I didn't know if he was going to run off or what it was but detain him and
         see what was going on but he was so bizarre. The best thing I can relate to was that
         he was either on PCP, angel dust, or LSD acid or just extremely intoxicated. I don't
         know which but it was real bizarre behavior. It appeared to me that he was on some
         type of narcotics.

QUES:    Okay. Do you know if he got some sort of urine analysis or anything at jail?
ANS:     No I don't.

QUES:    A blood test or anything?
ANS:     No.

QUES:    Okay. So why did you– I mean, you've stated and I just want to clarify this that you
         never identified yourself as a police officer?

11

**Sergeant Robert Kroll**
**CRA Case #04-2153**

ANS:      No. Not at all.

QUES:     And did you hear Sergeant Krueger, yes, Sergeant Krueger identify himself as a police officer?

ANS:      No.

QUES:     So why did you– Did you have a reason for not? Because I'm looking now at the Inappropriate Conduct. I might as well just read it. It says, "This complaint alleges that Sergeant Kroll and Sergeant Krueger conducted themselves inappropriately when they failed to identify themselves as police officers and failed to inform Victim #1 that he was under arrest. Do you want to speak to that?

ANS:      Sure. One, it's not inappropriate conduct to not identify yourself as an officer to everybody you come in contact with when you're off duty. That's not a practice of mine.

QUES:     What if you were going to detain somebody though?

ANS:      We didn't even have time to get that far and we– As we approached, we were going to– It was the kind of thing, "What are you doing?" You know. We didn't get that far before we were rushed by this crowd and with him swinging his bag at us. So, again, I was off duty and that's why I really don't understand why I'm here. But it's completely accurate that I did not identify myself and the main reason for that is when you're getting assaulted by a crowd like that and they find out you are police things can turn very deadly against you if off-duty. There is a thing we call Off Duty Survival. If you're where a crime goes on and you're not and you're not prepared–- you're not on duty, you're not armed, you're not prepared to deal with– you know for yourself, defend yourself as it–as it– How am I trying to say this? If you're not prepared to adequately defend yourself, the worse thing you can do is ID yourself as an officer. Say a robbery take over where they found out that we have, you know– If a police officer's there, they'll kill 'em. So, the last thing we wanted to do by an angry crowd is to say "Hey, we're the police," because it could have turned, it could have took a real turn for the worse for us. Particularly, if it was car jack situation, if these people figure, Oh, it's the cops, we're going to be in trouble because of our assault against them, or we're going to make a good witness or whatever, you don't identify yourselves as police when you're the victim of a crime. Had I been armed, had a pulled firearm, obviously then, and if I was going to take police action, I would have. But on this point, there was no benefit to me to identify myself.

12

Sergeant Robert Kroll
CRA Case #04-2153

QUES:     Sure. And I guess you spoken to it but you say you both, you and Sergeant Krueger, never got as far as wanting to place them under arrest?

ANS:      No, we didn't even get to the point of you know, just say, "Hey. Police, you're under arrest." That wasn't our initial thing anyway. Our initial thing was what, does the guy need some help or something like that? I mean, if I would have been on-duty I would have kind of approached this as an emotionally disturbed person or a CIT Call, Crisis Intervention type of thing. Because like I say, at first, he wanted us to stop the vehicle. He was standing in like he was directing traffic in the middle of Marshall Avenue and he put his hand up. And you know that's maybe sometimes an emergency would have occurred, someone was in distress and needed help. But then when we went passed, you know we saw people around, I thought if this guy needs help there's– It wasn't a stranded motorist. It wasn't, you know, it wasn't inclimate weather. If he needs help, there's people there to provide it so why would he hit the vehicle as we passed. And then so–

QUES:     Then paragraph "C" failure to provide adequate or timely police protection. This alleges that there were some uniformed officers there that did not prevent you from kicking the complainant. Just to put it–to encapsulate it or to paraphrase here. But it says, "Failed to provide complainant with adequate or timely protection when," and this is all alleged, of course, "when although standing in close proximity to complainant they failed to intervene and stop Sergeant Kroll from continuing to kick complainant." Do you want to speak to that or would you like some questions?

ANS:      No, I don't believe I kicked anyone when the officers on duty were present.

QUES:     Okay. Alright.
ANS:      No, if– And again, we're going back to this other person that I said, with the tattoos–

QUES:     Right. Right.
ANS:      If that's the case, why didn't he approach the officers and say this guy kicked me? I believe he fled.

QUES:     Okay.
ANS:      And I was trying to detain at least as many– well, one. The primary person, if I was able to detain more, I would have but I think this guy fled. I don't think he approached the officers. I don't know. Because I would have him booked.

QUES:     Alright. I think that's all the questions I have for you Sergeant. Is there anything else

**Sergeant Robert Kroll**
**CRA Case #04-2153**

ANS:        you want to add?
            I just want the name of the actual complainant if– I don't think he's in the report and
            this guy– You know, I know it's a year and a half later and I don't what someone
            would say about a tab charge for an assault but . . . .

QUES:       Let me go off record for a moment and let me double check that it– I'm pretty sure it
            is public but we'll come right back on and I can give it to you. Let me just stop it for
            a second here. Okay, we're back on record with Sergeant Kroll. The name of the
            complainant, Sergeant, is Daniel Nelson.
ANS:        Does he have a middle name?

QUES:       Not that I know of. And the address that we have for him, that's also public is 3125
            Columbus Avenue South 55407.
ANS:        Do you have a date of birth?

QUES:       I don't know if that's public.
ANS:        Okay. Yeah, I don't– To me, if you're assaulted and the police are there on the scene
            why didn't they–why didn't he tell them, "Hey, this guy assaulted me." And I don't
            think that was the case with anybody. I mean, when the police arrived that's what I
            told them. This guy assaulted me. We're looking for other ones and with a massive
            crowd like that I couldn't specifically ID others other than the tattoo guy.

QUES:       Alright. Has this been a true and correct statement to the best of your knowledge?
ANS:        Yes.

QUES:       Alright. And when we transcribe it and send it to you, will you be willing to read it,
            make any necessary corrections, sign it and return it to us?
ANS:        Yes.

QUES:       Very well. That'll conclude this statement. It's now approximately 10:47 AM.

Signature: _Robert J. Kroll_____ Date: _2-15-06_____

slm

14