1

1   UNITED STATES DISTRICT COURT

2   DISTRICT OF MINNESOTA

3   ------------------------------------------------------------

4   Jackson Mahaffy; Flora Mahaffy;
    Daniel Nelson; and Paul Von Arx,          COPY

5        Plaintiffs,

6
    vs.                                  Case File No. 08-cv-4992
7                                             JMR/SRN
    Robert J. Kroll; Wallace M.
8   Krueger, Christopher J. Bennett;
    Aaron C. Hanson; Christopher
9   Bishop; David Campbell; Toddrick
    Kurth; Brandon Kitzerow; James
10  Rugel; Clark Goset; and Mark
    Durand, all acting in their
11  individual capacity as
    Minneapolis Police Officers;
12  and the City of Minneapolis,

13       Defendants.

14  ------------------------------------------------------------

15

16

17               Deposition of

18             AARON C. HANSON

19            September 22, 2009
                  9:50 a.m.

20

21
              Linda J. Trondson, RPR, MR
22      Ask, Trondson & Smith Court Reporters
        701 Fourth Avenue South - Suite 500
23          Minneapolis, Minnesota   55415
         612-332-2603 *** 800-332-2603
24           ats@atscourtreporters.com

25

EXHIBIT

tabbies

M

1          Deposition of Aaron C. Hanson taken on the 22nd day
    of September, 2009 commencing at approximately 9:50 a.m.
2   at the Office of the Minneapolis City Attorney, 300
    Metropolitan Centre, 333 South Seventh Street,
3   Minneapolis, Minnesota, 55402, before Linda J. Trondson,
    Notary Public, County of Hennepin, State of Minnesota, to
4   be used in the above-entitled matter.

5                         APPEARANCES:

6               JAMES W. DELAPLAIN, Attorney at Law,
    2140 Fourth Avenue North, Anoka, Minnesota, 55303,
7   and,

8               DANIEL J. BRAZIL, Attorney at Law,
    2124 Dupont Avenue South, Minneapolis, Minnesota,
9   55405, appeared on behalf of the Plaintiffs.

10              C. LYNNE FUNDINGSLAND and DARLA BOGGS,
    Assistant City Attorneys, Office of the Minneapolis
11  City Attorney, Suite 300, 333 South Seventh Street,
    300 Metropolitan Centre, Minneapolis, Minnesota,
12  55402, appeared on behalf of the City of Minneapolis.

13

                       EXHIBITS MARKED
14

15  1  Supplemental Number 1 - Statement of Aaron Hanson....17

16  2  Statement of Office Aaron Hanson - 11/12/04..........45

17  3  Case Report with Supplements.........................68

18  4  Scene Diagram........................................69

19

20

21

22

23

24

25

AARON C. HANSON,

1

2   being first duly sworn, testified as follows:

3                            EXAMINATION

4   BY MR. DELAPLAIN:

5   Q   Good morning, Officer Hanson.  My name is Jim

6       Delaplain.  I represent the plaintiffs in regard to a

7       lawsuit against the City of Minneapolis in which

8       you're named a defendant.  The plaintiffs are Jackson

9       Mahaffy, Flora Mahaffy, Daniel Nelson and Paul

10      Von Arx.  Have you had your deposition taken before?

11  A   One other time.

12  Q   One other time.  Was that in a civil case?

13  A   Yes.

14  Q   And what was the nature of that civil case?

15  A   It was a lawsuit against the City, and his name was

16      Derrick Trotter.  That happened about ten years ago

17      maybe.

18  Q   Was that an unreasonable use of force case?

19  A   Unreasonable?  No.  It was a force case, yes, but it

20      was -- I guess I arrested the wrong person, even

21      though that's still questionable.

22  Q   Were you a named defendant in that suit?

23  A   Yes.

24  Q   And what was the outcome of that litigation, if you

25      know?

4

1   A   They did a settlement, so it never went to any type

2       of Court case or anything like that.

3   Q   Now, in that case was there any other officers that

4       were named as --

5   A   Yep.

6   Q   -- defendants?

7   A   Yes, Phil Gangnon.

8           MS. FUNDINGSLAND:    You've got to wait

9       until he finishes his question before you start to

10      answer.

11          THE WITNESS:    Okay.

12          MS. FUNDINGSLAND:    Take your time.

13  Q   Any other officers?

14  A   No.

15  Q   So you're familiar with depositions, but I'll go over

16      the rules again quickly.  As Ms. Fundingsland pointed

17      out, for the court reporter's benefit I'd ask that

18      you wait for me to finish my question before you

19      begin to answer, and I'll wait until you finish your

20      answer before I start asking my question, and that

21      way the court reporter can write down what we're both

22      saying.  Is that agreeable?

23  A   Yes.

24  Q   And if I ask a question and you don't really

25      understand what I'm asking or if it's confusing, if

1    you can point that out to me and I'll try to ask it

2    in a different way or reask the question.  Is that

3    agreeable?

4  A    Yes.

5  Q    Okay.  Officer Hanson, how long have you worked for

6    the Minneapolis Police Department?

7  A    Twelve and a half years.

8  Q    And can you just real quickly run through for me what

9    your assignments have been in that twelve and a half

10   years.

11 A    I've been in Patrol the whole time.  I've worked in

12   the 1st Precinct and the 2nd Precinct Patrol in a

13   police car.

14 Q    And how long have you been in the 2nd Precinct?

15 A    I'm back in the 1st Precinct now, but I was in the

16   1st Precinct, 2nd, and now I'm back in the 1st

17   Precinct, and I've been there three years.

18 Q    So in approximately 2006 you went to the 1st

19   Precinct?

20 A    Yes.

21 Q    And how long had you been in the 2nd Precinct before

22   2006?

23 A    Five years.

24 Q    And prior to the night in question, which is May

25   14th, 2004 -- I'm sorry, March 14th, 2004, were you

1          familiar with Sgt. Robert Kroll?

2      A   Yes.

3      Q   And how did you know Sgt. Kroll?

4      A   I knew him because he's on our Police Federation.

5              MS. FUNDINGSLAND:    I'm sorry, can we back

6          up just a second?  I think first you said May 14th

7          and then you said March.

8              MR. DELAPLAIN:    Yes.

9              MS. FUNDINGSLAND:    But I think it is May,

10         just so we're clear for the record here.  I think you

11         were right the first time.

12             MR. DELAPLAIN:    I did the first one from

13         memory and the second one what I had written down.

14             MS. FUNDINGSLAND:    Yes, it just struck

15         me, and I thought we better clear that up.  Yes, it's

16         May.

17             MR. DELAPLAIN:    May, okay.

18             MS. FUNDINGSLAND:    Okay.

19     Q   So you knew Sgt. Kroll because of his work with the

20         Federation?

21     A   Yes.

22     Q   Have you had meetings with him while he's in his role

23         for the Federation?

24     A   Large group meetings only.

25     Q   He wasn't involved in the Trotter case at all?

1 A No.

2 Q Wasn't he in the 2nd Precinct at that time, a

3   Sergeant?

4 A I don't know.

5 Q Okay.  But you knew him at the time, on May 14th you

6   had known him by sight?

7 A Yes.

8 Q On May 14th, 2004.  And I think in one of your

9   reports you described him as being high up in the

10   department.

11 A Yes.

12 Q And if you view him as high up in the department, is

13   that both because of his role in the Federation or

14   also because of his rank?

15 A Rank.

16 Q So at that time you were aware of his rank?

17 A Yes.

18 Q Other than the meetings that you may have attended

19   where he was at in regard to the Federation, were

20   there any other social interactions you had with

21   Robert Kroll prior to that?

22 A No.

23 Q And then how about any other additional police events

24   other than Federation events?

25 A No.  I never worked for him so I never ran into him

1          that much.

2     Q    And then how about the same questions for

3          Sgt. Wallace Krueger.  Would you have known him by

4          sight in May of 2004?

5     A    No.

6     Q    And how about his name, would you have been familiar

7          with his name as being a Sergeant in the 2nd Precinct

8          in May of 2004?

9     A    The name only.

10    Q    Let me go back a step.  Prior to working for the

11         Minneapolis Police Department, how were you employed?

12    A    I worked as a Community Service Officer for the City

13         of Minneapolis before I became a police officer.

14    Q    If I'm not mistaken, I noticed from some of the

15         records I was provided that you originated up on the

16         Iron Range.  Is that true?

17    A    I went to college up there, but I grew up in

18         Burnsville.

19    Q    And where did you go to college?

20    A    Hibbing.

21    Q    And did you obtain a degree there?

22    A    Yes.

23    Q    And what was that degree in?

24    A    It's called an Associate's in Applied Science.

25    Q    And did you undertake any additional schooling after

9

1          that degree?

2    A     I went briefly to Northwestern College in Roseville.

3    Q     And what were you studying there?

4    A     It was called Christian Counseling, Marriage and

5          Family Counseling.

6    Q     And did you obtain any certificates or degrees from

7          that schooling?

8    A     No.  I got married, and then I stopped going.  And

9          divorced, so I didn't think family and marriage

10         counseling probably would be a good job for me.

11   Q     How about any schooling after that?

12   A     No.

13   Q     Now, as you sit here today, do you recall the events

14         of May 14th, 2004?

15   A     I do.

16   Q     And prior to your deposition today, did you review

17         any documents to prepare?

18   A     Yes, I did.

19   Q     What documents did you review?

20   A     I reviewed my report, and then I reviewed a copy of

21         the Civilian Review Authority report.

22   Q     And when you reviewed the copy of the Civilian Review

23         Authority report, did you review all of the

24         statements that were associated with the Civilian

25         Review report?

1    A    I just looked at my own statement.

2    Q    So in preparation for today, you haven't looked at

3         any other of the officers' statements?

4    A    No.

5    Q    Have you talked to any of the other officers in the

6         past couple months about your pending deposition?

7    A    No.

8    Q    Are you still in contact with Officer Bennett?

9    A    Periodically.

10    Q    Is he still in the 2nd Precinct?

11    A    No, he's in the 3rd Precinct now.  It's never come

12         up, the conversation about this lawsuit, since 2004.

13    Q    All right.  So as you sit here today, can you tell me

14         what you remember from the start, from when you first

15         got the call on that evening in 2004.

16    A    I was working patrol car with Officer Bennett, and we

17         were on routine patrol, you know, driving around

18         looking for suspicious activity, and we were in the

19         area of Broadway Street Northeast and University

20         Street Northeast, and a call for a fight in progress

21         was aired by the dispatch.

22              At that time we did not have GPS so the

23         dispatch didn't know we were that close, so we

24         answered up and began to head that way.  While

25         en route, a tone was put over our police radio which

1    meant that an officer is in trouble, and the dispatch

2    stated at that point that there was officers being

3    assaulted at the initial address on Marshall Street

4    Northeast.

5  Q   Then what do you remember next?

6  A   I remember pulling up to the address and seeing a

7    group of people outside, and at that time I remember

8    seeing Lt. Kroll in the middle of the street running

9    backwards, fighting off people, three to four people,

10   attempting to attack him.

11  Q   And then what happened next?

12  A   I exited the car and began to run towards the group

13   of people in an attempt to stop the assault that was

14   going on.

15  Q   Okay.  What did you do to try to stop the assault?

16  A   At that time I ran after the group and I tackled one

17   of the individuals that was assaulting Lt. Kroll.

18  Q   Is that the individual that was ultimately placed

19   under arrest?

20  A   No.

21  Q   What happened after you tackled the individual?

22  A   She got up, and I didn't place her under arrest.  I

23   believe she went back into the group of people back

24   on the sidewalk, and I never saw her again.

25  Q   And then what happened next?

12

1    A    At that time there was still a large group of people

2          in the street and Sgt. Kroll was still having people

3          getting close to him.  He was talking to the group,

4          they were yelling, and at that point it was complete

5          chaos.

6    Q    Okay.  And then what happened next?

7    A    At that time I observed a male quickly walking up to

8          Kroll as he was looking the other way talking to this

9          group of people, and I tackled him.

10    Q    And that male, is that the man who was eventually

11         arrested?

12    A    Yes, McAfee.

13    Q    Mahaffy?

14    A    Mahaffy.

15    Q    And after you tackled Jackson Mahaffy, what happened

16         next?

17    A    I brought him to the ground, I got on top of him, and

18         with the assistance of Officer Bennett we handcuffed

19         him.

20    Q    And then what?

21    A    We eventually picked him up and walked him back to

22         our police car.

23    Q    And from your recollection, after you walked

24         Mr. Mahaffy back to the police car was there still

25         any altercations going on between Sgt. Kroll or

1       Sgt. Krueger and anyone else?

2   A   I don't know.  It was still chaos at that point,

3       people were yelling and there was still a lot of

4       activity going on, but at that point I couldn't see

5       because I was focused on Mahaffy.

6   Q   And I understand that eventually you went with

7       Sgt. Kroll and Sgt. Krueger and Officer Bennett over

8       to a parking lot nearby at the Grain Belt Brewery.

9   A   Yes.

10  Q   Do you recall that?

11  A   Yes.

12  Q   Now, between what you described when you brought

13      Mr. Mahaffy to the squad car after you handcuffed

14      him, from that point forward did you see anybody

15      striking either Sgt. Kroll or Sgt. Krueger?

16  A   No.

17  Q   And did you see Sgt. Kroll or Sgt. Krueger striking

18      anybody?

19  A   No.

20  Q   So tell me what happened in that time between when

21      you brought Jackson Mahaffy to the squad car and then

22      when you left to go over to the Grain Belt Brewery

23      parking lot.

24  A   We left Mahaffy in the squad car, and at that time we

25      began to do crowd control in front of Dusty's Bar.

1   Q   And what did that consist of?

2   A   Standing in the street, facing the large group and

3       attempting to get the situation under control.

4   Q   And during that time where was Sgt. Kroll?

5   A   I don't know.

6   Q   How about Sgt. Krueger?

7   A   I don't know.

8   Q   Now, eventually was it your squad that Sgt. Kroll got

9       into to go over to the Grain Belt Brewery or was that

10      someone else's squad?

11  A   It wasn't ours.

12  Q   Do you recall when Sgt. Kroll got into the squad to

13      go over to the Grain Belt Brewery?

14  A   No.

15  Q   Do you recall going over to the Grain Belt Brewery

16      parking lot?

17  A   Yes.

18  Q   Now, in between when you brought Jackson Mahaffy to

19      the squad car and when you left to go over to the

20      Grain Belt Brewery, was there any time in that

21      stretch where you know where Sgt. Kroll was?

22              MS. FUNDINGSLAND:   I'm sorry, can you

23      repeat that question?

24                      (The requested portion was read)

25              THE WITNESS:   I have no idea.

1    Q    And is the same true of Sgt. Krueger, did you have

2         any idea where he was in that intervening period?

3    A    Like I said in the Civilian Review, I didn't know it

4         was Sgt. Krueger until we got over to the Grain Belt

5         Brewery, due to his weight loss, extreme weight loss.

6    Q    And I did read that in your report.  As I understand

7         it, when you first saw Sgt. Krueger he had had a

8         great weight loss and so you didn't even recognize

9         him.  Is that true?

10   A    Correct.

11   Q    But at some point prior you would have recognized him

12        before his weight loss?

13   A    Probably.

14   Q    Now, even though you didn't recognize him, as you

15        were on the scene did you realize that there was

16        another officer involved other than Sgt. Kroll?

17   A    At that point I thought it was only Sgt. Kroll.

18   Q    And at what point did you become aware that there was

19        an un-uniformed officer other than Kroll that was

20        involved?

21   A    Behind the Grain Belt Brewery.

22   Q    Okay.  What do you remember about what happened

23        behind the Grain Belt Brewery?

24   A    We, the paramedics, Kroll and Krueger met behind the

25        Grain Belt Brewery to get out of the volatile

1      situation, and we had the paramedics take a look at I

2      believe Kroll and Krueger and eventually Mahaffy.

3   Q  Why did you have the paramedics take a look at

4      Mahaffy?

5   A  He vomitted.

6   Q  Do you recall any other physical injuries on

7      Mr. Mahaffy?

8   A  No.

9   Q  I understand from your report that when you were at

10     the Grain Belt Brewery parking lot -- let me go back.

11     When you were in the Grain Belt Brewery parking lot,

12     did you have any conversation with Sgt. Kroll?

13  A  Yes.

14  Q  And what did that conversation consist of?

15  A  We were getting a better understanding of how the

16     incident occurred.

17  Q  And as you sit here today, can you recall what

18     Sgt. Kroll said to you about the incident that night?

19  A  Not really.  Just that there was a dispute over -- a

20     dispute with a male that was inside the roadway.

21  Q  And is that all you remember about your conversation

22     with Sgt. Kroll in the parking lot at the Grain Belt

23     Brewery?

24  A  About the incident?

25  Q  Yes.

1    A    Yes.

2    Q    Do you recall any other conversation you had with him

3         in the Grain Belt Brewery parking lot about anything

4         else?

5    A    No.

6    Q    How about Krueger, do you recall talking to Krueger

7         about the incident?

8    A    No, I didn't talk to him the whole night.

9    Q    I understand that Sgt. Krueger's wife was also

10        present.  Did you have any conversation with her that

11        night?

12   A    I never saw her.

13   Q    Now, at that time did you talk to Mr. Mahaffy and ask

14        him what happened?

15   A    No.  Like I put in the report, at that point he was

16        very apologetic and he was very calm with us.  We

17        didn't have any incident with him throughout the time

18        from the Grain Belt Brewery -- or from the front of

19        Dusty's to the Grain Belt Brewery all the way to the

20        jail.  It was a quiet ride down to the jail.

21   Q    I noticed in your report that you referred to

22        Mr. Mahaffy as being very decent or pretty decent to

23        you and your partner.  Is that --

24   A    To us, yes.

25                    (Hanson Deposition Exhibit 1

1         marked for identification)

2    Q   Now, I want to go back and show you what's been

3        marked as Exhibit No. 1, and I'd like to ask you to

4        identify this document, if you could.

5    A   That is my supplement to the incident.

6    Q   And is this one of the documents you looked over in

7        preparation for your deposition today?

8    A   Yes, last night.

9    Q   And I see on the top there it has an indication of

10       5-15-04 at 0025 hours.  So is that the time at which

11       this original report would have been prepared?

12   A   Yes.

13   Q   So May 15th at 12:25 a.m.?

14   A   Yes.

15   Q   So it would have been within a couple hours of when

16       the incident occurred?

17   A   Yes.

18   Q   And so is it fair for me or others to assume that

19       what you put down in this report is an accurate

20       rendition of what happened that night?

21   A   Yes.

22   Q   And I'm going to run through this report, some areas

23       of this supplemental report, and also I have what you

24       just told us about your recollection of what

25       happened, and I just want to touch on some of the

1     areas and delve into them a bit further.

2          Now, in your report it says that dispatch

3     stated that there were off-duty officers on the scene

4     being attacked by a group of people and holding one

5     down to the ground.

6          Now, I've seen that some of the other

7     supplementals say that there was a dispatch that

8     there was one in custody.  Can you recall from

9     looking at your report exactly what it was that

10    dispatch communicated?

11  A   I believe that's what they said, what I put in there.

12  Q   Now, do you interpret when it says attacked by a

13    group of people and holding one down to the ground

14    that they're holding one of the officers that are

15    being attacked down to the ground?

16  A   I think at that point I thought that was what was

17    happening.

18  Q   So I imagine if you're driving to the scene and you

19    hear over the radio that there's a group of people

20    attacking off-duty officers and holding one to the

21    ground, that that creates kind of an adrenaline rush.

22    Is that true?

23  A   I think we were worried, yes.

24  Q   How often do you get these -- is this what is

25    referred to as a help call?

1    A   Yes.

2    Q   How often do you get help calls?

3    A   Once a week.

4    Q   And are those usually similar in nature to this,

5         where there's an actual physical fight going on?

6    A   It's usually with uniformed officers.  I don't

7         remember many with off-duty officers.

8    Q   Now, in your report, in the supplemental you say,

9         "Upon arrival, my partner," and that's Officer

10       Bennett, is that right?

11   A   Yes.

12   Q   "exited the squad car and observed a large fight in

13       front of the bar."  Now, were you the passenger in

14       the squad that night or were you driving?

15   A   Passenger.

16   Q   And you immediately observed Sgt. Kroll with people

17       running at him as he was attempting to push people

18       away.  Now today you say you remember him in the

19       middle of the street running backwards, fighting

20       people that were attempting to attack him.  So can

21       you tell me exactly what you remember about what

22       people were doing and why you characterized it as

23       people attacking him.

24   A   He was backing up, running backwards, with people,

25       and I think he was pushing people away, waving his

1         arms around.

2    Q    Did you observe him punching anybody?

3    A    No.

4    Q    Did you observe anybody punching him?

5    A    No.

6    Q    So why do you characterize it as attempting to attack

7         him?

8    A    Well, they were running after him aggressively in the

9         middle of the street, a group of people after one

10        person.

11   Q    Okay.  How many people were in the group?

12   A    Like I said, I think it was three to four.

13   Q    Now, I know when you talked with the Civilian Review

14        they had a map marked up with the location of

15        vehicles and such.  Do you recall that?

16   A    No.

17   Q    I'll put in front of you what I'll represent is a

18        printout from the city or county map department.

19        It's a representation of that area.  By looking at

20        that can you orient yourself and understand what

21        you're looking at?

22   A    Yes.

23   Q    So I think 1319 is Dusty's Bar and 1317 is the Old

24        Science Renovation Factory.  Is that how you

25        recognize that?

1    A    Yes.

2    Q    And are you able to remember when your squad pulled

3         up what its approximate location was in relation to

4         Dusty's or the Old Science Renovation Factory?

5    A    Right about there (indicating).

6    Q    Okay.  Can you put an X there.

7    A    (Indicating).  I might have to move it up a little

8         bit.  I still think -- I always think that's Dusty's.

9         A little bit more (indicating).

10   Q    Okay.  So you marked a new X and then scribbled out

11        the old X.  And it looks like the current X is right

12        in front of and maybe just a shade to the south of

13        the center of the Old Science Renovation.

14   A    Yes.

15   Q    Can you indicate to me with -- let's use a K maybe,

16        where it was you saw Sgt. Kroll backing into the

17        street with people chasing him.

18   A    (Indicating).

19   Q    Okay.  And the K that you put down is in the west

20        lane of Marshall Street Northeast, right?

21   A    Yes.

22   Q    And so that's on the far lane from where Dusty's and

23        the Old Science Renovation Factory is, right?

24   A    Yes.

25   Q    And where you marked down the K, is that the extent

1   of how far he backed up or is that the --

2   A   I would have to say he backed up five to ten feet

3       from when we arrived until when I finally got to him.

4   Q   And by the time you got to him, I think you put in

5       your report that he was fending people off.  By the

6       time you got to him, had he fended people off?

7   A   He was still in the process of doing that.

8   Q   Okay.  So when you arrived, your observation was that

9       he was running backwards with six people maybe, some

10      number of people in a group coming at him, and he was

11      pushing them away and moving backwards into the

12      westbound lane of Marshall Street Northeast?

13  A   Yes.

14  Q   Approximately in front of Dusty's Bar?

15  A   Yes.

16  Q   And when you tackled the first person, the female,

17      was that one of those individuals that you saw were

18      rushing at him?

19  A   Yes.

20  Q   Now, in your supplemental report you say, "I quickly

21      grabbed her and threw her on the ground," and then I

22      noticed in your Civilian Review report you initially

23      said that you pushed her and she fell to the ground.

24      And then the interviewer asked you about the

25      supplemental report, and you said, "Yeah, that's

24

1  accurate, I grabbed her and threw her on the ground."

2  But it was clear from that statement that you also

3  ended up on the ground.  So can you tell me exactly

4  what you remember about how you and she got on the

5  ground at that point, how that happened?

6 A I think it would be best to summarize it as tackled.

7  I tackled her to the ground, and at that time we both

8  fell to the ground.

9 Q And where was that in relation to where Sgt. Kroll

10  was standing?

11 A I believe she was just south of Sgt. Kroll, running

12  after him.  She was one of the people running after

13  him.

14 Q Now, it's not in the supplemental report, but if I

15  remember correctly, in the Civilian Review report did

16  you say that Kroll was faced the opposite direction

17  so she was coming at him from behind?

18 A No, that was actually Mahaffy.

19 Q Okay.  So when you tackled the woman, Kroll was

20  actually facing her?

21 A Yes.

22 Q And was that one of the people that he was pushing

23  away or was she approaching him and you managed to

24  tackle her before she came in contact with him, or

25  what?

1    A    She was one of the people that he was trying to fend

2         off and was running at him.

3    Q    Did you see him make any physical contact with her?

4    A    No.  I believe he was just trying to keep his

5         distance from the group.

6    Q    So when you say fend off, are you saying that he was

7         physically pushing these people back from himself or

8         he was just telling them to stay at bay and not come

9         into contact with him?

10   A    From what I remember, he was backing up quickly and

11        holding his arms straight forward, blocking like he

12        was an offensive lineman blocking the defensive

13        linemen.  More of like a pass block.

14   Q    All right.  I can appreciate that.  I coach some

15        football and watch a lot of football, so I know what

16        you're talking about.

17   A    That's exactly how it looked when I arrived.

18   Q    Okay.  And while he was doing his pass blocking, did

19        he actually have contact with the individuals or was

20        he just holding his hands out with the individuals

21        not actually touching his hands?

22   A    I think they were getting close to possibly touching.

23        He wasn't pushing them, he was more like attempting

24        to keep his distance.  He had his arms out straight

25        and he was keeping his distance from the group.

1   Q   But as far as you recall, at that time he wasn't

2       physically pushing people back away from him?

3   A   It didn't look like that, no.

4   Q   Now, in your supplemental, after this sentence where

5       you say, "I quickly grabbed her and threw her on the

6       ground," referring to the first woman or girl, you

7       say, "At this point other officers arrived and we

8       worked on crowd control in stopping this chaotic

9       event."

10              And then the next paragraph starts with the

11      next individual that you tackled, which says, "I then

12      observed a male later ID'd as AP-1 quickly walking

13      towards Police Victim Kroll."  Do you see where it

14      says that?

15   A   Yes.

16   Q   So between where Sgt. Kroll was doing his offensive

17      lineman pass blocking of these people and when you

18      observed AP-1 -- that's Jackson Mahaffy, right, the

19      guy you eventually arrested?

20   A   Yes.

21   Q   So between the incident with tackling the girl and

22      when you say Jackson Mahaffy came towards Kroll,

23      there was a pause and additional officers arrived?

24   A   Yes.

25   Q   And when you say you were doing crowd control, at

1        that point had things settled down as far as the

2        people coming into close proximity with Sgt. Kroll?

3    A   It was still a volatile situation.  At this point it

4        appeared that more people were arriving also, from

5        possibly inside the bar were coming out.

6    Q   Okay.  At that time when you were doing crowd

7        control, were you able to get the crowd back towards

8        the curb in front of Dusty's and the Old Science

9        Renovation?

10   A   I think we were still working on it at that point

11       before I arrested Mahaffy.

12   Q   So when you say you were doing crowd control, the

13       plan there or your intent or what was going on was

14       that you and other uniformed officers were trying to

15       move the crowd or keep them on the sidewalk in front

16       of Dusty's and Old Science, is that fair?

17   A   Yes.

18   Q   And I think, from reviewing the Civilian Review

19       report, you recognized a couple of the other officers

20       who were there, but do you remember now who the other

21       officers were who were doing crowd control work?

22   A   All I remember at this point was Officer Kurth and

23       his partner Officer Kitzerow.

24   Q   All right.  And how close in proximity to you were

25       Kurth and Kitzerow?

1   A   Before the Mahaffy arrest, I don't remember them.

2       I'm sure they showed up after the Mahaffy arrest as

3       we were walking back.

4   Q   So in your supplemental, after you tackled the girl

5       you say, "At this point other officers arrived and we

6       worked on crowd control."  Now you're saying that

7       those other officers weren't, to your recollection

8       now, Kitzerow and Kurth.  Do you recall who those

9       other officers were?

10  A   No.

11  Q   Could it have been Kitzerow or Kurth, or is it just

12      that you don't remember who for sure it was that was

13      arriving, or do you remember it wasn't Kitzerow and

14      Kurth at that time?

15  A   I don't remember at that point.

16  Q   So then you say you observed Jackson Mahaffy quickly

17      walking towards Sgt. Kroll, and that Kroll was

18      looking the other way and Mahaffy was quickly walking

19      towards Kroll as if to assault him.

20          Can you describe that for me and why you

21      characterize it as appearing to you that Mahaffy was

22      walking towards him as if to assault him?

23  A   I saw Mahaffy walking towards Kroll quickly and he

24      was making a beeline for Kroll, and that's what I

25      thought was happening, I thought he was going to

29

1        assault him.

2    Q   Did you observe Mr. Mahaffy doing anything

3        threatening, or was he yelling or any other physical

4        indications that he was preparing for an assault?

5    A   At that point I don't know.  I just remember him

6        walking quickly, focused on Kroll, and I thought

7        there was going to be another incident.

8    Q   And in your statement today you said that you tackled

9        him.  Is that right?

10   A   Yes.

11   Q   And in your supplemental report you say, "I grabbed

12       Mahaffy and brought him down to the ground.  Kroll

13       immediately came over, pointed at AP1," Mahaffy, "and

14       stated, 'That's the male that damaged the truck and

15       assaulted me.'"  So is that true?

16   A   The quotes, I made a mistake in the report by putting

17       that in quotes.  Kroll stated that not in those exact

18       words.

19   Q   What do you remember Kroll saying?

20   A   Just that that was the male that hit the vehicle and

21       that he assaulted him.

22   Q   All right.  So you're saying you don't know for sure

23       that those are the exact words that he said that you

24       put in quotes, but that's what you remember

25       approximately him saying, that that was the

30

1 individual who hit the vehicle and that had assaulted

2 Kroll.

3 A Yes.

4 Q And the next sentence says, "My partner and I quickly

5 handcuffed AP-1," that's Mahaffy, "and placed him in

6 the squad car."

7 A Yes.

8 Q Talk me through the process you went through after

9 you tackled Mahaffy and you and your partner were

10 handcuffing him and placing him in the squad car.

11 A I tackled him to the ground, I got on top of him, on

12 top of his back, and at that time Officer Bennett

13 assisted me in placing him in handcuffs.

14 Q Now, when you're on top of his back, did you pull his

15 arms around behind his back?

16 A Yes.

17 Q All right.  Is there a standard procedure that

18 officers follow when they're placing someone under

19 arrest that's laying on the ground?

20 A No.  We attempt to do whatever -- we just try to get

21 their hands around their back and handcuff them as

22 quickly as possible.

23 Q So you're on top of Jackson Mahaffy's back, so he's

24 facing the pavement of Marshall Street Northeast,

25 right?

1    A    Yes.

2    Q    And you've got his hands up behind his back, right?

3    A    Yes.

4    Q    And are you holding his wrists together so they get

5         in proximity so you can handcuff him?

6    A    Yes.

7    Q    And Officer Bennett is there.  I think I remember

8         from reading the report that Officer Bennett is

9         leaning over helping you.  Is that correct?

10   A    Yes.

11   Q    And where was Kroll when that was happening?

12   A    I believe he was in the area.  As we were handcuffing

13        him and getting him up, Kroll came over and stated

14        that Mahaffy was the suspect in the incident.

15   Q    I thought that happened before you handcuffed him.

16        At least in your report, in the supplemental, that's

17        the sequence.

18   A    I believe it happened all at the same time.  It was a

19        very quick handcuffing.  He didn't struggle with us,

20        it went pretty smooth.  It could take a matter of

21        seconds.

22   Q    In your statement to the Civilian Review Board, at

23        that point you say about Mahaffy, "I grabbed him and

24        brought him to the ground.  As I was getting him,

25        pulling him away, bringing him to the ground, Kroll

```
 1          pointed to him and said, 'That's the guy.  This is
 2          the guy that started this problem.  He's the right
 3          guy.'"  And then the questioner there says, "So you
 4          had him down on the ground and what happened next?"
 5          And you say, "We placed him in the squad car."  So
 6          does that help with you recalling what the sequence
 7          was?
 8     A    This all happened at the same time.  He was quickly
 9          brought down to the ground, and then during the
10          handcuff process is when Kroll came over.
11     Q    Now, who was -- I'm sorry, go ahead.
12     A    It could have been right at about the same time as
13          the handcuffing.
14     Q    So right as you're on top of Jackson Mahaffy with him
15          facedown on the street and you've got his hands back
16          behind his back, was it you that put the handcuffs on
17          him?
18     A    Yes.
19     Q    All right, and you're handcuffing him.  Right at that
20          moment Kroll comes over and says whatever he says,
21          "That's the guy, you've got the right guy"?
22               MS. FUNDINGSLAND:    I'm going to object to
23          that as a mischaracterization of the deponent's
24          testimony.
25     Q    Right at that time Kroll comes over and says, "That's
```

1      the guy.  This is the guy that started this problem.

2      He's the right guy"?

3                MS. FUNDINGSLAND:    Same objection.

4                MR. DELAPLAIN:    Are you instructing him

5      not to answer?

6                MS. FUNDINGSLAND:    No, I'm objecting for

7      the record.  Can you answer the question?

8                THE WITNESS:    Yes.  Kroll told me,

9      "That's the guy.  That is the man that started all

10     this."

11  Q   And so at least at that moment you're on top of

12     Mahaffy and handcuffs are on him, and Kroll is right

13     there within a foot, is it fair to say, and Officer

14     Bennett is there within a foot?

15  A   Officer Bennett was assisting me, so he was kneeling

16     very close to me, and Kroll was approaching us.

17  Q   Do you remember if Kroll was approaching you -- what

18     was your orientation when you're on top of Mahaffy?

19     Were you facing forward towards his head as you were

20     holding his arms behind his back?

21  A   Yes.

22  Q   And do you recall which way Kroll was approaching

23     you?

24  A   Can I mark it on the --

25                MR. DELAPLAIN:    Yes.  Could he borrow

1   your red pen there, Lynne?

2           MS. FUNDINGSLAND:   Sure.  You still have

3   to point out though, if you would, for the record

4   because the copies won't show the colors.  What I'm

5   saying is that the original deposition will have the

6   colored stuff.  We'll get a copy.  So it would assist

7   us in looking at the deposition later if you'll note

8   on the map where you're putting this.

9           THE WITNESS:   Yes.  This is Mahaffy

10   right here.  He was on the ground, I was on top of

11   him like this.

12   Q   And there's a line coming off -- you have two stick

13       figures, one stick figure on the ground in front of

14       Dusty's Bar there, it looks like, near the center of

15       Marshall Street Northeast.

16   A   Yes.

17   Q   And there's an M pointed down there.  And then

18       there's also a Me, showing you, on top of Mahaffy.

19   A   Yes.

20           MS. FUNDINGSLAND:   Okay.  Thank you.

21   Q   And then at that time Kroll was still there?

22   A   Kroll arrived and was probably standing there when he

23       instructed us that that was the male.

24           MS. FUNDINGSLAND:   Where the K is?  Or

25   where --

1          THE WITNESS:     The arrow.  K is where I

2     saw him running backwards.

3          MS. FUNDINGSLAND:     Okay.

4          THE WITNESS:     This other K is.

5          MS. FUNDINGSLAND:     Is what?

6          THE WITNESS:     When he came upon us after

7     we had Mahaffy on the ground.

8     Q    So you had Mahaffy on the ground and Kroll comes

9          forward to you and Mahaffy a little bit to the north,

10         right?

11    A    South.

12    Q    Yes, okay, south, but generally towards the front of

13         you.  So you're on top of Mahaffy, you can see Kroll

14         coming and saying, "That's the guy"?

15    A    I heard him.

16    Q    Did you see him?

17    A    I'm sure I did.  I just remember hearing him saying

18         that.

19    Q    Now, one question I think in your supplemental -- or

20         not in the supplemental but in your statement to the

21         Civilian Review, and also in your supplemental, you

22         say Kroll was looking the other way when Mahaffy was

23         walking towards him.  And where you show Kroll is

24         that he's out in the westbound lane of Marshall, and

25         I'm assuming Mahaffy was coming from in front of the

1          Dusty's Bar area.  Is that true?

2    A    Yes.

3    Q    So what was Kroll looking at?

4    A    I believe he was looking at a group he was arguing

5          with.  There was still a group of people that he was

6          arguing with in the street.

7    Q    Now, based on how you described it earlier, with the

8          people he was interacting with though, he would have

9          been facing towards the Old Science Renovation or

10        Dusty's in the direction of approximately northeast

11        or east, right?

12    A    I want to say that he was facing northbound.  When I

13         observed Mahaffy walking towards Lt. Kroll, I was

14         south of them.  So I was looking up north, and that's

15         when I saw Mahaffy going towards Kroll.

16    Q    So at that time were you also south of where Kroll

17         was standing?

18    A    Yes.

19    Q    And you want to say that Kroll was looking north?

20    A    Yes.

21    Q    So wouldn't that put Kroll looking right at the

22         direction that Mahaffy is coming from?

23    A    Mahaffy was coming east and west, east to west.

24         Mahaffy was walking towards Kroll.  Kroll was looking

25         north, so he couldn't see him from the side.

Q    If Kroll was looking directly north, he's looking

over to the parking lot to the left of Dusty's,

right?  That street is a little bit off there, it's

not exactly a north/south street, and the cross

street, 13th, isn't exactly an east/west street, it's

a little bit off kilter like a lot of streets in

Minneapolis.

But, at least according to the legend on

the bottom of this little map that shows north and

south, if Kroll is looking north from the location

where you place him when you arrived, he would be

looking up towards the parking lot that's to the

north of Dusty's.  Is that what you remember?

A    Now I would have to say northwest.  You know, I

consider this straight north.  I believe Marshall

Street is north, but looking at this map it shows

Marshall going northwest.

Q    So you're saying that Sgt. Kroll was looking straight

up Marshall.

A    Yes.

Q    And so the individuals who he was interacting with

were further north on Marshall than he was, to the

northwest of him on Marshall?

A    Yes.

Q    Are these the same individuals that you described

1        earlier as having been coming at him while he was

2        backing away from Dusty's Bar backwards into the west

3        lane of Marshall?

4   A   I don't know.

5   Q   And where were the other officers located that had

6        arrived?

7   A   I don't know.

8   Q   Prior to you tackling Mahaffy?

9   A   I don't know.  I know when they arrived they all

10       parked behind our squad cars.  So the squad cars

11       actually were lined up going southbound.

12  Q   Were there any squad cars that ended up to the

13       northwest of Dusty's Bar, that you recall?

14  A   Not one.

15  Q   In your supplemental report you said that, "We

16       remained on scene for another five to ten minutes,"

17       and that's after you placed Mahaffy in the squad car,

18       right?

19  A   Yes.

20  Q   "doing crowd control, as the crowd continued to be

21       aggressive and attempting to antagonize us."  How was

22       the crowd being aggressive?

23  A   They were getting close to us, yelling at us,

24       swearing at us.  They were very unhappy with us.

25  Q   Were you able to ascertain from their comments what

1      they were unhappy about?

2   A  I think they were upset with the incident.

3   Q  Do you recall them saying what it was about the

4      incident that they were upset about?

5   A  No.

6   Q  And you say, "They were attempting to antagonize us."

7      What were they doing to attempt to antagonize you?

8   A  Well, they were getting very close to us.  As we

9      instructed them to stay back, they were, you know,

10     swearing at us.  They were very upset with us.

11  Q  But you don't remember what it was they were saying

12     about why they were upset?

13  A  No.

14  Q  Do you remember anybody questioning to the effect of

15     why Kroll and Krueger weren't being detained?

16  A  I don't remember at that point.

17  Q  Do you recall anybody indicating that Kroll and

18     Krueger had been the aggressors in the original

19     assault?

20  A  I don't remember exactly what they were saying.  They

21     were just very upset.  They got so consumed by their

22     anger at us, that I think that's all I can remember.

23  Q  But if there's other people who are reporting that

24     what the crowd is saying is that Kroll and Krueger

25     had started it, you're not saying that that isn't

1       true, are you?

2    A    I don't remember exactly what they were saying.

3    Q    So it could have been that?

4              MS. FUNDINGSLAND:    It could have been

5    what?  That they said that or that's something else?

6              THE WITNESS:    I don't remember them

7    saying anything like that.  I just remember they were

8    very upset about what happened, that there was an

9    altercation in the street.

10    Q    Did you attempt to talk to any of them to ask a

11    witness what it is they saw happen?

12    A    No, I didn't.

13    Q    To your knowledge did Officer Bennett talk to anybody

14    from the crowd to try to ascertain what happened?

15    A    I don't know if he did at that point.

16    Q    Okay.  To your recollection, did he?

17    A    I'm not sure.  I can't remember if he did or not.

18    Q    So you were there five to ten minutes with Mahaffy in

19    the car, right?

20    A    Yes.

21    Q    So for what reason were you keeping Mahaffy in the

22    car for five to ten minutes?

23    A    We were still working on the crowd.  We placed him in

24    there, and we got back out and were continuing to

25    deal with the unruly crowd.

1    Q   Okay.  And because Kroll told you that you had gotten

2          the right guy, I assume that's one reason why you

3          handcuffed him and put him in the car, right?

4    A   Yes.

5    Q   So Kroll told you that, but you didn't ask anybody

6          else at that time what had happened or what they had

7          observed?

8    A   I think we were just so focused on the chaotic

9          situation, that we were attempting to get that under

10        control.

11    Q   So the answer is that you did not ask anybody else

12        what they had observed?

13    A   No.

14    Q   I've got to clarify the answer because I think I

15        asked the question in a way that your no might be

16        contradicting it.  Are you saying that you did not

17        ask anybody else on the scene other than Kroll what

18        it was that had happened, is that true?

19    A   Yes.

20    Q   And eventually you did transport Mr. Mahaffy down to

21        booking, right?

22    A   Yes.

23    Q   And prior to transporting Mahaffy to booking, did you

24        talk to anybody other than Kroll about what had

25        happened at the incident?

1   A    I do remember talking to the owner of Dusty's Bar and

2        Grill, and he was more upset about that there was an

3        incident outside.

4   Q    Do you recall anything he said?

5   A    No.

6   Q    Do you recall whether he was saying that he had

7        witnessed anything that had any bearing on what you

8        were doing?

9   A    No.

10  Q    Eventually Mr. Mahaffy was placed under arrest,

11       right?

12  A    Yes.

13  Q    Now, where is the transition point where he's just

14       being handcuffed and held in the car and when he's

15       under arrest, in your mind?

16                MS. FUNDINGSLAND:   Well, I'm going to

17       object as far as that calls for a legal conclusion.

18                MR. DELAPLAIN:   I think you can answer,

19       if you know.

20                THE WITNESS:   He was placed under arrest

21       when we handcuffed him.

22  Q    And when you had handcuffed him, what were you

23       placing him under arrest for?

24  A    Well, at that point, assault.  He had not assaulted

25       him yet, but I believe that's what was going to

43

1        happen.

2    Q    So you placed Mahaffy under arrest for assault based

3          on your observations of Mahaffy walking quickly

4          towards Kroll?

5    A    Yes.

6    Q    And how did Kroll's identification of Mr. Mahaffy

7          factor into your arrest of Mr. Mahaffy?

8    A    It confirmed that he was involved with the assault

9          previous to our arrival.

10   Q    With what assault?

11   A    That he had assaulted Sgt. Kroll.

12   Q    So Sgt. Kroll told you that Mahaffy had assaulted

13         Kroll?

14   A    Kroll informed me that Mahaffy had assaulted him.

15   Q    And did Kroll describe to you what he said was an

16         assault by Mahaffy against Kroll?

17   A    No.

18   Q    He just said, "That guy assaulted me"?

19   A    Yes.

20   Q    Now, at the bottom of your report you say, "We then

21         transported AP-1 to HCJ," which is the Hennepin

22         County Jail, right?

23   A    Yes.

24   Q    And AP-1 is referring to Mahaffy, "for PC-assault 4,

25         and PC-inciting a riot, and that means probable

1  cause, is that right, am I reading that right?

2  A  Yes.

3  Q  Now, what is assault 4?

4  A  It is an assault on a law enforcement officer.

5  Q  So you transported him because you believed there was

6  probable cause to charge him with assaulting a police

7  officer and inciting a riot?

8  A  Yes.

9  Q  And was that your determination or your call, that

10  statement of probable cause, to bring him to the

11  Hennepin County Jail?

12  A  We had to contact a supervisor to get that type of

13  authority to arrest him.  Probable cause needs to

14  have authorization from a supervisor.

15  Q  Can you recall what supervisor you contacted?

16  A  No.

17  Q  Now, as far as assault 4 or inciting a riot, the

18  probable cause for that would have been based on

19  statements that Kroll gave you about what happened

20  prior to you arriving, right?

21      MS. FUNDINGSLAND:    I'm going to object as

22  a mischaracterization of the witness' testimony at

23  this point.

24      MR. DELAPLAIN:    I didn't characterize his

25  testimony in any way.

45

1          MS. FUNDINGSLAND:    Yes, you did.

2          MR. DELAPLAIN:    I think you can answer if

3    you understand the question.

4          THE WITNESS:    Yes.

5    Q    Now, in regard to the damage to Sgt. Krueger's

6    vehicle, did you yourself look or see any damage on

7    Sgt. Krueger's vehicle?

8    A    No.

9          MR. DELAPLAIN:    I'm just going to real

10   quickly for myself take a moment to flip through your

11   Civilian Review Authority statement and see if I have

12   any follow-up questions about what you said there.

13   So if you can bear with me for a moment, I'd

14   appreciate it.

15                    (Hanson Deposition Exhibit 2

16                     marked for identification)

17   Q    Officer Hanson, I'm showing you what's been marked as

18   Deposition Exhibit No. 2.  Do you recognize that

19   document?

20   A    Yes, it's a copy of the Civilian Review report.

21         MR. DELAPLAIN:    I have a copy for you,

22   Ms. Fundingsland.

23         MS. FUNDINGSLAND:    Thank you.

24   Q    I'd ask you to turn to the last page of the 13-page

25   document.  I'd ask you to turn to the last page.  Is

1          that your signature on the bottom line there?

2    A     Yes.

3    Q     All right.  And it's dated 11-28-04?

4    A     Yes.

5    Q     And do you recall giving this statement to the

6          Civilian Review Authority?

7    A     Yes.

8    Q     And is this one of the documents you had a chance to

9          review in preparation for your deposition today?

10   A     Yes.

11   Q     And do you believe that this statement is a true and

12         correct transcription of what you said to the

13         investigator that day?

14   A     Yes.

15   Q     And that everything contained within the statement is

16         true and correct?

17   A     Yes.

18   Q     Now, I want to ask you a couple questions about

19         what's said in this statement, just to clarify that

20         in comparison to the supplemental and your testimony

21         here today.

22               At the bottom of page two, if I could

23         direct your attention to page two, at the very bottom

24         you're referring to when you first got out of your

25         car, I believe, "And I saw at that point in time

1        Sgt. Kroll, Bob Kroll, he's one of the Federation

2        guys. I've known -- one of the important guys in the

3        police department." Do you see where it says that?

4   A    Yes.

5   Q    And then you say, "I saw him immediately under -- he

6        had his regular clothes on. I saw that he was

7        involved with a fight." So by saying he was involved

8        with a fight, are you describing anything different

9        than you described here today?

10  A    No.

11  Q    Okay. So what you described here is, "I saw that he

12       was involved with a fight." Is it your observation

13       of him doing something similar to what an offensive

14       lineman would do when they were blocking on a pass

15       play, he's just holding people at bay and backing

16       away from them?

17  A    It appeared that that was a fight, to me.

18  Q    But at that time, what you observed, you didn't

19       observe anybody throwing punches?

20  A    No.

21  Q    Is that an, "I saw nobody throwing punches," is that

22       true, is that what you're seeing?

23  A    They were just running at him.

24  Q    And then on the next page in the third question down,

25       the investigator asks, "How many people did you see?"

48

1      and then on the second line you say -- well, what you

2      say is, "That I don't know.  I thought it was

3      multiple people.  It seemed like when we arrived it

4      was chaos, in my eyes.  That it was more than a

5      one-on-one fight.  It was multiple people."

6              So when you say that, are you describing

7      that there was multiple fights going on like multiple

8      hot spots going on when you arrived or are you just

9      saying there was this one hot spot going on between

10     Kroll and the people who you say were advancing on

11     him out into the street?

12  A   I was so focused on Kroll at that point that -- I do

13     remember a lot of people being in the area, but I

14     just remember being focused on Kroll and the people

15     running after him.

16  Q   Now, on page four on the third question up from the

17     bottom, you say that you observed that there was a

18     female in the truck.  And that's Krueger's truck,

19     right?

20  A   Yes.

21  Q   Do you remember the female that was in the truck ever

22     getting out of the truck?

23  A   No.

24  Q   On the scene do you recall ever seeing her out of the

25     truck?

1    A    No.

2    Q    Then two questions down, starting on the bottom of

3         page four and continuing onto page five, the

4         questioner is asking, "Okay.  And this group of

5         people if Sgt. Kroll trying to get his space and

6         everything, do you think they were in the street or

7         were they on the sidewalk, do you have a recollection

8         of that?" and your answer there was, "It ended up

9         going into the street."

10             So my follow-up question to that is you've

11        described Sgt. Kroll backing into the westbound lane

12        of Marshall Street Northeast with these individuals

13        coming towards him.  Where did your observations

14        start out?  Was he actually up on the curb or on the

15        sidewalk when you arrived and you watched him come

16        off the sidewalk into the westbound lane of the

17        street, or was he already out into the street when

18        you arrived?

19    A    He was already out into the street.  I think when you

20        read it it doesn't depict on how I was attempting to

21        -- I was trying to paint a picture to this Civilian

22        Review gentleman, and by saying it ended up going

23        into the street, I was just trying to give him an

24        idea that the fight was in the street.

25    Q    I understand.  I just wanted to clarify and pin that

1  down to make sure that that's what you were saying.

2  (Off the record discussion)

3  (Recess)

4  MR. DELAPLAIN:   We're back on the record

5  after a short break, and I'm just going to keep going

6  through a couple of these points of the statement

7  that you've given to the Minneapolis Civilian Police

8  Review Authority.

9  Q  Now, on page five, and we were on page five, down in

10  the next to the last paragraph you're talking about

11  the first interaction with the woman which you

12  earlier described as your tackling the woman, and in

13  your statement to the Civilian Police Review

14  Authority -- I'll just say Civilian Review from here

15  on out.

16  MS. FUNDINGSLAND:   CRA.

17  MR. DELAPLAIN:   CRA.  I'll try to

18  remember that.

19  Q  You say, "I observed a female -- Sgt. Kroll was

20  facing the other way and a female was about to grab

21  onto him behind and I pushed her out of the way and

22  she fell to the ground.  I felt like she was going to

23  attack Sgt. Kroll so I pushed her to the ground."

24  Now, when I was asking about that earlier,

25  I understood you to say it wasn't that he was facing

1      the other way, but that she was one of the people

2      that was going towards him, that he was facing her.

3   A   Yes.  I got confused with that one.  I did tackle her

4      to the ground, and she was one of the individuals

5      going after him.

6   Q   Okay.  So you think what you said today is correct if

7      it's a little bit different than what was said in the

8      statement?

9   A   Well, when I said on there, "She fell to the ground,"

10      I felt like she was going to attack so I pushed her

11      to the ground.  What I was meaning is the tackling,

12      the push to the ground.

13   Q   Okay, and I understand that, and actually that's

14      clarified by the interviewer later in transcript, but

15      what I'm focusing on is that, "Sgt. Kroll was facing

16      the other way and a female was about to grab onto him

17      from behind."  So that's what I was asking about,

18      that statement, because it seems to me like it

19      contradicts a little bit what you stated earlier that

20      she was one of the people that was advancing upon

21      him, so he would have been looking at her.

22              MS. FUNDINGSLAND:   Was that a question?

23              THE WITNESS:   I'm thinking.

24              MR. DELAPLAIN:   I saw that.

25              THE WITNESS:   I must have got confused on

1    that one.  She was one of the individuals that was

2    coming towards Sgt. Kroll.

3  Q  Okay.  So you think he was facing her and she was

4    coming at him from the front.

5  A  I believe that's what was happening.

6  Q  Now, one thing that I noticed is that your partner,

7    Officer Bennett, described in his statement that he

8    looked back and saw that you had taken two people

9    down to the ground.  Did you review his statement

10    before your deposition?

11  A  Briefly.

12  Q  Do you remember him making reference to that?

13  A  No.

14  Q  And it's a little bit marked up, but it's my copy of

15    the supplemental of Officer Bennett, and that was

16    attached to the police report, so I believe that's

17    something you might have reviewed prior to the

18    deposition.  Did you review the whole police report

19    prior to the deposition?

20  A  I think I ran through it last night.

21        MS. FUNDINGSLAND:    Just a second.  What

22    do you mean by the whole police report?

23        MR. DELAPLAIN:    I guess I'm referring to

24    what I got is what I consider the whole police

25    report.  It's titled on the top MPD CAPRS Case Report

1    with Supplements, MP-04-115690, and it's a 16-page

2    document, although the one I'm referring to is the

3    Supplemental of Officer Bennett, page 10 of 16, and I

4    think -- can you hand me Exhibit 1 there real quick?

5    I think what is Exhibit 1 in this deposition, the

6    Supplemental Statement of Officer Hanson, is page 9

7    of 16 of that report.

8              MS. FUNDINGSLAND:    So are you asking him

9    if he reviewed everybody's supplements?

10             MR. DELAPLAIN:    I'm asking him if he

11   reviewed the report, and I think he said he skimmed

12   through it.

13             THE WITNESS:    Not entirely.

14   Q    Now, here in Officer Bennett's supplement he says --

15        well, I'll read this third paragraph:  "As I

16        responded to aid Kroll, I pushed several males away

17        and told them to get back.  We then created some

18        space in between ourselves and the unruly crowd.

19        Just then I saw my partner with two people down on

20        the ground nearby, and then Kroll stated to me,

21        pointing at AP-1, "That's the guy that assaulted us."

22             And then I see the same thing in his

23        statement to the Civilian Review Board, he references

24        that he looks -- I think he looks back and sees that

25        you've got two guys on the ground.  Do you recall

1    recall taking two guys down?

2              MS. FUNDINGSLAND:    I'm sorry, does his

3    supplement say two guys?

4              MR. DELAPLAIN:    It says two people down

5    on the ground nearby.

6              MS. FUNDINGSLAND:    Okay.

7              THE WITNESS:    Gosh, I really think that

8    he was referring to the female and then Mahaffy.   I

9    did not at one point have two down at the same time,

10   no.

11   Q   Now here I guess is where I got the two guys.   I'll

12       quickly refer to Bennett's statement to the CRA.

13       Real quickly I'll reference what he said on page

14       four.   I don't know whether you reviewed these or

15       not, but here's from the Civilian Review Authority

16       how he described that was.

17              "My partner ended up having that guy," he's

18       referring to Mahaffy, "down on the ground behind me."

19       And then he says, "Actually, he had two guys down on

20       the ground, and they kind of -- I'm not sure how he

21       got them down, if they went down or if he put -- I

22       don't know, I wasn't looking, but he had a couple --

23       a guy or two on the ground, and then I heard

24       Sgt. Kroll say, 'That's the guy right there,' that

25       initially attacked him.   And so I quick -- you know,

1        I pushed a couple guys back so I had some space

2        between me and the crowd.  So then I went and

3        assisted my partner in handcuffing this AP."

4               And I'm just bringing it up to see if you

5        remember there being a couple of guys that you had

6        down.

7  A    I definitely brought two people down to the ground in

8        the whole incident, a female who was never named and

9        Mahaffy.

10  Q    But the way you described it earlier, when you

11        brought down the female, then she went back into the

12        crowd, I know from your report that's what you say,

13        and then other officers were arriving and then this

14        incident happened where you tackled Mahaffy.

15  A    Yes.

16  Q    And so you don't remember there being another

17        individual that was involved in your taking down of

18        Mahaffy?

19  A    No.

20  Q    And so by Officer Bennett's description, it seems

21        like he's describing it when you got out of the car

22        and you went northwest on Marshall Street from your

23        car towards where Kroll was, that Bennett was in

24        front and you were kind of behind Bennett.  Is that

25        accurate or do you remember?

1                MS. FUNDINGSLAND:    Are you asking him if

2      it's accurate that Bennett said that or is it

3      accurate that that's what happened?

4                MR. DELAPLAIN:    Accurate that that's what

5      happened.

6                THE WITNESS:    I don't remember who was

7      first.

8  Q    Now, still on page -- I guess I'm on page seven of

9      your statement to the CRA.  In about the middle of

10     the page you reference that you placed Mahaffy in the

11     squad car, and then you do crowd control.  You don't

12     say that, but that's that you're describing.  And

13     then you say, "They were very angry at us.  The scene

14     got out of control so we tried to work on keeping

15     everybody okay.  Tried to figure out what happened

16     here."  Now, what did you do to try to figure out

17     what had happened?

18  A    Well, at that point I think when I say what happened

19     here, I think I was just trying to get an idea, you

20     know, for my own -- you know, I just wanted to find

21     out how this incident occurred.  It was a chaotic

22     situation so, you know, we were trying to calm

23     everyone down so we could have some peace.

24  Q    And when you said you were trying to understand how

25     this situation occurred, and I understand from your

1   testimony earlier that you're saying you didn't talk

2   to anybody other than Kroll who might have been a

3   witness to the incident, what were you doing to try

4   to understand how the situation occurred?

5   A   I think I was just trying to get the whole group of

6   people under control.  Like I said, when we showed

7   up, it was chaotic, it was complete chaos.  So our

8   job at that point was trying to sort out the crowd

9   and try to get everything under control.

10  Q   Now, if you respond to a fight call, if there's a

11  normal to it, wouldn't it normally be part of your

12  job to talk to witnesses to determine what had

13  happened?

14  A   Yes.  However, the people were so upset and unruly, I

15  don't think I would have gotten any cooperation from

16  them.

17  Q   So in, let's say, a normal fight call, you would

18  consider part of your job duty to ask witnesses to

19  describe what had happened?

20          MS. FUNDINGSLAND:   Objection, asked and

21  answered.

22          MR. DELAPLAIN:   You can answer.

23          THE WITNESS:   In the perfect situation,

24  that's what we try to do.

25  Q   And you didn't do that in this situation.

1   A   It was impossible to do at that time.

2   Q   Now, on the next page, on page eight, and I had asked

3       you about this earlier and I honestly wasn't trying

4       to trip you up on this, but I kind of remembered this

5       when I asked you this question earlier.  But on page

6       eight on the third question down or second question,

7       second full question, the investigator asked you,

8       "Anyway, were the people accusing Sgt. Kroll and/or

9       Sgt. Krueger of being in the wrong?"  Do you see

10      where it says that?  It's the third answer.

11              MS. FUNDINGSLAND:    It starts with, "I've

12      got."

13              THE WITNESS:    Okay, okay.

14              MR. DELAPLAIN:    Yes, the second question.

15      "Anyway, were the people accusing Sgt. Kroll or

16      Sgt. Krueger of being in the wrong?" the investigator

17      asked you, and your answer here was, "Yes.  Yes.  Oh,

18      definitely.  They weren't real happy with how that

19      started and how it evolved and things like that.  We

20      didn't find out how it -- what happened until we went

21      to a different location and we gathered up and we

22      finally heard this is what happened."

23              And I know it's been a long time ago, but

24      when I was asking you earlier about whether you could

25      get any indication from the crowd about what they

1    were unhappy or angry about towards the police, you

2    didn't recall.  Now, does this refresh your

3    recollection at least that the crowd was expressing

4    some -- well, accusing Kroll and Krueger of being in

5    the wrong?

6  A  I think when I answered that earlier, I don't

7    remember specifically what people were saying.  I was

8    so consumed by them being unhappy, I can't really say

9    exactly what anybody was saying.

10 Q  Okay.  But beyond remembering the specifics of what

11   people's exact statements were here, do you recall

12   that the gist of it was that there were members of

13   the crowd expressing to you that Kroll and Krueger

14   were in the wrong?

15 A  Not specifically, but there were people upset with

16   them.

17 Q  So when you answered this question in 2004, and the

18   investigator said, "Anyway, were the people accusing

19   Sgt. Kroll or Sgt. Krueger of being in the wrong?"

20   and you said, "Yes.  Yes.  Oh, definitely," are you

21   saying something different now?

22 A  No, I just was pointing out that -- when I said,

23   "Yes.  Yes.  Oh, definitely," there were people

24   upset.  It was a very tense situation, and it

25   appeared that there was a group that were against or

1     upset with what had occurred.  And I didn't get into

2     specifics with them because it was an unmanageable

3     group and I didn't interview any of them.

4  Q  But at least here, you were aware that the people

5     were accusing Kroll and Krueger of being in the

6     wrong, right?

7  A  I'm not sure if they were -- like I said, there was a

8     lot of angry people, and they were angry at them

9     specifically, but I was not able to get from them

10    what they were upset about.

11 Q  Were you able to get from them that somehow Kroll and

12    Krueger were in the wrong?

13 A  No, not specifically they were in the wrong, but that

14    they were involved in an incident where there was an

15    assault, there was some chaos.

16 Q  I'm having a hard time in my mind reconciling your

17    answer here to what you said, "Yes.  Yes.  Oh,

18    definitely," in your statement.

19              MS. FUNDINGSLAND:    Is that a question?

20              MR. DELAPLAIN:    Can you clarify that for

21    me?

22              MS. FUNDINGSLAND:    I think you've got to

23    be more -- clarify what?

24              MR. DELAPLAIN:    The difference between

25    what he's saying now, which he appears to me to be

1    saying that he is unaware of any reason or that

2    people were accusing Kroll and Krueger of anything,

3    and then in his Civilian Review statement when he was

4    asked that, he says, "Yes.  Yes.  Oh, definitely."

5    It seems like now he's saying he didn't know what

6    they were mad about.

7          MS. FUNDINGSLAND:    But you need to ask

8    him a question that he can answer.

9          MR. DELAPLAIN:    Well, I did ask him to --

10   I said I understand -- I forget which word I used,

11   but I said it doesn't seem consistent to me, and I

12   asked him if he can clarify for me why there's a

13   difference today as compared to what your answer was

14   to the investigator for this Civilian Review

15   Authority.

16         MS. FUNDINGSLAND:    I think he's tried to

17   clarify it, and I don't think there is a difference.

18         THE WITNESS:    That's what I'm trying to

19   say, is, yes, I couldn't begin to tell you at that

20   time what they were upset about.  It was just that

21   they were upset about some actions from Sgt. Kroll

22   and Krueger.

23   Q    So the question of the investigator was, "Anyway,

24        were the people accusing Sgt. Kroll and Sgt. Krueger

25        of being in the wrong?" and your answer starts out,

1   "Yes.  Yes.  Oh, definitely," you're not changing

2   that, right?

3            MS. FUNDINGSLAND:    Excuse me, but that's

4   only part of his answer to the --

5            MR. DELAPLAIN:    That is what I said, I

6   said the answer starts out with, "Yes.  Yes --"

7            MS. FUNDINGSLAND:    But I think you need

8   to put it in context of the entire answer that he

9   gives at the time.

10            MR. DELAPLAIN:    Okay, let's put it in

11   context.

12            MS. FUNDINGSLAND:    Let's do that.

13            MR. DELAPLAIN:    What it says after that

14   is, "They weren't real happy with how that started

15   and how it evolved and things like that."  So explain

16   to me what it was --

17            MS. FUNDINGSLAND:    But that's not the end

18   of his answer, counsel.

19            MR. DELAPLAIN:    Okay, let's read the

20   whole answer.  Let's read the whole question.

21            "I've got his statement or somebody got his

22   statement," and that's referring to the owners of

23   Dusty's.  "Anyway, were the people that were accusing

24   Sgt. Kroll and/or Sgt. Krueger of being in the

25   wrong?"  And the answer is, "Yes.  Yes.  Oh,

1    definitely.  They weren't real happy with how that

2    started and how it evolved and things like that.  We

3    didn't find out how it -- what happened until we went

4    to a different location and we gathered up and we

5    finally heard this is what happened.  'Cause as far

6    as we knew, there were cops drinking inside Dusty's

7    and a fight started.  But it was a lot more than

8    that."  Do you see where that's your answer?

9    A    I think the way I understood the question was back

10        then were there people upset with the behavior of

11        Krueger and Kroll, and they were.

12   Q    And how were they indicating that to you?  How did

13        you know they were upset with the behavior of Krueger

14        and Kroll?

15   A    Just by their anger towards us.

16   Q    And in your answer, you say as part of your answer,

17        "They weren't real happy with how that started and

18        how it evolved and things like that."  That answer

19        suggests to me that you at least had some awareness

20        of the crowd expressing displeasure at how the whole

21        thing started and how it evolved, right?

22   A    I didn't know exactly what happened, but from what I

23        had gathered I assumed at that point -- I assumed

24        that there was some type of altercation, and it

25        appeared that these were Mahaffy's friends or a group

64

1        that he was with.

2    Q   So you didn't undertake any type of inquiry or

3        investigation to ask these people why it was they

4        were saying Kroll and Krueger were in the wrong?

5    A   I couldn't get that information from them.

6    Q   Did you attempt to get that information from them?

7    A   No, not at that point.  They were too upset with us.

8    Q   And you didn't find out -- this is the rest of your

9        answer.  "We didn't find out how it -- what happened

10       until we went to a different location and we gathered

11       up and we finally heard this is what happened."  Now,

12       at that other location all you heard about what

13       happened was what Kroll's version of what happened

14       was, right?

15    A   Correct.

16    Q   And at that time you didn't even ask Jackson Mahaffy

17       what had happened, did you?

18    A   No, but he was very apologetic.

19    Q   When you described Jackson Mahaffy, you described him

20       as walking quickly towards Kroll, right?

21    A   Yes.

22    Q   And aggressively.

23    A   Yes.

24    Q   And I know I asked you earlier, but I want to see if

25       there's any additional information on what it was,

1          other than walking towards Kroll, that you claim that

2          Mahaffy was doing that was aggressive.

3   A   I just observed him walking very quickly, and he

4          seemed focused on Kroll.

5   Q   But then when you tackled him, and then further in

6          your car, he was polite and cooperative?

7   A   Yes.   I assume he knew he made a mistake.

8   Q   But you never asked him what his version of what

9          happened was, right?

10              MS. FUNDINGSLAND:    Objection, asked and

11          answered.

12   Q   Now, you said that as far as taking Mr. Mahaffy to

13          the Hennepin County Jail for the PC Assault 4 and PC

14          Inciting a Riot, that that would have required some

15          authorization from a higher-up?

16   A   Yes.

17   Q   But you don't recall who that was?

18   A   No.

19   Q   How do you get that authorization, do you just call

20          it out over the radio and give a description of what

21          happened or is that done down at Hennepin County?

22   A   Over the radio we talk to the supervisor and explain

23          the situation and get the authority.

24   Q   And it's all verbal, or at that time did you have a

25          computer keyboard that you would type information

| | | |
|---|---|---|
| 1 | | into for that procedure? |
| 2 | A | Always verbal. |
| 3 | Q | And would it have been you that was talking to the |
| 4 | | supervisor to get the authorization? |
| 5 | A | That I don't know. |
| 6 | Q | Would it have been either you or Officer Bennett? |
| 7 | A | Yes. |
| 8 | Q | Now I'll show you the front page of what I described |
| 9 | | earlier as the police report, and down in this |
| 10 | | paragraph right where it has the complainant's |
| 11 | | signature and notary signature stamp, if you'd review |
| 12 | | that paragraph. |
| 13 | A | Okay. |
| 14 | Q | Although this one isn't signed, would this have been |
| 15 | | your language, that paragraph? |
| 16 | A | Yes. |
| 17 | Q | All right.  And is that paragraph prepared by what |
| 18 | | you communicate verbally or was it just something |
| 19 | | that was typed out later? |
| 20 | A | Verbally. |
| 21 | Q | So in regard to this incident, as I understand it, |
| 22 | | after you went over to the Grain Belt parking lot |
| 23 | | with Mahaffy and Bennett and Kroll and Krueger, then |
| 24 | | you over your police radio communicate with a |
| 25 | | supervisor, give them a description what is |

1    happening, and then they give you authorization to

2    take someone into the Hennepin County Jail based on

3    the description of what you gave.

4    A    Yes.

5    Q    And for this incident, the paragraph that we're

6    looking at there is the description that you had

7    given, is that right?

8    A    Yes.

9    Q    That clears up one question.  Then at the very bottom

10   it says, "PC authorized by Sgt. Johnson."  So is

11   Sgt. Johnson the one you would have been

12   communicating with on the radio that approved the

13   probable cause?

14   A    Yes.

15   Q    And in the statement that's on this page, in the

16   description it says, "The victims exited the vehicle

17   and attempted to apprehend AP-1 for this offense."

18   Now, in that paragraph, the victims, you're referring

19   to Kroll and Krueger right?

20   A    Yes.

21        MS. FUNDINGSLAND:    I think, counsel, if

22   you're going to read from something, why don't we get

23   that marked for the record.

24        MR. DELAPLAIN:    I'll do that.  I'm also

25   trying to find an extra copy or two here.

68

1          (Hanson Deposition Exhibit 3

2           marked for identification)

3     Q     So showing you what's been marked as Exhibit No. 3,

4           Officer Hanson, is this the document that we were

5           just referring to that contains the paragraph at the

6           bottom that is a recitation of the statement you had

7           given to the supervising officer in regard to?

8           Mr. Mahaffy?

9     A     Yes.

10    Q     And maybe two-thirds of the way down in the

11          description of the event, it says, "Victims exited

12          the vehicle and attempted to apprehend AP-1 for this

13          offense."  And by that you're referring to Kroll and

14          Krueger, correct?

15    A     Yes.

16    Q     And AP-1 is Mahaffy, right?

17    A     Yes.

18    Q     So then you say, "AP-1 then began to assault Victims

19          1 and 2 and called over a group of onlookers to

20          participate in this assault."

21    A     Yes.

22    Q     And then it says, "When officers arrived, AP-1 was

23          pointed out and apprehended," right?

24    A     Yes.

25    Q     And is the source for your statement here solely the

1    information that was given to you by Sgt. Kroll?

2 A Yes.

3 Q Now, that entire evening did you see anyone punch

4    either Sgt. Kroll or Sgt. Krueger?

5 A No.

6 Q Did you see anybody otherwise physically strike

7    Sgt. Kroll or Sgt. Krueger?

8 A No.

9 Q Did you see anybody kick Sgt. Kroll or Sgt. Krueger?

10 A No.

11 Q And did you see Sgt. Kroll make physical contact with

12    anybody?

13 A No.

14 Q Did you see Sgt. Krueger make physical contact with

15    anybody?

16 A No.

17     MR. DELAPLAIN: I don't have any further

18  questions.

19     MS. FUNDINGSLAND: We'll read and sign.

20     MR. DELAPLAIN: Wait, before we go, I do

21  want to mark -- I'd also like the court reporter to

22  mark the diagram of the area as Exhibit 4.

23     (Hanson Deposition Exhibit 4

24     marked for identification)

25 (The matter was adjourned at 12:00 Noon on September 22, 2009)

SIGNATURE OF WITNESS:

       BE IT KNOWN THAT I, the undersigned deponent, have read the within transcript of my deposition testimony and believe the same to be true and correct, except as follows:

_____     _____
Aaron C. Hanson                        Dated
Mahaffy, et al vs. Kroll, et al

Page: Line: Correction and Reason Therefor:
___ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

LT
Please return to:  Ask, Trondson & Smith Court Reporters
                     701 Fourth Avenue South - Suite 500
                     Minneapolis, Minnesota   55415

STATE OF MINNESOTA        )
                          ) ss:
COUNTY OF HENNEPIN        )

BE IT KNOWN THAT I, Linda J. Trondson, the undersigned, a duly commissioned and qualified Notary Public within and for the County and State aforesaid, do hereby certify that before the giving of his/her deposition, the said witness was by me first duly sworn upon his/her oath to depose the whole truth and nothing but the truth; that the foregoing is a true and correct transcription of the stenotype notes taken by me at said deposition; that I am not an employee, attorney, or relative of any of the parties to the cause; that I am not an employee, attorney or relative of any counsel to the cause; that I have no interest whatever in the result of the action nor am I financially interested in the action; that I do not have a contract with any of the parties, counsel for any of the parties or any person with an interest in the action that affects or has a substantial tendency to affect my impartiality.

WITNESS MY HAND AND SEAL this 25th day of September, 2009.

Linda J. Trondson
Notary Public,
Hennepin County, Minnesota
My commission expires January 31, 2010