1

```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MINNESOTA

 3      ---------------------------------------------------------

 4      Jackson Mahaffy; Flora Mahaffy;
        Daniel Nelson; and Paul Von Arx,
 5
                      Plaintiffs,
 6
        vs.                              Case File No. 08-cv-4992
 7                                               JMR/SRN
        Robert J. Kroll; Wallace M.
 8      Krueger, Christopher J. Bennett;
        Aaron C. Hanson; Christopher
 9      Bishop; David Campbell; Toddrick
        Kurth; Brandon Kitzerow; James
10      Rugel; Clark Goset; and Mark
        Durand, all acting in their
11      individual capacity as
        Minneapolis Police Officers;
12      and the City of Minneapolis,

13                    Defendants.

14      ---------------------------------------------------------

15
                      Videotaped Deposition of
16
                         ROBERT J. KROLL
17
                        November 6, 2009
18                         9:00 a.m.

19                          Volume I

20


21
                      Linda J. Trondson, RPR, MR
22            Ask, Trondson & Smith Court Reporters
              701 Fourth Avenue South - Suite 500
23               Minneapolis, Minnesota   55415
                612-332-2603 *** 800-332-2603
24                 ats@atscourtreporters.com

25
```

B32

```
 1              Videotaped Deposition of Robert J. Kroll taken
        on the 6th day of November, 2009 commencing at
 2      approximately 9:00 a.m. at the Offices Ask, Trondson &
        Smith Court Reporters, Suite 500, 701 Fourth Avenue South,
 3      Minneapolis, Minnesota, 55415, before Linda J. Trondson,
        Notary Public, County of Hennepin, State of Minnesota, to
 4      be used in the above-entitled matter.

 5                    APPEARANCES:

 6              JAMES W. DELAPLAIN, Attorney at Law,
        2140 Fourth Avenue North, Anoka, Minnesota, 55303,
 7      and,

 8              DANIEL J. BRAZIL, Attorney at Law,
        2124 Dupont Avenue South, Minneapolis, Minnesota,
 9      55405, appeared on behalf of the Plaintiffs.

10              C. LYNNE FUNDINGSLAND and DARLA BOGGS,
        Assistant City Attorneys, Office of the Minneapolis
11      City Attorney, Room 210, 350 South Fifth Street,
        Minneapolis, Minnesota, 55415, appeared on behalf of
12      the City of Minneapolis.

13              KARIN E. PETERSON, Attorney at Law, Rice,
        Michels & Walther, LLP, 10 Second Street Northeast,
14      Suite 206, Minneapolis, Minnesota, 55413, appeared on
        behalf of Robert J. Kroll and Wallace M. Krueger.
15

16

17

18

19

20

21

22

23

24

25
```

3

1                          ROBERT J. KROLL,

2        being first duly sworn, testified as follows:

3                              EXAMINATION

4        BY MR. DELAPLAIN:

5        Q    Good morning, Lt. Kroll.  As I said on the record, I

6             represent the plaintiffs in regard to a case that has

7             been brought against the City of Minneapolis and

8             yourself as one of the defendants regarding an

9             incident that occurred on May 14th, 2004, in the area

10            of Dusty's Bar and the Old Science Renovation

11            Factory, and I'm going to try to move quickly through

12            this deposition for everybody's benefit, and I'm

13            hoping we can work together on just getting through

14            some background information.

15                 Did you graduate from a Minnesota high

16            school?

17       A    Yes.

18       Q    And where was that?

19       A    Harding High School in St. Paul, Minnesota.

20       Q    And what year was that?

21       A    1983.

22       Q    And did you attend any education after high school?

23       A    Yes.

24       Q    And what type of education have you achieved since

25            high school?

4

```
 1    A    I have an Associate of Arts degree from Lakewood

 2         Community College, now it's Century College, in White

 3         Bear Lake, Minnesota, and I have a Bachelor of

 4         Science degree from St. Mary's University in

 5         Minneapolis.

 6    Q    In what year did you obtain the Associate of Arts

 7         degree?

 8    A    '87.

 9    Q    And how about the Bachelor of Science?

10    A    2004.

11    Q    Beyond those degrees, do you have any other degrees

12         or certificates from an educational institution?

13    A    Several military, on Reserve.  Other than that, no.

14    Q    Were you ever in the active military?

15    A    No.

16    Q    And did you say you're in the Reserve?

17    A    I was.  I retired after 21 years.

18    Q    And I understand you work for the Minneapolis Police

19         Department.  Prior to your employment with the

20         Minneapolis Police Department, have you worked for

21         any other law enforcement organization?

22    A    No.

23    Q    Do you teach any classes or give instruction

24         yourself?

25    A    Currently I just teach at the Citizens' Academy.  In
```

```
 1            the past I've taught many classes.
 2   Q    Can you describe to me what those many classes are
 3        that you've taught in the past?
 4   A    Well, in the military I was a Military Police
 5        Instructor for nine years.  I taught civil
 6        disturbance, riot control, building clearing,
 7        military operations in an urban terrain, leadership
 8        courses.  I've got a lengthy military file with
 9        regard to instruction.  I'm sure I'm missing quite a
10        bit.
11   Q    Have you ever taught classes within the Minneapolis
12        Police Department?
13   A    Yes, fairly extensive also.
14   Q    Can you name some of those classes that you've
15        taught?
16   A    Various courses in SWAT.  Again, crowd control,
17        building clearing, civil disturbance.  I've taught
18        various classes in SWAT operations, I've taught
19        various classes in union work.  I assisted at
20        training many years ago in Officer Survival Week.
21        Again, SWAT courses through other agencies.  It's
22        lengthy.
23   Q    And when were you first hired by the Minneapolis
24        Police Department?
25   A    1989.
```

1  Q  And can you just give me briefly an overview of how

2     your career progression has gone and what your

3     postings have been since 1989?

4  A  I was a recruit in '89.  I worked the 4th Precinct,

5     the 5th Precinct and 3rd Precinct patrol.  I then

6     worked undercover vice.

7            I was promoted to sergeant in '95.  I

8     worked as an investigator in the Juvenile Division

9     and the Fraud Forgery Unit.  I worked as a unit

10    supervisor in the Public Housing Unit, the Booking

11    Unit, the Waterworks Unit.  I worked as a patrol

12    Supervisor in the 3rd Precinct, and STOP, which was

13    the full-time version of SWAT's strategic tactical

14    operations.

15           I was promoted to Lieutenant three and a

16    half years ago, so that would be 2005, May of -- or

17    June of 2005, promoted and detailed temporarily as a

18    Lieutenant in my current assignment in STOP or

19    full-time SWAT, then permanently promoted to

20    Lieutenant in the 2nd Precinct patrol, and about a

21    month ago reassigned to command the Domestic Assault

22    Unit.

23  Q  I'm sorry, command --

24  A  The Domestic Assault Unit.

25  Q  Is that within any certain precinct or is that --

```
 1    A    No, that's at headquarters in the Criminal

 2         Investigation Division.

 3    Q    And prior to May, 2004, did you know Wallace Krueger?

 4    A    Yes.

 5    Q    And when did you first meet Sgt. Krueger?

 6    A    Approximately when I first got on SWAT, which was

 7         '91.

 8    Q    And did you become friends with Sgt. Krueger?

 9    A    Yes.

10    Q    Is he still your friend presently?

11    A    Yes.

12    Q    And you were on SWAT together in 1991, is that

13         correct?

14    A    Yes.

15    Q    What other assignments have you had while you were

16         working together?

17    A    I don't think we've ever been assigned in the same

18         position department-wise.  We've been on the union

19         board together.

20    Q    Are you still on the union board?

21    A    Yes.

22    Q    And what's your position?

23    A    Vice-president.

24    Q    And how long have you been vice-president of the

25         union?
```

```
 1      A    I think it's three to four years now.

 2      Q    And was Sgt. Krueger the vice-president immediately

 3           prior to you becoming vice-president, do you recall?

 4      A    Yes.  I was a director on the board, and he came on

 5           the board as a vice-president, and a few years back

 6           we switched roles, and he became a director and I

 7           became the vice-president.

 8      Q    Do you remember how many years ago it was that he

 9           became a director -- I'm sorry, that you were a

10           director and he became vice-president?

11      A    I've been on the board 13 and a half years, so I

12           guess I got on in '96, and I think Wally came on

13           around '98 or '99.

14      Q    And with the Federation, the union, what is your role

15           currently?  As vice-president, what do you actually

16           do?

17      A    There's various duties.  We do contract negotiations.

18           We represent officers in internal statements,

19           internal investigations, disciplinary proceedings.

20           I'm on the IOD committee, I'm on the uniform

21           committee.  There's several committees that we sit

22           on, oversee.  I'm chair of the personnel committee,

23           which entails the grievance committee, the uniform

24           committee, the IOD committee.

25      Q    What is IOD?
```

```
 1      A    Injured on duty.  We review cases that are submitted.

 2      Q    And in the scope of those duties you've described, is

 3           one of your duties with the Federation to sit with

 4           officers in, for example, Civilian Review

 5           investigation statements?

 6      A    Correct, yes.

 7      Q    And how many times would you estimate have you done

 8           that?

 9      A    Somewhere between a thousand and two thousand.  I'm

10           estimating.  I guess approximately a thousand.  I

11           mean I've been doing it for 13 years.  I probably do

12           50 a year, upwards of 50 a year.

13      Q    So you're familiar with the process.

14      A    Oh, yes.

15      Q    Do you also sit in Internal Affairs investigations,

16           do you represent officers?

17      A    Yes.  I should clarify.  That's a combination of

18           Civilian Review and Internal Affairs proceedings.

19      Q    Have you ever -- and the term you used, you used the

20           term representing an officer if you're sitting with

21           them?

22      A    Yes.

23      Q    Have you ever represented Sgt. Krueger in Civilian

24           Affairs or internal investigations?

25      A    I don't believe so, but that's not to say I haven't.
```

```
 1              Again, with the volume of people I've represented, I
 2              don't have a specific recollection of representing
 3              him.
 4      Q      How about one of the other co-defendants in this
 5              case, Officer Bennett, do you know if you've
 6              represented him in any Internal Affairs
 7              investigations or Civilian Review investigations?
 8      A      I can't say for sure.
 9      Q      How about Officer Hanson?
10      A      I can't say for sure.
11      Q      Officer David Campbell?
12      A      I can't say for sure.
13      Q      How about Officer Bishop?
14      A      Again, the same, I can't say for sure.
15      Q      So you have no recollection of representing any of
16              those officers in Internal Affairs investigations or
17              Civilian Review investigations, right?
18      A      Correct.  Nothing significant that sticks out.  Not a
19              major deal where, you know, there was any substantial
20              disciplinary action taken on any of them.
21      Q      Now, do you know all of those officers, all four of
22              them?
23      A      Yes.
24      Q      And did you know all four of those officers prior to
25              May 14th, 2004?
```

```
 1    A   I guess I knew who they were, but very vaguely.  We

 2        had never worked in the same -- I had never worked in

 3        the same assignments with any of those officers.  And

 4        I actually got to know all of them better because my

 5        last assignment where I was a lieutenant was in that

 6        2nd Precinct where most of those worked at that time.

 7        So since this incident we're discussing, I've got to

 8        know all of them better, and I would have known them

 9        by face, possibly by name, at the time of the

10        incident, but I'm not certain.

11    Q   Now, at the time of the incident you were a sergeant

12        in the 2nd Precinct, is that correct?

13    A   No.  I was a sergeant, and I don't remember what my

14        unit was at the time.  I want to say I was either in

15        the Waterworks Unit or STOP patrol, I don't remember

16        specifically which assignment.

17    Q   What do you do on the Waterworks?

18    A   That was a unit that was developed for Homeland

19        Security, the threat of terrorist activity at the

20        water treatment facility.  It was two-fold.  It was

21        at the height of, you know, terrorist alerts where

22        they took measures to secure the water treatment

23        because we supplied it for, you know, three counties

24        and seven cities, the Minneapolis water treatment

25        facility.  And in addition to that, it was a unit
```

1          that was formed up as a job saving measure to avoid

2          layoffs.  So we developed a unit that replaced

3          private security there, and I had about a dozen

4          officers that worked under me at that assignment.

5          There was a unit created for that.

6     Q    And how about STOP patrol?  Is STOP patrol

7          essentially SWAT?

8     A    Yes, it's a full-time patrol division, much like a

9          precinct, except its a citywide patrol and all the

10         officers assigned to it are members of the SWAT team,

11         and they can be pulled out of regular patrol to go

12         execute high-risk search warrants or to perform

13         other, you know, SWAT duties, a full-scale callout or

14         something like that, but they're a citywide uniformed

15         patrol function.

16    Q    When you're on STOP patrol, are you also still

17         assigned to some specific precinct?

18    A    No, you're citywide responsibility.

19    Q    Now, I understand on the night in question that you

20         were attending a party prior to the incident

21         involving Mr. Mahaffy.

22    A    Yes.

23    Q    And a party in Uptown somewhere, right?

24    A    Yes.

25    Q    Do you remember where that was?

```
 1    A    I know it was on Lagoon.  I can't remember the name

 2         of the establishment.  It was on Lagoon, near

 3         Hennepin.

 4              MS. PETERSON:    If we're going to get into

 5         the particulars of that incident like we did with

 6         Mr. Krueger, Sgt. Krueger, I'd like this under the

 7         confidential agreement that we had before, as this is

 8         still a disciplinary measure that has not resulted in

 9         the final disposition of a disciplinary measure, so

10         all of this should be under that protective order,

11         just as we did it for Mr. Krueger, or Sgt. Krueger.

12              MR. DELAPLAIN:    Okay, we'll acknowledge

13         that you've made a request that all of this be

14         protected by the protective order in the case.

15              MS. PETERSON:    What do you mean, you're

16         going to acknowledge that it will be protected by the

17         protective order?

18              MR. DELAPLAIN:    Well, that means that I

19         recognize that you're designating it as protected.

20         I'm not agreeing it is protected, but I am agreeing

21         that we have to abide by the order, whether it's

22         ultimately protected or not.

23              MS. PETERSON:    So you're saying that the

24         Court will decide whether this is under the

25         protective order or not?
```

1              MR. DELAPLAIN:    Yes.

2              MS. PETERSON:    You can raise your

3      objection, but under the Data Practices Act he has

4      the right, because it's not the final disposition of

5      this disciplinary matter, that everything that

6      revolves around this matter is private personnel data

7      and is not public, and is therefore subject to the

8      confidential order that we agreed to.  And if we need

9      go to court on that, we will go to court on that.

10             MR. DELAPLAIN:    Understood.

11             MS. PETERSON:    Before you start, all of

12     Lt. Kroll's answers from here on until we deem

13     otherwise I am putting under the confidential order

14     as private personnel data, and until such time as I

15     say that it is not protected by that, I want all of

16     his answers to be deemed to be under that

17     confidential, subject to the Court order.

18             COURT REPORTER:    Did you also want this

19     portion sealed?

20             MS. PETERSON:    I do.

21             MR. DELAPLAIN:    I'll state for the record

22     that I object to the sealing of any of the police

23     reports.  Particularly, for example, the supplemental

24     report, which I think already was public record and

25     doesn't contain any particular confidential

15

1          information regarding Lt. Kroll and was actually used

2          as a part of the basis for charging Mr. Mahaffy with

3          a crime.

4                    (The unprotected portion of the deposition

5                     was concluded at approximately 9:20 a.m.

6                     on November 6, 2009)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

16

```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MINNESOTA

 3     ---------------------------------------------------------

 4     Jackson Mahaffy; Flora Mahaffy;
       Daniel Nelson; and Paul Von Arx,
 5
                       Plaintiffs,
 6
       vs.                                    Case File No. 08-cv-4992
 7                                                  JMR/SRN
       Robert J. Kroll; Wallace M.
 8     Krueger, Christopher J. Bennett;
       Aaron C. Hanson; Christopher
 9     Bishop; David Campbell; Toddrick
       Kurth; Brandon Kitzerow; James
10     Rugel; Clark Goset; and Mark
       Durand, all acting in their
11     individual capacity as
       Minneapolis Police Officers;
12     and the City of Minneapolis,

13                       Defendants.

14     ---------------------------------------------------------

15
                   Continued Videotaped Deposition of
16
                           ROBERT J. KROLL
17
                          November 6, 2009
18                           9:20 a.m.

19       Volume II - Sealed as Private and Confidential
                  Pursuant to Protective Order
20                        Pages 16-87

21


22
                       Linda J. Trondson, RPR, MR
23              Ask, Trondson & Smith Court Reporters
                701 Fourth Avenue South - Suite 500
24                Minneapolis, Minnesota   55415
                  612-332-2603 *** 800-332-2603
25                   ats@atscourtreporters.com
```

Sealed as Private and Confidential Pursuant to Protective Order

17

```
 1          Volume II of the Videotaped Deposition of
     Robert J. Kroll taken on the 6th day of November, 2009
 2   commencing at approximately 9:20 a.m. at the Offices Ask,
     Trondson & Smith Court Reporters, Suite 500, 701 Fourth
 3   Avenue South, Minneapolis, Minnesota, 55415, before
     Linda J. Trondson, Notary Public, County of Hennepin,
 4   State of Minnesota, to be used in the above-entitled
     matter.
 5
                    APPEARANCES:
 6
              JAMES W. DELAPLAIN, Attorney at Law,
 7   2140 Fourth Avenue North, Anoka, Minnesota, 55303,
     and,
 8
              DANIEL J. BRAZIL, Attorney at Law,
 9   2124 Dupont Avenue South, Minneapolis, Minnesota,
     55405, appeared on behalf of the Plaintiffs.
10
              C. LYNNE FUNDINGSLAND and DARLA BOGGS,
11   Assistant City Attorneys, Office of the Minneapolis
     City Attorney, Room 210, 350 South Fifth Street,
12   Minneapolis, Minnesota, 55415, appeared on behalf of
     the City of Minneapolis.
13
              KARIN E. PETERSON, Attorney at Law, Rice,
14   Michels & Walther, LLP, 10 Second Street Northeast,
     Suite 206, Minneapolis, Minnesota, 55413, appeared on
15   behalf of Robert J. Kroll and Wallace M. Krueger.

16          Also Present:  Sophie Mills

17
                    EXHIBITS MARKED
18
     1   Street Map.......................................20
19
     2   Supplemental Report..............................46
20
     3   CRA Statement....................................47
21
     4   CRA Printout.....................................64
22

23

24

25
```

Sealed as Confidential Pursuant to Protective Order

18

```
 1                     EXAMINATION (Continued)
 2    BY MR. DELAPLAIN:
 3    Q    Lt. Kroll, do you remember where you were prior to
 4         going to the party?
 5    A    No.
 6    Q    Do you remember if you drove to the party?
 7    A    I rode with Sgt. Krueger.
 8    Q    Do you know, that night did you leave your vehicle at
 9         another location or at home?
10    A    I believe it was in the SWAT garage.
11    Q    Was it your recollection that you left from work to
12         go to the party?
13    A    I was in the union office working earlier that day.
14    Q    And do you recall what time you arrived at the party?
15    A    No.
16    Q    Had you been drinking alcohol at all prior to the
17         party?
18    A    No.
19    Q    And at the party did you have some alcohol?
20    A    Yes.
21    Q    And do you recall how much you drank?
22    A    Not exactly.  Probably three beers.
23    Q    And then I understand you left the party and went to
24         Psycho Suzie's.
25    A    Yes.
```

Sealed as Confidential Pursuant to Protective Order

19

1    Q    Did you have any alcohol at Psycho Suzie's?

2    A    I had one beer.

3    Q    So prior to encountering Mr. Mahaffy, your testimony

4         is you had three beers at those two parties.  Did you

5         have any other alcohol in addition to that that

6         evening prior to the incident?

7    A    No.  We went for dinner at Psycho Suzie's, or I had

8         dinner at Psycho Suzie's.

9    Q    And I understand that before you encountered

10        Mr. Mahaffy you were driving in Mr. Krueger's

11        vehicle, Sgt. Krueger's vehicle?

12   A    I was riding in his vehicle.

13   Q    Okay.  Can you describe to me what occurred as you

14        approached that area of 13th Avenue Northeast and

15        Marshall Street Northeast?

16   A    Wally was driving his Envoy.  His wife Cheryl was in

17        the front seat, I was seated in the back.  There was

18        a person later identified as Mr. Mahaffy in the

19        street, in the middle of the street like he was in

20        distress, putting up like a stop indication for us,

21        waving his arms, stopping us to stop, flagging us

22        down.

23             Wally slowed down, and it didn't appear to

24        be normal, he was acting -- he had bizarre behavior,

25        and he just decided to continue past.  We didn't know

Sealed as Confidential Pursuant to Protective Order

20

```
 1              if it was a stranded motorist, someone in distress,
 2              why he was flagging us down, but it wasn't inclement
 3              weather, there was people around, we just didn't
 4              think it was a good idea to stop, or he didn't, he
 5              was driving the car.  And he slowed, and as he
 6              continued to pass, Mahaffy had some type of bag or
 7              satchel that he swung and hit the rear driver's side
 8              of Wally's truck.
 9      Q   And then what happened after that?
10      A   Wally stopped the truck and got out and checked for
11              damage and detained the guy, and I did the same, I
12              got out of the passenger side and went around to see
13              what that was all about, and at that time we got
14              jumped by a mob of about 15 to 20 people that came
15              off the sidewalk to the east side of the road.
16                              (Kroll Deposition Exhibit 1
17                               marked for identification)
18      Q   I'm showing you what has been marked as Deposition
19              Exhibit No. 1.  I'll represent that this is a graphic
20              that was obtained by my office from the Minneapolis
21              Map Department.  They purport to represent a
22              schematic of that area, Marshall Street Northeast and
23              13th Avenue Northeast, along with an outline of the
24              buildings in that area.
25                      Now, looking at what's been marked as
```

Sealed as Confidential Pursuant to Protective Order

21

```
 1          Exhibit No. 1, do you recognize that as being the
 2          area that you've been describing?
 3     A    Yes.
 4     Q    And looking at the markings of the buildings, would
 5          you agree that what's indicated there as 1319 is the
 6          location of what's been referred to as Dusty's Bar?
 7     A    Yes.
 8     Q    And 1317 is what's known as the Old Science
 9          Renovation, Inc.?
10     A    Yes.
11     Q    And is this where the incident occurred that you're
12          talking about?
13     A    Yes, it is.
14     Q    And can I have you mark for me -- I'll give you a red
15          pen and ask, if you can, to draw in where it is that
16          Mr. Krueger's vehicle was stopped at the time he got
17          out of it.
18     A    (Indicating).
19     Q    And could you just put a 1 next to that so we can
20          keep track.
21     A    (Indicating).
22     Q    Thank you.  And can you place on that diagram an M at
23          the location that you first saw Mr. Mahaffy or where
24          Mr. Mahaffy was when he struck the vehicle.
25     A    (Indicating).
```

Sealed as Confidential Pursuant to Protective Order

22

1   Q   Now, you say you got out of the vehicle.  Was there

2       any conversation or any words between you and

3       Sgt. Krueger prior to the two of you exiting the

4       vehicle?

5   A   No.

6   Q   So you both just got out and went around to see if

7       there was damage on the vehicle?

8   A   To stop him and see, you know, why he did it and,

9       yes, if there was damage, to check for damage and not

10      let him get away.  It was a brand-new vehicle.

11  Q   Now, when you got out of the car, you were on the

12      passenger side so you had to come around the -- did

13      you come around the backside or the frontside?

14  A   Just got out of the back door and went behind the

15      vehicle.

16  Q   And what was Mr. Mahaffy doing when you came around

17      the backside of the vehicle?

18  A   Displaying bizarre behavior.  He took up like a

19      karate fighting stance and was swinging a bag and

20      yelling vulgarities that were unintelligible, I

21      couldn't understand what he was saying.

22  Q   And this is as you were coming around the backside of

23      the vehicle?

24  A   Yes.

25  Q   And so you're saying he was standing there -- and

Sealed as Confidential Pursuant to Protective Order

23

```
 1            this is prior to either you or Sgt. Krueger

 2            confronting him or coming in close proximity to him?

 3      A     When we parked he was, yeah, acting very bizarre in

 4            the middle of the street.

 5      Q     And then what did you do?

 6      A     Well, we looked at the vehicle and went to approach

 7            him, and then he took up like a karate fighting

 8            stance and started swinging and kicking, and then all

 9            of the people that were in front of 1317 to 1319 came

10            off and tackled us and began punching us and kicking

11            us, and, you know, the next thing we knew -- the way

12            I've described it before is it looks like a

13            quarterback drops back to pass and the offensive line

14            lays down and the defense splits, that's exactly what

15            it looked like, like eleven-plus people tackling us.

16      Q     Okay, and you being the quarterback?

17      A     Yes.

18      Q     And so how many people were -- how big was the crowd

19            when you first got out of the vehicle?

20      A     I estimate it at 15 to 20.

21      Q     And they were located where on the diagram?

22      A     In this area here (indicating).

23      Q     Okay.  And you marked that, and maybe you can put

24            just a No. 2 next to that so we can keep track of

25            that spot.
```

Sealed as Confidential Pursuant to Protective Order

24

```
1    A    (Indicating).

2    Q    And you've indicated an area in front of -- in the

3         curb area or the sidewalk area in front of Dusty's

4         Bar and the Old Science Renovation?

5    A    Yes.

6    Q    So when you first got out of the vehicle, was that

7         crowd up on the sidewalk or out on the street, or

8         where were they?

9    A    Both.  I didn't pay particular attention to the crowd

10        at first, but along the sidewalk area there on the

11        edge of the street.

12   Q    All right.  And you've indicated Mr. Mahaffy as being

13        out in the middle of the street.  Was there anybody

14        else out in the middle of the street with him?

15   A    No.

16   Q    So he was in the middle of the street and the crowd

17        was over on the sidewalk area?

18   A    Yes.

19   Q    And you say that he took up a fighting stance?

20   A    Yes.

21   Q    And was taking swings and punching and swinging his

22        bag at you?

23   A    Yes.

24   Q    And did he at that time hit you?

25   A    I got hit by so many people all at once, I couldn't
```

Sealed as Confidential Pursuant to Protective Order

25

1        specifically -- other than the guy with a beard, a

2        tattooed beard, on top of me that I distinctively

3        remember because of it, punching me, I don't know who

4        exactly hit me.

5    Q   Do you recall seeing Mr. Mahaffy hit, kick or punch

6        Sgt. Krueger?

7    A   No.  And I can't recall any of the specific hits and

8        punches because, again, there was just too many

9        people and it happened too quick.

10   Q   All right.  So, as I understand your testimony, you

11       don't remember who specifically hit or kicked you, is

12       that right?

13   A   I'm guessing I was hit by Mahaffy early on, either by

14       his bag or a fist, but again when everyone was on

15       top, there was just a hog pile of people on top, all

16       hitting us, women, men.

17   Q   What would be the basis of your guess that you were

18       hit by Mr. Mahaffy?

19   A   He was swinging as we approached, and then when more

20       people got there and I got knocked down, I mean he

21       was in closest proximity to do so initially, and just

22       too many people to identify.  So I'm guessing I was

23       hit by Mahaffy.  I remember the guy with the tattooed

24       beard had clear shots at me.

25   Q   Okay.  So as far as whether you were hit by Mahaffy

Sealed as Confidential Pursuant to Protective Order

26

 1       or not, you're making a guess, right?

 2   A   Yes.

 3   Q   And you don't have any specific recollection of being

 4       hit by Mahaffy?

 5   A   No.

 6   Q   Do you have any specific recollection of Mahaffy

 7       hitting anybody?

 8   A   No.

 9   Q   So when you approached Mr. Mahaffy, what were you

10       going to do to him or what was your intention in

11       approaching him?

12   A   Well, to detain him, find out why he hit the vehicle

13       and have police come, and if damage was done to the

14       vehicle, have him arrested for damage to property.

15   Q   And so it was your intent, at least initially, to

16       detain Mr. Mahaffy?

17   A   To see if there was damage to detain him, and, if so,

18       have police come and make an arrest.

19   Q   But I thought you had already looked to see if there

20       was damage.

21   A   We got out to look, and I came by the other side.  So

22       we got out to look initially, but then we thought --

23       I thought, well, I'm going to hang onto this guy

24       before he takes off.  So I initially didn't inspect

25       the vehicle, I didn't take that long.  First we were

Sealed as Confidential Pursuant to Protective Order

27

1        going to stop and check it out, but then I thought

2        this guy is either going to fight or flee, so detain

3        him.  So I went towards him.  I think Wally stopped

4        to look initially when he passed.

5   Q    Okay.  So you went towards him to physically detain

6        him?

7   A    Yes.

8   Q    And were you the closest headed towards him and

9        Sgt. Krueger was behind you?

10  A    I don't remember.

11  Q    And did you say anything to Mr. Mahaffy as you

12       approached him?

13  A    No.

14  Q    Do you recall Sgt. Krueger saying anything to

15       Mr. Mahaffy when he approached him?

16  A    No.

17  Q    Is it fair to say that the two of you approached him

18       together?

19  A    Yes.

20  Q    And I understand you to say that, like the defensive

21       line coming through the offensive line, that right as

22       you approached Mr. Mahaffy you were tackled by a

23       crowd.

24  A    Yes.

25  Q    Was there any incident that preceded the crowd

Sealed as Confidential Pursuant to Protective Order

28

1   tackling you or was that just some spontaneous event

2   that they charged out at you?

3 A I thought we were going to get robbed or carjacked,

4   is what it seemed like to me, that this guy was out

5   there as a decoy to stop traffic, to do whatever.  I

6   didn't understand the situation.  It looked to me

7   like, you know, either it was a case of mistaken

8   identity with us or they wanted the vehicle or they

9   wanted to rob us.  I didn't know.

10 Q So as you're sitting here today, would you describe

11   that Mr. Mahaffy assaulted you personally?

12 A Again, I can't say specifically, other than the

13   person with the tattoo who I saw punch me when I was

14   below him on the ground.  It was just too fast with

15   too many people to describe who exactly beyond that

16   hit me.

17 Q So you don't know for sure whether Mr. Mahaffy

18   assaulted you or not?

19 A No.

20 Q No, what?  You're agreeing with the statement?

21 A I don't know for sure.  I think I've testified to

22   that several times now.

23 Q So when the crowd assaulted you, did you see what

24   happened with Sgt. Krueger?

25 A No.  I know he was down too next to me, off to my

Sealed as Confidential Pursuant to Protective Order

29

```
 1              right, which would have been south, in the street.
 2     Q    I'll give you a purple pen now.  Could I have you
 3              mark with a No. 3 where it was that you say were
 4              tackled to the ground by the crowd.
 5     A    (Indicating).
 6     Q    Okay.  And you've indicated just about at the
 7              centerline of the street in front of the gap between
 8              Dusty's Bar and the Old Science Renovation,
 9              approximately.
10     A    Yes.
11     Q    And so how far, do you know, were you from
12              Sgt. Krueger when that happened?
13     A    A little more than an arm's reach, I'm thinking.
14     Q    And then what happened?
15     A    Well, we were getting pounded and exchanging punches
16              with these people, and I kind of squirmed my way out
17              from beneath the crowd and got my phone out and
18              called 911.  I called the nonemergency number because
19              I know that when you call on a cellphone -- I mean I
20              called the dispatch, I didn't call 911, because when
21              you call 911 it goes to the State Patrol, so I called
22              348-2345, which is the direct line to Minneapolis
23              Communications.
24     Q    Now, I know Sgt. Krueger described that he was
25              physically pinned down on the ground by members of
```

Sealed as Confidential Pursuant to Protective Order

30

| 1 | | this crowd.  Was the same true for you? |
|---|---|---|
| 2 | A | At one point. |
| 3 | Q | So you were actually pinned on the ground with your |
| 4 | | back flat on the street? |
| 5 | A | Yes. |
| 6 | Q | Can you describe that for me in detail as to how that |
| 7 | | happened and who was doing that to you? |
| 8 | A | It happened very quickly, and there was, again, 15 to |
| 9 | | 20 people that rushed out at the two of us, tackled |
| 10 | | us to the ground, and I was down there briefly, and |
| 11 | | there was just a lot of people on top of me punching, |
| 12 | | etc., and I kind of turned and squirmed and pushed |
| 13 | | out from underneath that.  I thought, I'm going to |
| 14 | | die under here if I don't get out of this crowd. |
| 15 | Q | And at that time as you were extricating yourself |
| 16 | | from underneath the crowd, would you agree that you |
| 17 | | punched and hit individuals? |
| 18 | A | Yes. |
| 19 | Q | Multiple individuals? |
| 20 | A | Yes. |
| 21 | Q | Do you recall any women? |
| 22 | A | No. |
| 23 | Q | And through that effort you managed to stand up? |
| 24 | A | Yes. |
| 25 | Q | And called the dispatch number? |

Sealed as Confidential Pursuant to Protective Order

31

```
 1    A    Yes.

 2    Q    And at that time where was Sgt. Krueger?

 3    A    I don't recall specifically.  I know when they hit us

 4         he was off to my right.

 5    Q    When you made your call to dispatch, had the crowd

 6         moved away from you or were you still engaged with

 7         the crowd?

 8    A    They were getting Mahaffy -- they were trying to get

 9         Mahaffy out of there, and I remember them saying,

10         "He's just drunk, he's just drunk," and they were

11         pulling him, trying to get him free, and I wanted to

12         maintain him there, so I called and said, "They're

13         trying to get a damage to property suspect away," or

14         something like that, and tried to describe what was

15         going on.  And when I went back to try and hang onto

16         him more, I was assaulted again.  There were several

17         exchanges like that as they were hustling him off

18         back to where he came from, back to the east side of

19         the street.  There was a group of people assisting

20         him to leave.

21              I don't know if he was stunned from blows,

22         if he was intoxicated or what, but he wasn't in his

23         right mind from the very beginning of the incident.

24         So I don't know if it was alcohol, narcotics or what

25         was impairing his judgment to do this, and they were
```

Sealed as Confidential Pursuant to Protective Order

32

1          trying to help him get out of there, I believe,

2          before the police came and arrested him.

3  Q  And I did see in one of your statements, and I think

4          you repeated it just now, is one reason that he may

5          have seemed groggy or in a stupor or unbalanced is it

6          might have been a result of you having hit him.

7  A  That's possible.

8  Q  And so you don't dispute that you did hit Jackson

9          Mahaffy?

10  A  No.  Again, I can't say specifically who I hit, and I

11          can't say specifically who hit me.  If it was a

12          one-on-one situation, obviously, but there was just

13          too many people on me.

14  Q  Now, I want to go back and just make sure I get all

15          the detail before you actually called the dispatch.

16               You had gotten up, and you say the crowd

17          was moving away and trying to drag Mahaffy away?

18  A  Yes.

19  Q  Or assist him to leave.  Were they actually pulling

20          him on the street?

21  A  Yes.

22  Q  And he was having a hard time standing?

23  A  No, I think he was coming back at us and stuff too.

24          So he was kind of resisting their efforts to remove

25          him.

Sealed as Confidential Pursuant to Protective Order

33

1    Q    And you think he was resisting that partially because

2         he was trying to assault you some more?

3    A    I don't know what was going through his mind.  I

4         think these are questions for Mahaffy, not me.  I can

5         only describe what he was doing.

6    Q    Okay.  But you're describing that he was attempting

7         to come back at you?

8    A    At some point, I believe so, yeah.  And, again, it

9         happened very rapidly, there was a lot of people

10        involved.  I knew they were trying to physically

11        remove him, and they're telling him, "Come on, come

12        on," you know.  So I don't know what his motives were

13        in the first place, what they were through the

14        incident, but it appeared to be apparent to me that

15        the people that were around him were trying to get

16        him out of there.

17   Q    Now, prior to calling dispatch I had asked you

18        whether you knew where Sgt. Krueger was, and you

19        said, as I understand it, you didn't.

20   A    You know, he was off to my right initially, he was

21        down on the ground for a while, he was up, but in a

22        situation like this, you know, you don't have a

23        camera running, and my mind's not photographic to

24        remember specifically at this time when I dialed the

25        phone what this guy was doing.  It was just too quick

Sealed as Confidential Pursuant to Protective Order

34

```
 1          of an incident involving too many people and too
 2          violent of action at the time.
 3     Q    So can you recall whether he had extricated himself
 4          from the group that he was engaged with at that time
 5          though?
 6     A    At that time, no.
 7     Q    But if he would have still been under a pile of
 8          people that were beating up on him, you would have
 9          made it a help call, right?
10               MS. PETERSON:    Objection, calls for
11          speculation.
12               THE WITNESS:    I called dispatch, and I
13          just said, "We're trying to hold one for damage to
14          property and they're getting away."  So I don't know
15          if he was back on his feet at that time, I don't know
16          if the crowd was leaving.  Because again after I got
17          on the phone, then people started leaving, and when
18          they saw lights and heard sirens coming, several of
19          these people fled the area.  So timing is such that I
20          don't know where Krueger specifically was, if he was
21          back on his feet, if people had left and fled when
22          they saw I called, et cetera.
23     Q    Now, when you called, were you still out there near
24          the center of the street?
25     A    Somewhere in the street.  I couldn't -- again, was I
```

Sealed as Confidential Pursuant to Protective Order

1           in the center, was I to this lane, to that lane?  I

2           was still in the street.

3    Q    And when you made the call, how long of a time was

4           there between when you made the call and when you

5           could hear sirens or see any indication of officers

6           responding?

7    A    Again, it's just too tough to estimate under those

8           circumstances what the exact time of it was.  I don't

9           know if it was thirty seconds or three minutes, I

10          really couldn't tell you.

11   Q    So you called dispatch on your cellphone?

12   A    Yes.

13   Q    And you say that the crowd was trying to get Mahaffy

14          out of the area.  Then what happened next?

15   A    Several people had fled through buildings and

16          whatever in an easterly direction, and then officers

17          arrived.  I seem to remember those squads arriving

18          from the south and parked, and we pointed out Mahaffy

19          who had initially did the damage to the vehicle that

20          the whole incident started over, and I was looking

21          for the guy with the beard that assaulted me, and he

22          had fled.

23   Q    I thought you said earlier that there was another --

24          that the crowd assaulted you again after you made

25          your initial call to dispatch.

Sealed as Confidential Pursuant to Protective Order

36

```
 1    A    Yes, there was -- when I got up and got out of there,
 2         I backed up and called -- I called communications,
 3         and then they were trying to get Mahaffy over, and
 4         when I went back and tried to maintain him again, I
 5         got assaulted again.
 6    Q    Okay.  So after you called dispatch the first time,
 7         then you went towards the curb and sidewalk area?
 8    A    I kind of went over here where the squads were
 9         arriving in the northbound lane.
10    Q    Okay.  So were you still in the street?
11    A    Again, at that time I believe I was, but it's just
12         too difficult to remember in that chaotic situation
13         specifically where my feet were planted.  It wasn't
14         something that I thought I'd be giving a detailed
15         description of in a deposition five and a half years
16         later.
17    Q    And as you sit here today, can you actually recall
18         the incident?
19    A    Yes, I recall the incident.
20    Q    And did you review some material in preparation for
21         your deposition today?
22    A    I had looked over my CRA statement that I had
23         provided several years ago.
24    Q    And did you look over your supplemental report that
25         you provided?
```

Sealed as Confidential Pursuant to Protective Order

37

```
 1    A    Not recently.

 2    Q    And you say you were trying to -- when you moved

 3         over, that you were trying to prevent Mr. Mahaffy

 4         from leaving.  Is that a fair characterization of

 5         what you said?

 6    A    Yes.

 7    Q    And how did you do that?

 8    A    Well, I attempted to hang onto him, but then when

 9         that would happen, I would get hit.

10    Q    Okay.  So which part of him were you attempting to

11         hang onto?

12    A    Wherever I could.

13    Q    So your testimony is that Mr. Mahaffy was trying to

14         move away in between your first call to dispatch and

15         your second call to dispatch?

16    A    I don't remember specifically when the calls came in.

17         Again, I know that I had called 911 twice or

18         communications twice, but, again, what Mahaffy's

19         specific actions were at that time when I was on the

20         phone, it's just too difficult to put into correct

21         order and placement.

22    Q    So you were trying to hold onto him, any part of him

23         you could get?

24    A    Yes.

25    Q    And what do you recall holding onto?  Did you have
```

Sealed as Confidential Pursuant to Protective Order

38

1           him by the legs, by the arms?

2      A    I don't recall what area, if any.  Shirt, arm, I

3           don't know.

4      Q    And you're saying that as you were trying to hold

5           onto Mr. Mahaffy, there were people assaulting you?

6      A    Yes.

7      Q    Was Mr. Mahaffy assaulting you?

8      A    His behavior, I don't -- he was, again, just acting

9           very bizarre.  He was yelling unintelligible things,

10          swinging.  I mean I described it earlier with the

11          Civilian Review as being on PCP or something like

12          that.

13     Q    And he was continuing to do that at this time --

14     A    Yes.

15     Q    -- when you were trying to grab him and detain him?

16                MS. PETERSON:    Mr. Kroll, make sure he's

17          done before you start.  Go ahead.

18     BY MR. DELAPLAIN:

19     Q    And he was continuing to exhibit that same behavior

20          at the time that you were trying to grab him after

21          you had made the call to dispatch?

22     A    Yes.

23     Q    So is that to say he was taking swings at you at that

24          time?

25     A    Yes, yes.  He did not -- well, I think I've already

Sealed as Confidential Pursuant to Protective Order

39

```
 1              described his behavior as best I could.  It was just
 2              very bizarre behavior of a person under the influence
 3              of maybe angel dust, PCP, acid, I don't know,
 4              yelling, swinging, flaying his arms, swinging the bag
 5              that he had.  So whether it was -- you know, if it
 6              was an assaultive behavior, you go right for one
 7              person and punch and kick, and specifically you may
 8              use boxing or wrestling techniques to overtake that
 9              person.  He wasn't doing that.  He was, again,
10              jumping around, acting bizarre, swinging, in a karate
11              stance and looking around, and he had a crazed look
12              about him.  So it wasn't a very calculated assault on
13              his part.
14        Q     But you understand I'm asking you to describe what
15              his demeanor and what his actions are after you had
16              made the first call to dispatch and when you're
17              trying to detain him.  So that description you just
18              gave is a description of what behavior he was engaged
19              in when you were trying to detain him after you had
20              made your first call to communications?
21        A     The demeanor and behavior and actions that I've
22              described for Mr. Mahaffy, he exhibited that
23              throughout our encounter with him.
24        Q     And beyond what you've described as swinging and
25              swinging his backpack, did he actually make physical
```

Sealed as Confidential Pursuant to Protective Order

40

```
 1            contact with you by punching you or hitting you or

 2            kicking you?

 3                    MS. PETERSON:    Objection, asked and

 4            answered.  You can answer again.

 5                    THE WITNESS:    I believe my prior answer

 6            and answer again is I can't say specifically if he

 7            made contact, but I assume so.

 8     BY MR. DELAPLAIN:

 9     Q    At that time?

10     A    At which time are we talking about now?

11     Q    When you're trying to detain him there by grabbing

12          onto him when you say that other people were trying

13          to get him away from the scene.

14     A    I can't say specifically if he struck me at that

15          time.

16     Q    But you do recall other people striking you at that

17          time?

18     A    Yes.

19     Q    And who do you specifically recall striking you at

20          that time?

21     A    Any one of the 15 to 20 other people that were

22          assaulting us, some of which had fled.

23     Q    Well, I'm asking you about a specific point in time

24          when you say they were trying to remove him from the

25          area.  And at that time are you saying there were
```

Sealed as Confidential Pursuant to Protective Order

41

```
 1            still 15 to 20 people assaulting you personally?

 2       A    There was 15 to 20 people in the entire group that

 3            assaulted myself and Wally Krueger, and now whether

 4            some had already fled at this point, some stuck with

 5            it, I don't know the whole time duration of the whole

 6            incident, but at some point people started running

 7            and leaving the scene.

 8       Q    So as you were grabbing and trying to keep

 9            Mr. Mahaffy from departing or being departed by

10            members of the group, was that when the squad cars

11            arrived?

12       A    Yes.

13       Q    And so when the squad cars arrived, were you still

14            grabbing onto Mr. Mahaffy?

15       A    No.  I don't know specifically what I was doing, but

16            I remember seeing the lights and sirens coming from

17            the south, and I thought, oh, finally they're here,

18            and then many more people fled.  The group that was

19            15 to 20 was down to probably five now.

20                 And then we identified Mahaffy, he was

21            still there, he didn't leave.  He was in his own

22            world, so to speak.  I don't know what he was doing.

23            I don't know if any of us had ahold of him or

24            whatever, but we eventually, and I don't recall

25            specifically how it was officers ended up being
```

Sealed as Confidential Pursuant to Protective Order

42

```
 1              directed to him, I thought I pointed him out or Wally
 2              pointed him out, one of the two or both of us, and
 3              then we identified him as the person that struck the
 4              vehicle and started the whole incident, and one of
 5              the officers detained him then.
 6      Q       Did you also identify him to the arriving officers,
 7              meaning Mahaffy, did you identify Mahaffy to the
 8              arriving officers as the person who had struck
 9              Sgt. Krueger?
10      A       I don't recall.
11      Q       Before we move on too far from that, can I have you
12              mark on Deposition Exhibit No. 1 by maybe putting a 4
13              at the location where you said you were grabbing
14              Mr. Mahaffy, trying to keep him from being removed
15              from the area.
16      A       (Indicating).
17      Q       So, again, it's on the street but near the sidewalk
18              area on the northwest corner of the Old Science
19              Renovation, Inc., approximately?
20      A       Sure.
21      Q       In that area approximately in front of where the gap
22              is that exists between Dusty's Bar and Old Science
23              Renovation?
24      A       Somewhere in that area.
25      Q       Now, were you ever up on the sidewalk, that you
```

Sealed as Confidential Pursuant to Protective Order

43

1         remember?

2     A   I don't know.

3     Q   Not that you remember?

4     A   I don't know.

5     Q   Were you ever up on the northwest corner of Dusty's?

6     A   Specifically -- these are all approximates of where I

7         was, so I can't say specifically throughout the whole

8         incidents where I was.

9     Q   Now, when you say you were trying to grab Mr. Mahaffy

10        to keep him from being departed, do you know where

11        Sgt. Krueger was?

12    A   No, not specifically.

13    Q   Generally were you keeping track of where he was, or

14        at that time were you just --

15    A   Through most of the incident he was off to my right,

16        which was a little bit south of me on Marshall.

17    Q   Okay.  So actually further down in front of the Old

18        Science Renovation Factory as opposed to north in

19        front of Dusty's?

20    A   Sure.

21    Q   Now, in your supplemental report, if you recall,

22        there's a reference that the individuals who were

23        trying to remove Mahaffy were trying to get him into

24        a vehicle.  Do you recall that?

25    A   No.

Sealed as Confidential Pursuant to Protective Order

44

1    Q    In that time between when it was that you made the

2         call to dispatch and when the officers arrive, the

3         squad cars and uniformed officers arrived, at any

4         time do you have a specific recollection of where

5         Sgt. Krueger was or what he was doing?

6               MS. PETERSON:   Objection, asked and

7         answered.  You can answer again.

8               THE WITNESS:   Just to the right of the

9         assault on Marshall Avenue throughout the incident

10        was where he was.

11   BY MR. DELAPLAIN:

12    Q    And so you're pretty sure that you knew his location

13        during that time.

14    A    Yes.

15    Q    Now, when is it that you made the second call to

16        dispatch?

17    A    I'm guessing within a minute of the first one.

18    Q    But is that after you were trying to grab and prevent

19        Mr. Mahaffy from being removed?

20    A    My memory is cluttered with regard to this.  I know

21        that I called initially and then later into it, but

22        again, specifically what Mr. Mahaffy's -- you know, I

23        didn't know who Mr. Mahaffy was at the time, I didn't

24        know who any of these people were at the time, and

25        who specifically was doing what, including where

Sealed as Confidential Pursuant to Protective Order

45

1                specifically I was when I made the calls, I'm
2                incapable of determining that.
3          Q     I'm not asking you to specifically determine where
4                everybody was, I'm asking you whether you recall
5                whether your second call to dispatch was after the --
6                back where you just described you were trying to
7                detain Mr. Mahaffy from being removed.
8          A     I don't know specifically what actions were taken
9                before, during or after the calls.
10         Q     Now, I've reviewed your statement with the Civilian
11               Review Board, and I know you said that you've
12               reviewed that at some time, correct?
13         A     Yes.
14         Q     And in that statement, is it true that in the course
15               of this incident of trying to detain Mr. Mahaffy that
16               you did indeed kick one of the other persons in the
17               area?
18         A     I think what I described in my CRA was I punched and
19               kicked at many people during the process, and at one
20               point when Mr. Mahaffy was being escorted away and I
21               was trying to hang onto him, I kicked at another
22               person who was trying to drag him from me.
23         Q     And is that in that same area where you've marked
24               a 4?
25         A     In between in here.  At some point he was in the

Sealed as Confidential Pursuant to Protective Order

46

1          middle of the street or even the southbound lane, and

2          then as this incident progressed, he moved easterly

3          through the northbound lane.  Can we take just a

4          short restroom recess?

5                    MR. DELAPLAIN:    Sure.

6                         (Recess)

7                         (Kroll Deposition Exhibit 2

8                          marked for identification)

9     BY MR. DELAPLAIN:

10    Q    Lt. Kroll, I'm handing you what has been marked as

11         Exhibit No. 2.  Can you identify that document for

12         me?

13    A    Yes, it's a statement that I made after the incident

14         at the direction of the investigator,

15         Sgt. Christiansen.

16    Q    And is this what is commonly referred to as a

17         supplemental report?

18    A    Yes.

19    Q    And is this a report that's prepared in regard to an

20         incident that happens -- that Minneapolis police

21         officers prepare to report on incidents that happen?

22    A    Yes.

23    Q    And is everything in there true and correct?

24    A    Yes.

25    Q    How long after the incident was it that you made up

Sealed as Confidential Pursuant to Protective Order

47

1          that supplemental report, if you know?

2    A    Within a couple days.  It was on 5/17, and I'm not

3          sure of the incident date.

4    Q    I believe it's 5/14, for the record, May 14th was the

5          day of the incident.  So the next day you think you

6          made up this supplemental report?

7    A    Yes.

8    Q    So at that point everything would have been fresh in

9          your mind?

10   A    Yes.

11   Q    And so everything in this report would have been

12         true?

13              MS. PETERSON:    I believe he said it was

14         5/17, not the day after.  You said the incident was

15         5/14.  The document says 5/17.

16              MR. DELAPLAIN:   Okay, I misheard him.  I

17         thought he said 5/15.

18              MS. PETERSON:    The document says it right

19         at the top.

20              THE WITNESS:    5/17/04.

21              MR. DELAPLAIN:   So three days afterwards.

22              THE WITNESS:    Correct.

23                          (Kroll Deposition Exhibit 3

24                           marked for identification)

25   BY MR. DELAPLAIN:

Sealed as Confidential Pursuant to Protective Order

1   Q   I'm showing you what's been marked as Exhibit No. 3.

2       Can you identify that document for me?

3   A   That's the Civilian Review statement I provided.

4   Q   And do you recall what date you provided that

5       statement?

6   A   That says December 5 of '05.

7   Q   And if I could ask you to turn to the last page of

8       what's been marked as Exhibit No. 3, is that your

9       signature on the last page?

10   A   Yes, it is.

11   Q   And when did you sign this document?

12   A   2/15 of '06.

13   Q   And you've had a chance to review this transcript

14       since the time you made the statement?

15   A   The CRA document?

16   Q   Yes.

17   A   Yes.

18   Q   And do you agree that the transcript is a true and

19       correct transcript of the statement that you gave to

20       the investigator?

21   A   Yes.

22   Q   And I notice there are a couple corrections here and

23       there in the document.  I just want to direct your

24       attention to it.

25             MS. PETERSON:    Page four.

Sealed as Confidential Pursuant to Protective Order

49

1    BY MR. DELAPLAIN:

2    Q    For example, on page four of Exhibit No. 3, if I

3         could have you turn to page four, do you see there on

4         the first answer from the top where there's some

5         handwriting and some words crossed off?

6    A    Yes.

7    Q    Is that your handwriting on there?

8    A    Yes, it is.

9    Q    So are those corrections you made to the transcript?

10   A    Yes, it is.

11   Q    So you had a chance to review this and make

12        corrections to anything that you think may not have

13        been correct.

14   A    Yes.

15   Q    And is everything within this statement true and

16        correct?

17   A    Yes.

18   Q    I want to direct your attention to page No. 10.

19        Earlier I was asking you about whether you had kicked

20        one of the individuals that was present that night.

21        And I want you to review, if you would, about the

22        last half of this page No. 10 of the statement you

23        gave to the Civilian Review Authority, and then I'll

24        ask you again about that.

25   A    Okay.

Sealed as Confidential Pursuant to Protective Order

50

1    Q    The third answer up from the bottom here, I

2         understand that what you told the investigator was

3         that, "There was a guy trying to drag Mahaffy out of

4         there, and when I pulled back I kicked a guy once or

5         twice to get him to kick down."  Now, do you see

6         where it says that?

7    A    Yes.

8    Q    Okay.  So does that refresh your recollection as to

9         whether you actually did kick someone that night?

10             MS. FUNDINGSLAND:   Excuse me, counsel,

11        but I believe it says, "kick him down," not, "kick

12        down."

13             MR. DELAPLAIN:   Okay.  If I misspoke --

14             MS. FUNDINGSLAND:   Yes.  Maybe you just

15        want to read it again.

16             MR. DELAPLAIN:   I'll read it again.

17        Well, maybe I'll read this and the next paragraph.

18   BY MR. DELAPLAIN:

19   Q    So that paragraph actually starts at the end of the

20        answer to the fifth question, or at the end of the

21        fifth question is your fifth answer.  "There was one

22        guy that was trying to drag --" and then the

23        investigator says, "Mahaffy?" and your answer is,

24        "Mahaffy out of there and when I pulled back I kicked

25        a guy once or twice to get him to get him to kick him

Sealed as Confidential Pursuant to Protective Order

51

```
 1              down.  He was picking him up and he was -- we kind of
 2              struggled over --" and the investigator says,
 3              "Mahaffy?" then your answer continues, "Mahaffy, and
 4              I was pulling him away, I didn't have a free hand.  I
 5              was trying to hang onto Mahaffy because the squads, I
 6              could hear 'em coming.  And I kicked this guy back
 7              away from me a couple times.  Kick him back because
 8              my hands were tied up.  So there was somebody and I
 9              couldn't identify who that was."
10                   So does that refresh your recollection as
11              to actually whether you did kick someone that night?
12         A    Yes.
13         Q    Okay.  And now you agree that indeed you did kick
14              someone that night.
15         A    Yes.
16         Q    And after reading that, can you give me a description
17              of what happened when that incident occurred, or are
18              you just relying on having read the questions and
19              answers to the questions there?
20         A    There was a struggle.  This person was trying to get
21              Mahaffy out of there.  I was trying to keep Mahaffy
22              there.  We both had ahold of him, there was a
23              struggle, and he came towards me, and in the struggle
24              over Mahaffy I didn't want to lose my hold of Mahaffy
25              because apparently at this time I had ahold of him, I
```

Sealed as Confidential Pursuant to Protective Order

52

1           don't know specifically how, and in order to get this

2           other person away, I kicked at him, kicked at him

3           once or twice.

4    Q      Do you recall which part of Mahaffy you were holding

5           onto at that point?

6    A      No.

7    Q      Do you recall where you were other than where you've

8           indicated the No. 4 on Exhibit No. 1?  Do you think

9           you were there or some other location?

10   A      Somewhere near 4 there.

11   Q      And so when you say he was trying to get Mahaffy

12          away, you were holding onto Mahaffy, and was he also

13          grabbing at Mahaffy and pulling him?

14   A      Between that and striking at me.

15   Q      And do you recall what part of his body you kicked

16          him upon?

17   A      No.

18   Q      So as you're holding onto Mahaffy, he's coming --

19                  MS. PETERSON:    Objection.  You keep using

20          these gestures as to a hold.  He's never said -- with

21          your gestures, I don't want your gestures to be on

22          this video at all.  He has never said he had a hold

23          on Mahaffy like you are demonstrating for the camera.

24                  MR. DELAPLAIN:    I'm not demonstrating

25          anything for the camera because I clarified before

Sealed as Confidential Pursuant to Protective Order

53

1        the deposition that the camera is not actually

2        recording me.

3                MS. PETERSON:    All right.  If the camera

4        is not recording you and if you did not have a hold

5        on Mr. Mahaffy like he is demonstrating, please

6        clarify.

7    BY MR. DELAPLAIN:

8    Q   Can you clarify for me by making arm gestures as

9        to --

10   A   I'm not understanding.

11               MS. PETERSON:    My objection is it says

12       that, "I was trying to hang onto Mahaffy because the

13       squads, I could hear 'em coming."  I think what he

14       wants to know is how you had or were trying to hang

15       onto Mahaffy.

16               THE WITNESS:    I don't remember

17       specifically how.  I think I testified earlier that

18       wherever I could, whether it was clothing, arm,

19       torso, whatever I could hang on to, and I don't

20       recall the specifics of how I grasped anything.

21   Q   But right at that moment, according to your

22       statement, you didn't have a hand free.

23   A   That is what it says, right.

24   Q   Okay.  So is it safe to assume that you were using

25       two hands to hold onto Mahaffy at that point?

Sealed as Confidential Pursuant to Protective Order

54

```
 1    A    Yes.

 2    Q    And do you recall as you were using your two hands to

 3         hold onto Mahaffy what direction the person you

 4         kicked was coming at you from?

 5    A    I seem to recall them trying to get him to the east

 6         side of the street away, like towards the buildings,

 7         towards the Old Science Restoration and Dusty's Bar.

 8    Q    And so you're to the west of that?

 9    A    Yes.

10    Q    So that I understand your positioning, you're to the

11         west of -- on Marshall Street Northeast facing

12         towards the east, approximately, and you're trying to

13         hold onto Mahaffy with two hands, and then there's

14         someone else trying to pull Mahaffy to the east.

15    A    Correct.

16    Q    And at the same time you say coming towards you.

17    A    Correct.

18    Q    Well, when you were kicking at that individual then,

19         were you standing up?

20    A    Yes.

21    Q    So does that mean that Mahaffy also was standing up?

22    A    Yes.

23    Q    And does that mean that the individual who you kicked

24         was standing up?

25    A    Yes.
```

Sealed as Confidential Pursuant to Protective Order

55

1    Q    Now, do you recall if that individual fell down?

2    A    I don't recall.

3    Q    Is it possible that they fell down and you continued

4         to kick them?

5              MS. PETERSON:    Objection, calls for

6         speculation.

7              THE WITNESS:    I don't believe that

8         occurred.

9    BY MR. DELAPLAIN:

10   Q    And that individual that you kicked, is that the

11        gentleman who you described in your report as with a

12        beard tattoo, if you remember?

13   A    I don't remember, and there was more than just one

14        person there also, so I can't specifically say.  I

15        know that he was the one that I -- only because of

16        the significance of the facial tattoo, that he was

17        one of those parties that was involved in trying to

18        get Mahaffy away, and I remember him on top of me in

19        the crowd earlier.

20   Q    Now, on the very bottom of page ten, it says -- I

21        guess it's the same question.  The investigator asked

22        you, "You don't know if it was the tattooed guy or

23        not?" and you say -- the transcription says, "M-mmm."

24        Is that a negative, that at that time you didn't know

25        who it was?

Sealed as Confidential Pursuant to Protective Order

56

1   A   Yeah, I didn't -- yeah, I didn't know who any of the

2       people were.

3   Q   And so after that occurred, after you kicked this

4       individual, do you recall whether then Mahaffy was

5       removed from your holding onto him?

6   A   I don't remember if he was removed or free.  I think

7       I answered this earlier.  When the squads arrived, I

8       specifically don't know where I was and where Mahaffy

9       was on the arrival of the first squad.

10  Q   So could it be that the arrival of the first squads

11      were at the time or prior to the incident that you

12      were just describing where you kicked someone?

13          MS. PETERSON:    Objection, calls for

14      speculation.  You can answer if you know.

15          THE WITNESS:    I don't know the answer to

16      that.

17  BY MR. DELAPLAIN:

18  Q   So the squad cars may have already been there when

19      you kicked that individual?

20  A   Oh, I should rephrase that.  I don't believe there

21      was any punching or kicking going on after the squads

22      arrived.

23  Q   And do you recall when the squads arrived whether you

24      still had your hands on Mr. Mahaffy?

25          MS. PETERSON:    Objection, asked and

Sealed as Confidential Pursuant to Protective Order

57

```
1          answered.  You can answer again.
2                THE WITNESS:    I don't remember
3          specifically, again.  It's getting kind of redundant,
4          but I'll say it again for the record.  I don't
5          remember specifically where I was, if I had ahold of
6          Mahaffy when they came, and where in the
7          street/sidewalk we were again.
8     Q    Do you remember when the first officers arrived?
9     A    No.
10    Q    Do you remember who the first officers that you
11         recognized were?
12    A    No.  And, again, to spin the clock back to that
13         incident, I didn't know any of those officers
14         specifically.  I mean I knew names and faces.
15    Q    Do you have any recollection of Mr. Mahaffy being
16         arrested?
17    A    Later on, yeah, they arrested him.
18    Q    Do you recall identifying Mr. Mahaffy to officers?
19    A    I know that he was taken into custody there, and I
20         can't recall if it was specifically me that told one
21         of the officers or Wally that told one of the
22         officers, and, if so, which officer was told that he
23         was the one that did this.  As I sit here today, I
24         don't recall which one that was.  But I know Mahaffy
25         was booked, he had thrown up in the back of the squad
```

Sealed as Confidential Pursuant to Protective Order

58

1           car and stuff.

2     Q     Now, when you're actually holding onto Mahaffy, in

3           your mind is that detaining him?

4     A     I don't think I had that control over him because,

5           again, I had several people interfering with my

6           efforts to detain him.  I was being assaulted by

7           several people while I was attempting to detain him,

8           and, you know, unfortunately I wasn't that big enough

9           or strong enough to have complete control over a

10          person while I was being assaulted by several others.

11    Q     So do you think -- did you ever detain Mr. Mahaffy,

12          you, yourself?

13    A     Well, he didn't get away before the arrival of

14          officers, and he was booked, so I guess in hindsight

15          he was successfully detained from leaving the area

16          before officers arrived.

17    Q     And I want to direct your attention to near the next

18          to the last paragraph of your supplemental report,

19          which is marked as Exhibit No. 2, and this goes back

20          to a question I asked you recently.

21                What the supplemental report says is, "When

22          uniformed officers arrived, I identified AP-1 Mahaffy

23          as the person who did damage to Sgt. Krueger's

24          vehicle and initiated the assault on us."  Do you see

25          where it says that?

Sealed as Confidential Pursuant to Protective Order

59

1   A   What paragraph are we in here?

2   Q   It's right near the bottom, right there (indicating).

3   A   Okay.  Yes.

4   Q   So does that refresh your recollection as to whether

5       it was you who identified Mahaffy?

6   A   Well, it does, and it's important to note that this

7       supplemental report that I gave at the direction of

8       Sgt. Christiansen occurred three days after the

9       incident, so everything was much more fresh in my

10      mind.

11          So, in my mind, this would probably trump

12      the statement and my testimony today because of the

13      fact that it was three days, and then we go to the

14      CRA statement, that's a year and a half after the

15      incident, and now we're five and a half years later.

16  Q   Okay.  So you'd agree, I guess in general, that if

17      there's a statement in Exhibit No. 2 that contradicts

18      some later statement you made, that Exhibit No. 2

19      would be more likely to be correct because it was

20      made closer in time to the incident?

21          MS. PETERSON:    Objection, asked and

22      answered.  He just answered that.

23          THE WITNESS:    The answer to the question

24      is yes.  I would think the most accurate of anything

25      would have been Exhibit No. 2, my supplement of the

Sealed as Confidential Pursuant to Protective Order

60

```
 1        incident.
 2     BY MR. DELAPLAIN:
 3     Q    After uniformed officers arrived, do you recall
 4          specifically speaking to any of the uniformed
 5          officers beyond identifying Mr. Mahaffy?
 6     A    No.
 7     Q    Do you recall going down and meeting with some of the
 8          officers in the parking lot of the Grain Belt
 9          Brewery?
10     A    There was a parking lot -- I don't remember the
11          specific lot, but I think like a block to the south
12          and east of there is where we met the paramedics and
13          the officers met.
14     Q    And did you give a statement to any of the officers
15          that night?
16     A    I didn't take a -- you know, what would be a formal
17          statement.  I spoke with a couple of them, and I
18          don't remember who or what other than, you know,
19          identifying the person that did -- you know, we
20          identified Mr. Mahaffy.  I said we were assaulted by
21          several that got away.  I gave them a general
22          overview of what happened, but there was no -- we
23          have statements in the police department and, you
24          know, they're formal question/answer statements, and
25          that didn't occur here.
```

Sealed as Confidential Pursuant to Protective Order

61

1    Q    So, as I understand it, you didn't give a formal

2         statement to any of the officers, but you talked to

3         them in essence informally and told them your version

4         of the events.

5    A    Sure.

6    Q    And identified Mr. Mahaffy, who they already had in

7         the squad car, but you further identified him as

8         being the one who had hit Wally Krueger or

9         Sgt. Krueger's car?

10   A    Yes.

11   Q    Now, referencing your supplemental report, in the

12        second paragraph there, I guess in the second

13        sentence, you describe when you approached

14        Mr. Mahaffy, you say, "He approached us, punching and

15        swinging his bag at us, and at one point struck

16        Sgt. Krueger in the eye, causing severe swelling."

17        Do you see where it says that?

18   A    Yes.

19   Q    Now, I know I asked about that earlier, and I think

20        earlier you had said that you don't recall

21        specifically seeing Mr. Mahaffy strike Sgt. Krueger.

22   A    Today, no.  And after reviewing my supplement here,

23        which has been quite sometime since I've seen it,

24        again I would have to place more credence in this

25        than five and a half years later on today's date.

Sealed as Confidential Pursuant to Protective Order

62

1      So, yes, in my supplement it appears that after the

2      incident I identified him as the one that struck

3      Wally Krueger.

4   Q   In your supplement you describe that he had struck

5      Wally Krueger when you approached him initially,

6      right?

7            MS. PETERSON:    I'm going to object.

8      That's not actually what the document says.  It

9      mischaracterizes it.

10            THE WITNESS:    Can you ask the question

11     again, please?

12           MR. DELAPLAIN:    Can you read back my

13     question, please.

14             (The requested portion was read)

15           THE WITNESS:    No, it looks like he struck

16     the truck when we approached him initially, and then

17     in the next paragraph, "As we approached, he was

18     screaming very bizarre obscenities and took up a

19     fighting stance with the bag he was carrying which

20     appeared to have a heavy object inside.  He

21     approached us, punching and swinging this bag at us,

22     and at one point struck Sgt. Krueger in his eye

23     causing severe swelling."

24   Q   Now, in reading that, would you interpret that as

25     being that it was when you initially were approaching

Sealed as Confidential Pursuant to Protective Order

63

1          Mr. Mahaffy that he struck Sgt. Krueger in the eye?

2    A     Yes.

3    Q     At any point do you recall Sgt. Krueger's wife being

4          out of the vehicle involved in the melee?

5    A     I think she was out of the vehicle.  I don't know if

6          she was involved.  I was just occupied with too many

7          people myself to pay attention to the specifics of

8          what was occurring around me in other areas.

9    Q     Do you recall whether Sgt. Krueger tried to go into

10         the Old Science Renovation, Inc.?

11   A     I don't recall that.

12   Q     Do you recall Sgt. Krueger having any loud verbal

13         altercations with specific individuals in the crowd?

14   A     No.

15   Q     I know in your supplement, in the statement you gave

16         to the Civilian Review Authority, you emphasized in

17         there that if on that night you would have had a

18         weapon, that you would have used it.

19   A     Yes.

20   Q     Do you still stick with that?

21   A     Yes.

22   Q     And can you describe that to me or your justification

23         for saying that?

24              MS. PETERSON:    Objection, calls for

25         speculation.  You can answer.

Sealed as Confidential Pursuant to Protective Order

64

1           THE WITNESS:    Well, being assaulted by a

2       group of 15 to 20 people, assaulting two after damage

3       to a vehicle took place, for all I knew we were being

4       victimized in a robbery of person or a carjacking and

5       it's a felony being committed against us at that

6       point, and then if I would have had a firearm on me,

7       the chances of me being assaulted by so many people,

8       if I would have been knocked unconscious, that

9       firearm could have been removed from me and used

10      against me.

11          So I think as the questioning went in the

12      CRA statement, he was trying to compare me to being

13      on duty, and if I were on duty with a firearm, being

14      assaulted by a crowd of that many people, I would

15      have pulled my firearm out to secure it, and if I

16      felt in this situation in fear for my life, I would

17      have used it.

18  Q   Now, as part of your answer you said something about

19      a carjacking, but there wasn't actually a carjacking

20      that occurred, right?

21  A   No.

22                      (Kroll Deposition Exhibit 4

23                       marked for identification)

24          MS. PETERSON:    Before you look at

25      Exhibit 4, these are your Civilian Review Police

Sealed as Confidential Pursuant to Protective Order

65

1          Authority, to the extent that none of these or any of

2          these did not result in any final disposition of a

3          disciplinary matter, this is all private personnel

4          data that is protected by the confidential agreement.

5     BY MR. DELAPLAIN:

6     Q    Lt. Kroll, do you recognize this document?

7     A    Yes.

8     Q    And have you seen this before or a similar printout?

9     A    Yes.

10    Q    And what is this document?

11    A    It's an officer's record within the Civilian Review

12         Authority.

13    Q    And is this your record?

14    A    Yes.

15    Q    And each of these case numbers on the left-hand

16         column underneath where it says badge, do each of

17         those separate case numbers represent a complaint

18         that was filed against you with the Civilian Review

19         Authority?

20    A    I don't know how the Civilian Review does their

21         coding.  It's a case number that -- whether it was

22         against me -- I don't know if it's against me or I

23         made statements in them.  I'm not familiar with their

24         reporting policies and procedures.

25    Q    Do you know how many complaints have been filed

Sealed as Confidential Pursuant to Protective Order

66

```
 1          against you with the Civilian Review Authority?
 2    A     No.
 3    Q     But if a complaint is filed against you at the
 4          Civilian Review Authority, do you become aware of
 5          that?
 6    A     Not all the time.  Sometimes you'll find out later
 7          that, you know, you were misidentified, and in the
 8          course of the investigation they don't even notify
 9          you, you know.  There could be a misidentification
10          through badge number, photo lineup, and, you know,
11          maybe they determine that you were off duty or in a
12          different precinct on a different call at that time,
13          and a generation of the case number and the incident
14          will still be there, and they won't even notify you
15          if during the course of the investigation they
16          determine this couldn't have been him because he was
17          here.  So not necessarily, no.
18    Q     So it might happen that there's actually a complaint
19          filed with the Civilian Review Authority against you
20          and you wouldn't know about it?
21    A     Yes.
22    Q     Since this incident with Mr. Mahaffy, do you know
23          whether there have been any additional complaints
24          filed against you with the Minneapolis Civilian
25          Police Review Authority?
```

Sealed as Confidential Pursuant to Protective Order

67

1    A    I don't know.

2    Q    You don't remember whether there have been any

3         complaints that you know of within the past five

4         years?

5              MS. PETERSON:    Objection, asked and

6         answered.  You can answer again.

7              THE WITNESS:    I don't know.

8    BY MR. DELAPLAIN:

9    Q    I want to run through these real quickly and see if

10        you can tell me whether you even remember what these

11        refer to.  The first now is badge number.  Up there

12        in the upper left-hand it says badge number, and

13        underneath that is 03874.  Is 03874 your badge

14        number?

15   A    Yes.

16   Q    And it has your name.  The first entry under that is

17        02-1799.  Do you see what I'm talking about?

18   A    Yes.  And I might be able to speed it up because all

19        of these case numbers, allegations, findings that

20        we're looking at are going to mean nothing to me

21        unless you've got some specific cases with it.

22             Rather than take the time -- if you want

23        to, you're entitled, obviously, but if you want to go

24        through every one of these and ask me if I know what

25        this is and that is, the answer is going to be the

Sealed as Confidential Pursuant to Protective Order

68

```
 1              same for all of what I'm looking at, and that is by

 2              what I'm provided here, I don't know what any of it

 3              means.

 4                     I can take the chart and graph and tell you

 5              what the findings and allegations mean by going

 6              through the chart.  If you would like to do that, I

 7              guess that's your entitlement, but I can spare you a

 8              lot of time because they mean nothing to me case

 9              number wise.

10     Q   Do you know, have you had any cases, complaints

11              against you filed with the Minneapolis Civilian

12              Police Review Authority where there has been a

13              sustained finding?

14     A   I'd have to look through on this.  I can tell you

15              that in the case that we're here about they sustained

16              it against me and discipline was imposed, but it's

17              not final yet, it's still being disputed.  There's an

18              arbitration, I'm told, this coming year on that.  So

19              there was a sustained finding.  Now, whether those

20              findings in the end will be overturned, we don't

21              know.  And I don't know if there was anything

22              sustained where discipline was not imposed.

23                     And CRA findings are not final disposition.

24              It comes to the Police Department, and then they

25              review it and you have a panel there, and sometimes
```

Sealed as Confidential Pursuant to Protective Order

69

1          they don't sustain.  So it's a very confusing

2          situation between the Civilian Review Authority and

3          how it relates to your final record within the MPD.

4                  But I can tell you that I don't believe I

5          have anything sustained where they imposed discipline

6          other than the case that we're here about.

7                  MS. PETERSON:    Can we just shortchange

8          this for a minute?  If you look at the badge number

9          and you look at the number, you've got 42153, and if

10          you look at the CRA case, which we're just using,

11          which is Exhibit 3, it has that same number on it.

12          So that is what we were talking about.

13                  THE WITNESS:    42153?  I don't see that

14          in here.  Oh, okay, 04-2153.

15     BY MR. DELAPLAIN:

16     Q    And when you're referring to that in the left-hand

17          column, the number 04-2153, that's referring to the

18          complaint with the Civilian Police Review Authority

19          that was made in this case, is that right?

20     A    That's what it says on Exhibit 3, yes.

21     Q    And in regard to this case, there was a sustained

22          finding, at least for now?

23     A    Yes.

24     Q    And it was a finding of excessive force?

25                  MS. PETERSON:    Objection, the document

Sealed as Confidential Pursuant to Protective Order

70

1           speaks for itself.  Go ahead and answer.

2                     THE WITNESS:    An allegation of excessive

3           force, findings sustained at hearing.  And then an

4           allegation, inappropriate conduct, and findings

5           sustained at hearing.

6                     MS. PETERSON:    May we have the record

7           reflect that all Lt. Kroll did was look at the

8           document and line up the codes with the numbers in

9           the document.

10                    MR. DELAPLAIN:    And was any discipline

11          imposed upon you as a result of there being these

12          sustained findings?

13                    MS. PETERSON:    Objection, asked and

14          answered.  You can answer again.

15                    THE WITNESS:    Yes, there was.

16     BY MR. DELALAIN:

17     Q    And what was that discipline?

18     A    A 160-hour suspension.

19     Q    Was there any discipline imposed beyond that?

20                    MS. PETERSON:    Objection, asked and

21          answered.

22                    THE WITNESS:    No.

23                    MR. DELAPLAIN:    So was that the

24          discipline that initially was imposed or was it some

25          discipline announced that was later not imposed?

Sealed as Confidential Pursuant to Protective Order

71

1          MS. PETERSON:    Objection.  Announced by

2     whom?  Vague.

3          MR. DELAPLAIN:    Well, I'm asking him.

4          THE WITNESS:    Well, I don't know if you

5     could call initially several years after the

6     incident, but the discipline was imposed -- it would

7     be two years ago in January that it was imposed.  So

8     it was imposed, what, three years after the incident.

9          MR. DELAPLAIN:    Well, maybe you can just

10    run through the procedure with me.

11         MS. PETERSON:    Objection.  If you would

12    like the procedure, he is just an officer in the

13    fleet force, he's a Lieutenant, and if you would like

14    the disciplinary procedure for an officer, he is the

15    wrong person to ask for that.  He is just a person

16    that can be disciplined and that is subject to the

17    grievance procedure under the collective bargaining

18    agreement.  Even though he is an officer of the

19    union, that document and the collective bargaining

20    agreement speaks for itself, as do the CRA rules, as

21    do the rules for the police department.

22         So all he can give you is a general

23    understanding, and actually this is not the right

24    witness, other than what he has experienced in his

25    own discipline, and it's not going to get you where

Sealed as Confidential Pursuant to Protective Order

72

1          you want.  If you want to ask those questions, you

2          have the wrong person.

3                    MR. DELAPLAIN:    Do you have an objection?

4                    MS. PETERSON:    I do.  The objection is

5          that this is irrelevant from this person, and he has

6          no direct knowledge other than his own discipline.

7                    MR. DELAPLAIN:    He certainly has direct

8          knowledge of his own discipline.  He's already

9          testified that he's sat in on thousands of hearings

10          regarding this.

11                    MS. PETERSON:    Lack of foundation.

12                    MR. DELAPLAIN:    Okay.  So let me run

13          through the procedure with you a little bit.  At the

14          conclusion -- I don't know, how many phases would you

15          say there are in this Minneapolis Civilian Police

16          Review Authority proceeding from the point that a

17          complaint comes in until it's ended?

18                    MS. PETERSON:    Objection.  Again, lack of

19          foundation.  You can answer if you know.

20                    THE WITNESS:    The Civilian Review

21          Authority is such a complicated endeavor, I think

22          there's people there that don't understand it.

23          There's certainly people within the police

24          administration that don't understand it, within the

25          City Council that don't understand it.  It's a monkey

Sealed as Confidential Pursuant to Protective Order

73

1           on their back that they just can't seem to shed and

2           they can't figure out.

3                   But my experience in the Civilian Review

4           Authority is a person makes a complaint and the

5           investigator interviews them, much like an

6           investigator would interview on the MPD side of the

7           house in Internal Affairs.  The investigator

8           interviews all witnesses and parties involved, the

9           complainant, witnesses, subject officers.

10                  When that is done, it goes before some type

11          of panel hearing at the Civilian Review Authority and

12          they make a determination of some type, and when that

13          is done, it's forwarded over to the police

14          administration for review, and I don't know if that

15          goes to Internal Affairs or to higher ranking

16          officers within the officers' chain of command, and

17          then they review it and they determine -- they have a

18          panel hearing, and then they call the officer in and

19          determine if they're going to impose discipline, and

20          then the department has the final authority of

21          discipline, but the department does not have the

22          authority to change a finding of Civilian Review.

23                  So what they do in many cases is we'll

24          leave the finding whatever it's deemed to be at the

25          Civilian Review side of the house and not impose

Sealed as Confidential Pursuant to Protective Order

74

1          discipline on the MPD side if they don't agree.  I

2          don't think they have the legal authority to change

3          it.

4                  If in a case they impose discipline with an

5          officer, an officer is entitled to a grievance

6          procedure in the collective bargaining agreement, and

7          that is union officials meeting with city officials

8          in the police department through the steps, and then

9          the ultimate finding being binding arbitration and

10         the case is presented before an arbitrator.  That's

11         about the best way I can nutshell the whole process

12         for you.

13    Q    Thank you for that explanation.  As I understand it,

14         in the procedure regarding this case, you're at the

15         stage where there's going to be an arbitration.

16    A    Yes.

17    Q    And do you know when that is scheduled for?

18    A    It's not been scheduled.  The City has been delaying

19         for years.

20    Q    Do you know why the City has been delaying for years?

21              MS. PETERSON:    Objection, calls for

22         speculation.  You can answer if you know.

23              THE WITNESS:    In most discipline cases,

24         in my experience on the Union Board, the City

25         excessively delays in all of them, trying to impose

Sealed as Confidential Pursuant to Protective Order

75

1         punishment off on the officer, first and foremost,

2         whether they're terminated or suspended, and, you

3         know, in cases of termination they keep putting it

4         back and putting it back, and generally we don't get

5         in for -- when they fire an officer, I usually tell

6         them nine months before we get it.  It's an

7         excessively long process.

8                 On the union side of the house, we try to

9         expedite the process, obviously in favor of the

10        officer to get him before a hearing, and my theory is

11        that's the way that the City chooses to impose

12        discipline before the ultimate overturning of the

13        finding for inappropriate discipline.

14   Q    Now, in regard to this case you said there's a second

15        panel that's impaneled where there's a determination

16        of discipline after a finding by the Civilian Review

17        Authority.  Is that what I heard you say?

18                MS. PETERSON:    Objection, lack of

19        foundation with regard to all of this.  You can ask

20        as many irrelevant questions as you want, but this is

21        not relevant to what is going on here.

22                MR. DELAPLAIN:    You've made your

23        objection.

24                MS. PETERSON:    You can answer if you

25        know.

Sealed as Confidential Pursuant to Protective Order

76

1              THE WITNESS:    There was a separate panel

2          within the Minneapolis Police Department that

3          convened a panel hearing in this case.

4     BY MR. DELAPLAIN:

5     Q    And is that the panel that announced or made a

6          determination of what discipline would be imposed?

7     A    Yes.

8     Q    And the discipline that was recommended by that

9          panel, is that the discipline that ended up being

10         imposed?

11    A    I don't recall if it changed.  I knew that during the

12         panel they changed the finding.  During the panel

13         hearing they changed it from one finding to another,

14         and I don't know if the initial recommendation was

15         160 hours or it was changed by an administrator

16         higher.  I think it was the initial recommendation,

17         but I'm not positive.

18    Q    And then do you know if that initial recommendation

19         was changed by a later on process?

20    A    The finding had been changed several times throughout

21         the process, and I think -- my understanding of the

22         finding is that the City sustained it for on duty

23         excessive force, when I was off duty through the

24         whole incident, and they imposed time.  And now at

25         the time of this lawsuit they say, no, you were off

Sealed as Confidential Pursuant to Protective Order

```
 1              duty and you have to pay your own attorney's fees and
 2              you're subject to your own liability.
 3                   So the City has successfully twisted it to
 4              manipulate it to discipline me as on duty and then
 5              leave me on my own on the lawsuit as off duty, and my
 6              theory is it's because of my union work.  So I don't
 7              know.  The finding had been changed several times.
 8      Q       And can you describe to me how the finding was
 9              changed and what it was changed from and to?
10      A       You'd have to go through the entire file and talk
11              with our attorney that's been handling this, but at
12              one point it was excessive force, and then at another
13              point it was inappropriate conduct, and at another
14              point discretion.  And there's been meetings
15              throughout the arbitration process prior to the
16              actual arbitration, negotiated settlements to change
17              it, and then the City Attorney had backed away from
18              that.  So it's gotten very complex with regard to how
19              they've changed the findings and into what category
20              they've placed it in.
21      Q       Now, after the next step in the proceeding, an
22              arbitration, does the result of that arbitration have
23              finality or is there anything that happens after
24              that?
25      A       Arbitrators' decisions are final.
```

Sealed as Confidential Pursuant to Protective Order

78

1    Q    Have you ever in the past gone yourself all the way

2         through an arbitration --

3    A    Oh, yes.

4    Q    -- on a complaint to the Civilian Review Authority?

5    A    Oh, no.

6    Q    When you said, "Oh, yes," about going through the

7         arbitration, what were you referring to?

8    A    Oh, we've arbitrated over when a Federation board

9         member is entitled to do Federation days, when the

10        City -- how much notice they have to give the City,

11        how long they can go work inside the union office

12        for, etc., we've got a finding on that.

13    Q    Okay, so just union issues.

14    A    Sure.

15    Q    Having nothing to do with this case.

16    A    No.

17    Q    Now, since we've been discussing this, does that

18        refresh your recollection at all as to whether each

19        of these case numbers indicated here do represent

20        complaints that were filed against you with the

21        Minneapolis Civilian Review Authority?

22    A    Their coding, I don't know if I was the complaint

23        against an officer or if I was an officer that may

24        have been a witness to an officer involved.  I don't

25        know how the Civilian Review Authority categorizes

Sealed as Confidential Pursuant to Protective Order

79

1       these cases.

2    Q   And it looks to me like there's 18 what look like

3        case numbers over in that left-hand column.

4            MS. PETERSON:    We'll stipulate that the

5        the document speaks for itself, there are 18 case

6        numbers.

7            MR. DELAPLAIN:    Would you dispute that

8        there has been 18 complaints against you that have

9        been filed with the Minneapolis Civilian Police

10       Review Authority?

11           MS. PETERSON:    Objection, asked and

12       answered.  He has already answered that question.

13       Can we take a break, please?

14           MR. DELAPLAIN:    I'd like him to answer

15       the question.

16           MS. PETERSON:    Oh, sure.

17           MR. DELAPLAIN:    I don't think he has

18       answered that question.

19           THE WITNESS:    I don't know their coding.

20       So I don't know if these are a witness or I was the

21       accused officer.

22    BY MR. DELAPLAIN:

23    Q   I understood that answer.  My question was whether

24       you dispute that there has been 18 complaints filed

25       against you with the Minneapolis Civilian Police

Sealed as Confidential Pursuant to Protective Order

80

1       Review Authority.

2                    MS. PETERSON:    Objection, asked and

3              answered.

4                    THE WITNESS:    I don't know, so I really

5              can't dispute it.  I'd have to look at what the cases

6              were specifically in order to go there.  So I don't

7              know what their codings are.  The case numbers are

8              irrelevant.  I don't know how they categorize it.  I

9              wouldn't have any evidence to say otherwise, if that

10             helps.

11                   MR. DELAPLAIN:    So do you want to take a

12             break now?

13                   MS. PETERSON:    Yes, please.

14                       (Recess)

15      BY MR. DELAPLAIN:

16      Q     Lt. Kroll, when we took our break I was asking you

17             about what's been marked as Deposition Exhibit No. 4,

18             some questions about what appears to be a printout

19             from the Minneapolis Civilian Police Review Authority

20             referencing your badge number and name and certain

21             case numbers.  And I understand from your testimony

22             that you don't know whether these are complaints that

23             were made against you or not.

24      A     That's correct.

25      Q     Now, where would the records be that showed whether

Sealed as Confidential Pursuant to Protective Order

81

1      these were complaints that were made against you, if

2      you know?

3   A   I would just assume still under the Police Review

4      Authority.

5   Q   Is there anything that's placed in your personnel

6      file when there's a complaint made against you with

7      the Civilian Review Authority?

8   A   I don't know.

9          MR. DELAPLAIN:    Counsel, now this is a

10     document that was provided to us in response to a

11     discovery request, and we asked for -- I don't have

12     the discovery request in front of me, but my

13     recollection is records of all prior complaints that

14     had been filed against the defendants.  And as I

15     understand Lt. Kroll's testimony and your objections,

16     you're now indicating that --

17         MS. PETERSON:    I believe we've fully

18     complied with your discovery request.  I believe you

19     have a complete copy of his personnel file, and that

20     was provided to you.  I believe you have a complete

21     copy of everything we have, and we have provided you

22     everything you asked for.

23         MR. DELAPLAIN:    Regarding any complaints

24     that have been filed with the Civilian Review

25     Authority?

Sealed as Confidential Pursuant to Protective Order

1           MS. PETERSON:    If we have a copy of any

2     of that, you have it.  And I believe the City has

3     also complied with all of your requests.

4           MR. DELAPLAIN:    Counsel, would you be

5     willing to -- we have discovery closing I think on

6     the 15th of this month.  In regard to this particular

7     document, I have a question, the same question I was

8     asking Lt. Kroll, whether this represents an

9     itemization of the complaints that have been made

10     against him with the Civilian Police Review

11     Authority.  Would you agree to respond to a request

12     for admission if I sent it to you at this time

13     regarding this specific document?

14           MS. PETERSON:    No.  I've responded to all

15     of your discovery on behalf of defendants Kroll and

16     Krueger, and we have answered everything to the best

17     of our knowledge that we have.  With regards to his

18     answers on this, I have no understanding of how the

19     Civilian Review Authority works or whether there are

20     other -- anything other than what I have that says at

21     the top of this document Minneapolis Civilian Police

22     Review Authority.  This is all that we have.  That's

23     all that we have from it.

24           MR. DELAPLAIN:    This is the only document

25     that you have from the Civilian Police Review

Sealed as Confidential Pursuant to Protective Order

83

1        Authority?

2                    MS. PETERSON:    This is the only document

3            that I believe I have from the Police Review

4            Authority.  I believe we have given you copies of

5            every document you have asked for.  You have had

6            copies of their personnel files.  And I don't believe

7            that you had any objections to any of the discovery

8            that we provided.

9                    MR. DELAPLAIN:    Well, in regard to this

10           particular item, my request was that you provide me

11           copies of the complaints that were made against him

12           with the Minneapolis Civilian Police Review Authority

13           and you gave me this document.  I wouldn't have

14           objected to it, with the understanding that you were

15           actually providing me the document that was

16           responsive to my request.

17                   MS. PETERSON:    I do not -- all I can do

18           for you is ask the Civilian Police Review Authority

19           for copies of what they can give me, that's all I can

20           do, and then I can provide those to you, and I have

21           done that.

22       BY MR. DELAPLAIN:

23       Q   Now, as a separate matter, Lt. Kroll, I'm going to

24           ask you, and I'm not going to mark it as an exhibit

25           at this time, but could I just ask you to look at

Sealed as Confidential Pursuant to Protective Order

84

1          that document and tell me whether you recognize it.

2     A    No, I don't recognize it.

3     Q    Do you recognize the form of the document?

4     A    It's some type of communications printout.

5     Q    Isn't that something that you work with in your --

6     A    No.

7     Q    -- position with the department?

8     A    You know, it looks like -- well, it says MDC.  Maybe

9          it's MDC printouts of the incident that we're talking

10         about.

11              MR. DELAPLAIN:    I'll take it back.  I

12         don't have any further questions.

13              MS. PETERSON:    We'll read and sign.  Oh,

14         I'm sorry, you may have some.

15              MS. FUNDINGSLAND:    I just have one

16         question, Lieutenant, and that is -- and I know you

17         probably absolutely answered this question, but I'm

18         going to try it anyway.

19                        EXAMINATION

20    BY MS. FUNDINGSLAND:

21    Q    Do you have any idea from the time that you and

22         Sgt. Krueger got out of Sgt. Krueger's vehicle to the

23         time that the uniformed squads first arrived how much

24         time would have elapsed?

25    A    No, I don't know.  I'm sure dispatch records would

Sealed as Confidential Pursuant to Protective Order

85

1           have when the call was made and the arrival of the

2           squads.

3   Q       We have that, but I'm trying to fill in prior to when

4           your call was made.

5   A       From when we got out to when the call was made?

6   Q       Okay, can you answer that?

7   A       Within a minute or two.

8   Q       Okay.  What do you think it's closer to?

9   A       It's too tough to answer.

10                  MS. FUNDINGSLAND:    All right.  That's all

11          I have.

12                  MS. PETERSON:    Do you have anything else?

13                  MR. DELAPLAIN:    Nothing.

14                  MS. PETERSON:   We'll read and sign.

15                  (The mater was adjourned at 11:21 a.m.

16                   on November 6, 2009)

17

18

19

20

21

22

23

24

25

1    SIGNATURE OF WITNESS:

2         BE IT KNOWN THAT I, the undersigned deponent,
     have read the within transcript of my deposition testimony
3    and believe the same to be true and correct, except as
     follows:

4    _____    _____

5    Robert J. Kroll                      Dated

6

     Page: Line: Correction and Reason Therefor:
7    ____ _____ _____

8    _____ _____ _____

9    _____ _____ _____

10   _____ _____ _____

11   _____ _____ _____

12   _____ _____ _____

13   _____ _____ _____

14   _____ _____ _____

15   _____ _____ _____

16   _____ _____ _____

17   _____ _____ _____

18   _____ _____ _____

19   _____ _____ _____

20   _____ _____ _____

21   _____ _____ _____

22   _____ _____ _____

23   _____ _____ _____

24   LT
     Please return to:  Ask, Trondson & Smith Court Reporters
25                      701 Fourth Avenue South - Suite 500
                        Minneapolis, Minnesota   55415

```
 1      STATE OF MINNESOTA      )
                                ) ss:
 2      COUNTY OF HENNEPIN      )

 3          BE IT KNOWN THAT I, Linda J. Trondson, the

 4      undersigned, a duly commissioned and qualified Notary

 5      Public within and for the County and State aforesaid, do

 6      hereby certify that before the giving of his/her

 7      deposition, the said witness was by me first duly sworn

 8      upon his/her oath to depose the whole truth and nothing

 9      but the truth; that the foregoing is a true and correct

10      transcription of the stenotype notes taken by me at said

11      deposition; that I am not an employee, attorney, or

12      relative of any of the parties to the cause; that I am not

13      an employee, attorney or relative of any counsel to the

14      cause; that I have no interest whatever in the result of

15      the action nor am I financially interested in the action;

16      that I do not have a contract with any of the parties,

17      counsel for any of the parties or any person with an

18      interest in the action that affects or has a substantial

19      tendency to affect my impartiality.

20                      WITNESS MY HAND AND SEAL this 16th day

21      of November, 2009.

22                      _____
                        Linda J. Trondson
23                      Notary Public,
                        Hennepin County, Minnesota
24                      My commission expires January 31, 2010

25
```