UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
08-CV-4992 (JMR/SRN)

Jackson Mahaffy; Flora Mahaffy;       )
Daniel Nelson; and Paul Von Arx       )
                                      )
        v.                            )
                                      )
Robert J. Kroll; Wallace M.           )        ORDER
Krueger; Christopher J. Bennett;      )
Aaron C. Hanson; Christopher          )
Bishop; David Campbell; Toddrick      )
Kurth; Brandon Kitzerow all acting    )
in their individual capacity; as      )
Minneapolis Police Officers; and      )
the City of Minneapolis               )

        Plaintiffs claim they suffered unconstitutional and
compensable police brutality. Defendants seek summary judgment.
The motion of defendants Kroll and Krueger is denied. The motion
of the remaining defendants is granted.

I.  Background

        The facts are sharply contested. For these motions, they are
viewed most favorably to plaintiffs, the nonmoving parties.

        On the evening of Friday, May 14, 2004, defendants Robert
Kroll and Wallace Krueger, both off-duty Minneapolis police
sergeants,[1] along with Krueger's wife, Cheryl, attended a birthday
celebration. Dinner and drinks were served at the party. After
the event, the Kruegers gave Kroll a ride to his car parked in
northeast Minneapolis. They stopped briefly for a drink along the
way.

---

[1] Kroll is now a lieutenant.

An art festival called Art-A-Whirl was under way in northeast Minneapolis at the time. Local art galleries and studios were open, serving refreshments and encouraging visitors to go from site-to-site on foot or by bike. The streets were crowded with Art-A-Whirl goers, including plaintiffs Jackson Mahaffy, Flora Mahaffy (his sister), Daniel Nelson, and Paul Von Arx, all of whom had been drinking as they biked from gallery to gallery.

At about 10:00 p.m., plaintiffs were gathered on the sidewalk in front of the Old Science Renovation art studio at the corner of Marshall Avenue and 13th Avenue. Jackson Mahaffy ("Mahaffy") was in the middle of Marshall Avenue when he spun around, swinging his shoulder bag. The bag hit the Kruegers' car as it drove slowly by. After Krueger pulled over to inspect the car, both he and Kroll approached Mahaffy on foot. They later testified they intended to detain Mahaffy and possibly issue him a citation for misdemeanor damage to property.

The parties dispute the ensuing events. Plaintiffs claim Kroll and Krueger pushed Mahaffy to the ground, punching and kicking him without provocation; Kroll and Krueger claim they were attacked by the crowd before they could reach or speak to Mahaffy. Bystanders disagree about whether any words were exchanged, when - if ever - Kroll and Krueger identified themselves as police officers, and many other details. All agree that within moments, a melee erupted, in which plaintiffs and Krueger were injured.

Several onlookers called 911, and Kroll himself broke away to call Minneapolis police dispatch[2] on his cell phone. Kroll identified himself as an off-duty police officer, but stated this was "[n]ot a help call" – meaning he did not need assistance. He said, "We've got a damage of property and an assault. We got one guy we're holding here." The dispatcher asked for Kroll's name and badge number, and the street address, which was in the Second Precinct. Kroll said, "Have a Second Precinct squad come," and told the dispatcher it was "[n]ot a help call but get one here quick." (Transmittal Affidavit of Daniel J. Brazil [Docket No. 64],[3] Ex. B60, Transcript of 911 calls.) In spite of Kroll's saying it was not a "help call," the dispatcher's call went over the police radio accompanied by an audible tone signaling an officer needed assistance.

Squad cars were dispatched to the scene. While waiting for them, Kroll saw Mahaffy's friends trying to help him walk away. Kroll testified he then grabbed Mahaffy in an attempt to detain him until the squads arrived. During this process, he kicked some of

---

[2] Plaintiffs make much of the fact that Kroll called Minneapolis dispatch directly, using its ten-digit telephone number, rather than calling 911. All agree, however, that 911 calls, as well as Kroll's calls, arrived at the same place: the Minneapolis police dispatcher. The Court considers the digits dialed irrelevant to the analysis.

[3] All Exhibits referred to in this Order, unless otherwise noted, are attached to the Transmittal Affidavit of Daniel J. Brazil.

Mahaffy's would-be rescuers.

Minneapolis Police Officers Christopher Bennett and Aaron Hanson were the first to arrive at 10:26 p.m.  Both knew Kroll and Krueger to be sergeants in the police department; Hanson recognized Kroll, and Bennett recognized both men, on sight.  (Ex. B39, Bennett Dep. at 6-7, 12; Ex. B42, Hanson Dep. at 6-8.)[4]

Upon arriving, Bennett and Hanson saw Kroll exchanging words with the crowd, but deny seeing him physically engaged with anyone. Bennett and Hanson approached Kroll.  When a woman from the crowd rushed towards Kroll, Hanson tackled her.  Mahaffy also approached Kroll, and when he did, Hanson and Bennett tackled him and placed him in handcuffs.  Kroll then told the uniformed officers Mahaffy had damaged the car and assaulted Krueger.  Based on Kroll's account, the uniformed officers arrested Mahaffy.

As other squads arrived, plaintiff Daniel Nelson sat on the curb.  He was kicked in the head three times as he sat there.  He could not identify who kicked him, but Flora Mahaffy and Britta

---

[4] Officers David Campbell and Christopher Bishop also testified they knew Kroll and Krueger and could recognize them on sight.  (Ex. B45, Campbell Dep. at 10-12, Ex. B48, Bishop Dep. at 9-10.)  Officer Brandon Kitzerow testifed he had heard Kroll's name prior to May 14, 2004, but did not know who he was and would not have been able to recognize Kroll or Krueger.  (Ex. B51, Kitzerow Dep. at 4.)  Officer Toddrick Kurth told the CRA inquiry that he would not have recognized Krueger, and that he had seen Kroll but did not recall seeing him that evening.  (Ex. B53, Kurth CRA Statement at 212-213.)

Shernoch later told him it was Kroll.  Britta Shernoch tried to get between Kroll and Nelson, and was thrown to the ground by a uniformed officer.  (Ex. B28, Shernoch Aff. ¶¶ 7, 9.)  Nelson does not know whether any uniformed officers saw him get kicked. Nelson's friend, Zoe LeSaout, stated, "one of the men from the SUV" ran "past an officer, and kicked Dan in the back of the head.  I jumped up to defend Dan and as I moved toward the man from the SUV, the officer held his arms out to stop me."  (Ex. B24, LeSaout Aff. ¶ 11.)  Another witness, Dylan Ryan, claims he saw someone "held down by police" and "kicked repeatedly" by Kroll.  This apparently occurred after Mahaffy had been placed in a squad car.  (Ex. B27, Ryan Aff. ¶¶ 12, 13.)

Meanwhile, Paul Von Arx observed the initial altercation between Kroll, Krueger, and Mahaffy from the roof of the building. He states he saw Krueger punch Flora Mahaffy as she tried to intervene.  At this point, he ran downstairs; when he emerged from the building, he saw Krueger had received a head injury.

Von Arx confronted Krueger and shouted at him.  Krueger backed away into a parking lot followed by Von Arx.  When Von Arx heard sirens in the distance, he decided to leave and get his bike from the front of the building.  At this point, a squad arrived,[5] parking on the street nearby.  As Von Arx looked down to unlock his

---

[5] It is not clear from the testimony whether it was Bennett and Hanson's squad, or a later-arriving one.  Von Arx could not identify which officers were in the squad.

bike, he was punched in the head and fell over.  He looked up to see Krueger taunting him.  Von Arx believes that, as their squad was parked nearby, uniformed officers may have seen Krueger punch him.  He cannot, however, state what, if anything, the officers actually saw.

More squads arrived.  Onlookers told the arriving officers Kroll and Krueger started the fight, and Mahaffy was blameless. The officers did not, however, release Mahaffy or arrest Kroll and Krueger.  Kroll and Krueger were allowed to leave the scene.  This apparently enraged the crowd of onlookers, who continued to shout at the officers and refused to obey orders to get out of the street.

Mahaffy's friends saw Officers Bennett and Hanson place him in a squad car and drive away.  No plaintiff testified to seeing Kroll or Krueger have any contact with Mahaffy after uniformed officers arrived.  (Ex. B1, Mahaffy Dep. at 28-30, 34-36; Ex. B3, Flora Mahaffy Dep. at 33, 58; Ex. B5, Nelson Dep. at 38; Ex. B8, Von Arx Dep. at 65.)  Several bystanders, however, claim they saw uniformed officers either hold Mahaffy down or form a circle around him to permit Kroll to assault him.  Remarkably, this testimony is not supported by any of the plaintiffs.

Doreen Johnson, for example, drove by and saw the fight.  She stopped to call 911, and when squads arrived, she claims she saw three uniformed officers stand watching as Kroll hit Mahaffy.  She

6

cannot identify any of the officers. (Ex. B18, Johnson Dep. at 17, 60-61, 67.)  Similarly, Matthew Rolfe was working at the Old Science Renovation building.  In his first deposition, he was "certain" he saw a uniformed police officer kick someone who was on the ground in handcuffs. (Ex. B21, Matthew Rolfe Dep. I, at 14-15, 17.)  He stated he could not identify either the officer or the victim.  (Id. at 20-23.)  Shortly afterward, he asked to give further testimony, at which time he corrected his prior testimony, saying the assailant was "one of the gentlemen from the truck" - meaning either Kroll or Krueger.  (Ex. B21, Rolfe Dep. II at 6, 13.)  He claimed a uniformed officer held the victim down, but he could not identify the officer. (Id. at 13.)  He states the victim was kicked once in the face (Id. at 19.), but he is "not positive" the victim was Mahaffy.  (Id. at 16.)  Peter Thomas claims as Mahaffy was being held down, Kroll "ran around the uniformed officers" and kicked him in the head. (Ex. B30, Peter Thomas Aff. ¶ 8.)

Mahaffy was taken to a nearby parking lot, to which an ambulance had been directed.  Kroll was driven there by another officer.  Krueger and his wife drove there in their own vehicle. Kroll, Krueger, and the other responding officers assembled in the parking lot.  Paramedics examined Krueger and Mahaffy.

Mahaffy was transported to the Hennepin County Adult Detention Center, where he spent the next three days.  Notwithstanding a

7

police recommendation that he be charged with assault on an officer, damage to property, and inciting a riot, the City Attorney's Office declined to pursue charges.

On May 26, 2004, Nelson filed a complaint with the Minneapolis Civilian Review Authority ("CRA"), charging Kroll and Krueger with excessive force, inappropriate conduct, and failure to provide adequate or timely police protection. The CRA Panel sustained the allegation that both Kroll and Krueger used excessive force against Mahaffy, that Kroll used excessive force against Nelson, and that Krueger used excessive force against both Flora Mahaffy and Paul Von Arx. The Panel further sustained the allegation of inappropriate conduct against both Kroll and Krueger based on a finding they failed to identify themselves as police officers and give appropriate instructions before approaching Mahaffy. Nelson also alleged other officers stood by and failed to protect him when Kroll kicked him; the Panel found insufficient evidence to substantiate this claim.

The CRA Panel recommended discipline for both Kroll and Krueger; as a result, the Minneapolis Police Department suspended Krueger for 24 hours, and Kroll for 160 hours.

Plaintiffs filed this lawsuit in August 2008. They bring federal civil rights claims against the City of Minneapolis and the named police officers. All defendants move for summary judgment.

II.   <u>Analysis</u>

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact.  Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 246 (1986).  The party opposing summary judgment may not rest upon the allegations in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial.  <u>See</u> <u>Anderson</u>, 477 U.S. at 248-49; <u>see also</u> <u>Hartnagel v. Norman</u>, 953 F.2d 394, 395-96 (8th Cir. 1992).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  <u>Anderson</u>, 477 U.S. at 247-48 (emphasis omitted).

Plaintiffs' Amended Complaint [Docket No. 36][6] alleges claims of excessive force (by Kroll and Krueger only), unreasonable seizure of Mahaffy (by the uniformed officers), and conspiracy to do the same (by the uniformed officers), as well as a claim that plaintiffs' injuries were caused by an unconstitutional policy or

---

[6] In May 2010, plaintiffs filed a new lawsuit in state court with the identical claims against Officers Kroll and Krueger only in their individual capacities.  The matter was removed and transferred to this Court.  Case No. 10-CV-2077.  Because the claims are virtually identical, the Court considers defendants' motions for summary judgment as if they were directed to plaintiffs' second lawsuit as well.

custom of the City of Minneapolis.[7]

A.   Excessive Force and Unreasonable Seizure

As an initial matter, defendants Kroll and Krueger deny they have been properly named in their individual capacity, and were not acting under color of state law as required by 42 U.S.C. § 1983. They are incorrect.

1.   Kroll and Krueger Properly Named Individually

Kroll and Krueger claim they have not been properly named in their individual capacity.   Official capacity and individual capacity suits are "different causes of action." Baker v. Chisom, 501 F.3d 920, 923 (8th Cir. 2007).   "Because section 1983 liability exposes public servants to civil liability and damages . . . only an express statement that they are being sued in their individual capacity will suffice to give proper notice to the defendants." Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999).   A plaintiff who would sue a public official in his or her individual capacity "must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."   Id.   The Eighth Circuit Court of Appeals offered an example of express and

---

[7] Count IV of the Amended Complaint also alleges a combined claim of negligence, deliberate indifference to safety, failure to protect, and state created danger against the City and the uniformed officer defendants.  As plaintiffs have not opposed this portion of defendants' motion, summary judgment is granted on this claim.

unambiguous notice, reading:    "Plaintiff sues each and all defendants in both their individual and official capacities." <u>Nix v. Norman</u>, 879 F.2d 429, 431 (8th Cir. 1989).

Plaintiffs have not been so explicit.  The Amended Complaint names the defendants as follows:

> Robert J. Kroll; Wallace M. Krueger; Christopher J. Bennett; Aaron C. Hanson; Christopher Bishop; David Campbell; Toddrick Kurth; Brandon Kitzerow; James Rugel; Clark Goset; and Mark Durand, all acting in their individual capacity; as Minneapolis Police Officers; and the City of Minneapolis, Defendants.

This sentence reflects - at least - a failure to incorporate Eighth Circuit precedent.  The Court, however, is willing to set aside its adventuristic grammatic structure and finds it sufficient to put defendants on notice of plaintiffs' claim of personal liability.  After the semi-coloned list of officers' names, the words "all acting in their individual capacity" appear.  This can certainly be distinguished from those cases where the complaint is silent as to individual capacity.  <u>See</u> <u>Baker</u>, 501 F.3d at 924; <u>Johnson</u>, 172 F.3d at 535; <u>Artis v. Francis Howell North Band Booster Ass'n</u>, 161 F.3d 1178, 1182 (8th Cir. 1998); <u>Nix</u>, 879 F.2d at 431; <u>Rau v. Roberts</u>, 2010 WL 396223, *7 (D. Minn., Jan. 27, 2010) (Kyle, J.)

Ultimately, the Court finds the Amended Complaint sufficient to give Kroll and Krueger notice they are being sued both officially and individually.

2.   <u>Kroll and Krueger Acted Under Color of State Law</u>

One liable under § 1983 must be "acting under color of state law" to deprive a plaintiff of a "right secured by the Constitution and laws of the United States." <u>See</u> <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).   The Eighth Circuit has interpreted "under color of state law" to mean the defendant "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" <u>Roe v. Humke</u>, 128 F.3d 1213, 1215 (8th Cir. 1997), <u>quoting</u> <u>West</u>, 487 U.S. at 49. Defendants argue Kroll and Krueger, off-duty and out of uniform, were not acting under color of state law.   But the fact that an officer is off-duty or out of uniform is not controlling.   <u>Stengel v. Belcher</u>, 522 F.2d 438, 441 (6th Cir. 1975).   The question is more nuanced.

Whether or not an off-duty police officer is acting under color of state law depends on "the nature and circumstances of the officer's conduct," and its relationship "to the performance of his official duties." <u>Humke</u>, 128 F.3d at 1216 (internal quotation omitted).   Similarly, the question does not turn on whether the plaintiff knows he or she is dealing with an off-duty police officer.   This is a factor to be considered, but is not dispositive. <u>See</u> <u>Lyons v. Adams</u>, 257 F. Supp. 2d 1125, 1133 (N.D. Ill. 2003) (plaintiff knew attackers were officers); <u>Huffman v. County of Los Angeles</u>, 147 F.3d 1054, 1058 (9th Cir. 1998)

12

(decedent did not know attacker was an officer).  Ultimately, an officer is not acting under color of state law unless there is an "actual or purported relationship between the officer's conduct and his duties as a police officer."  Humke, 128 F.3d at 1216.

For this reason, whether an off-duty police officer is acting under color of state law is fact-dependent.  An off-duty officer who agrees to follow his inebriated relatives home, and then gets physically involved in a family dispute, is not acting under color of state law.  See Barna v. City of Perth Amboy, 42 F.3d 809, 817-818 (3d Cir. 1994).  But when a few minutes later, that same officer draws his service weapon and attempts to arrest a relative who brandishes a loaded shotgun on the street, the officer acts under color of state law.  See id. at 819-820.  An off-duty officer who visits the home of a crime victim to provide information about her case may be acting under color of state law.  See Almand v. DeKalb County, 103 F.3d 1510, 1514 (11th Cir. 1997).  But when the victim throws him out, and he later breaks in and forcibly rapes her, he is acting as a private person.  Id.

Much depends, therefore, on how Kroll and Krueger's actions are characterized.  If they simply wanted to punish Mahaffy for scratching the car, they acted from personal motives unrelated to their law enforcement duties.  But if they believed Mahaffy committed a crime, and approached him intending to detain him and investigate, there is a nexus between their conduct and their law

enforcement duties.   The question, then, depends on whether plaintiffs have adduced evidence from which a reasonable jury could find Kroll and Krueger's actions were in furtherance of the state's interest in law enforcement.

Here, although it is a close question, the Court finds a sufficient nexus between Kroll and Krueger's actions, and their expressed intention to charge Mahaffy with criminal damage to property or assault, to raise a question of fact as to whether they were acting under color of state law.[8]

A defendant acts under color of law "when he misuses power possessed by virtue of state law and made possible only because he was clothed with the authority of state law."   United States v. Colbert, 172 F.3d 594, 596 (8th Cir. 1999)(citation omitted). Minneapolis police department regulations permit off-duty officers to act as "peace officers" within their jurisdiction. (Transmittal Affidavit of Karin E. Peterson [Docket No. 52], Ex. K18, Minneapolis Police Department Policy and Procedure Manual, at § 5-202.)   Among other things, a peace officer has the authority to arrest a person without a warrant.   Minn. Stat. § 629.34 (2008).

It is undisputed that Kroll and Krueger were within their jurisdiction, that being the City of Minneapolis.   After Mahaffy's

---

[8] The Court is mindful that plaintiffs' witnesses' accounts of the fight, if believed, suggest Kroll and Krueger were acting purely on personal motives.   But because there is a dispute of fact, the question whether Kroll and Krueger are acting under color of state law is for the jury to decide.

14

bag hit the side of Krueger's car, both Kroll and Krueger testified they emerged from the car intending to "detain" Mahaffy.  (See, e.g., Ex. B32, Kroll Dep. at 26-27; Ex. B33, Kroll CRA statement, at 3, 11, 13, 20-27; Ex. B36, Krueger CRA statement at 10.)  Krueger's stated intent was "to make a citizen's arrest and probably issue a ticket." (Ex. B35, Krueger Dep. at 74.)  Krueger testified that if he had reached Mahaffy, "the first thing I would have said was that you're under arrest." (Id. at 76.)  Kroll stated he wanted to "detain him [and] obtain identification" in the event there was damage to the car.  (Ex. B33, Kroll CRA statement at 3.)

What followed was clearly a brawl.  Kroll, Krueger, and the crowd exchanged blows.  Defendants are correct:  Kroll and Krueger were unarmed, out of uniform, and never showed their badges, gave commands, or identified themselves as police officers prior to confronting Mahaffy.  Yet Kroll's and Krueger's own testimony could lead a jury to conclude their actions were not purely personal.

Kroll (among others) called the police dispatcher.  Unlike the other calls from private citizens, Kroll said nothing about a fight in progress.  Instead, the transcript of Kroll's call reflects he simply identified himself as an off-duty officer and stated:  "We've got a damage of property and an assault.  We got one guy we're holding here." (Ex. B60.)  Kroll told the dispatcher he was "holding" someone suspected of committing crimes ("a damage of property and an assault").  From this evidence, a reasonable jury

15

could find Kroll was acting as a peace officer rather than a private citizen reporting a crime.  Contrast Redding v. St. Eward, 241 F.3d 530, 533 (6th Cir. 2001) (off-duty officer who called 911 to report a break-in at house where she was staying was not acting under color of state law).

Kroll testified he physically held Mahaffy when the crowd tried to help Mahaffy get away.  He did so because he was trying to keep Mahaffy at the scene until the squads arrived.  When the squads arrived, much of the crowd dispersed.  Kroll and Krueger remained on the scene to identify themselves, answer the uniformed officers' questions, and point out Mahaffy, the person they claimed committed property damage and assault.  They were permitted to move freely about the scene, and voluntarily followed the uniformed officers to the nearby parking lot - the only witnesses (other than Mahaffy, in custody) to do so.

Again, a reasonable jury could find Kroll and Krueger's actions - in holding Mahaffy until squads arrived, in using force on those trying to remove Mahaffy, and in remaining at the scene to participate in the investigation - were behaving more like peace officers making an arrest, than participants in a street brawl. Contrast Lyons, 257 F. Supp. 2d at 1129 (off-duty officers involved in bar fight, who fled after citizen's 911 call and before uniformed officers arrived, were not acting under color of state law).

"Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it." <u>Screws v. United States</u>, 325 U.S. 91, 111 (1945). Considered in the light most favorable to plaintiffs, the evidence could permit a reasonable jury to find Kroll and Krueger were not just private citizens involved in a street fight, but assumed the role of peace officers as they sought to detain someone they suspected - rightly or wrongly - of breaking the law. Their motion for summary judgment is denied.

B.  <u>Qualified Immunity</u>

Plaintiffs contend the uniformed officers unlawfully arrested Mahaffy, and conspired with Kroll and Krueger to allow the use of excessive force on all plaintiffs.  Officers Hanson, Bennett, Bishop, Campbell, Kurth, and Kitzerow reply by seeking qualified immunity.[9]

Government officials performing discretionary functions are generally entitled to qualified immunity unless they violate clearly established constitutional rights of which a reasonable person would have known.  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  The availability of qualified immunity is to be decided before trial.  <u>See</u> <u>Hunter v. Bryant</u>, 502 U.S. 224, 228 (1991) (per curiam).  When doing so, a court considers whether the alleged

_____

[9] Kroll and Krueger do not seek qualified immunity or make any argument with respect to the merits of plaintiffs' excessive force and unlawful seizure claims.

facts, viewed most favorably to plaintiffs, show the official's conduct violated a constitutional right; and whether that right was clearly established. Pearson v. Callahan, 129 S.Ct. 808, 815-16 (2009).

Whether or not the right was "clearly established" focuses on the specific case rather than any general proposition. The court asks "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled in part on other grounds by Pearson v. Callahan, id. The inquiry is individualized and focused on "whether each defendant committed acts rendering him liable to each plaintiff." Jones v. Coonce, 7 F.3d 1359, 1364 (8th Cir. 1993).

Plaintiffs allege two constitutional violations. First, arrest without probable cause; and second, the use of excessive force during arrest. Both are "clearly established" for qualified immunity purposes. See Graham v. Connor, 490 U.S. 386, 394-95 (1989); Hunter, 502 U.S. at 227. Each is governed by the Fourth Amendment's "objective reasonableness" standard. See Graham, 490 U.S. at 388; Hunter, 502 U.S. at 228-29.

### 1. Mahaffy's Arrest

The Fourth Amendment bars arrest without probable cause. See, e.g., Baker v. McCollan, 443 U.S. 137, 142 (1979); Hill v. Scott, 349 F.3d 1068, 1072 (8th Cir. 2003). "Probable cause exists if the

totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed an offense at the time of the arrest."  Smithson v. Aldrich, 235 F.3d 1058, 1062 (8th Cir. 2000) (internal citations and quotations omitted).  At the same time, however, officers are afforded qualified immunity "if they arrest a suspect under the mistaken belief that they have probable cause to do so – provided that the mistake is objectively reasonable."  Id.  Thus, for immunity purposes, the issue "is not probable cause in fact but arguable probable cause."  Id. (internal quotation omitted).

Mahaffy argues the uniformed officers who arrested him failed to conduct a reasonable investigation, and ignored exculpatory evidence before making the arrest decision.  "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence."  Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999).  The Court does not find an illegal arrest here.

Plaintiff claims "no investigation was performed." (Pl. Mem. at 44.)  He is incorrect.  Bennett and Hanson responded to a call indicating an off-duty officer needed assistance.  Under such circumstances, officer safety is considered the first priority. (Ex. B35, Krueger Dep. at 95.)  They arrived amidst a "big melee" according to Bennett. (Ex. B40, Bennett CRA Statement at 221.) They saw Kroll fending off an unruly crowd, but did not see him hit or kick anyone.  Hanson, who described the scene as "complete

19

chaos" (Ex. B42, Hanson Dep. at 12), saw a woman run at Kroll. Seeing this, Hanson tackled her.

Hanson then saw Mahaffy approach Kroll. Believing Mahaffy was about to assault Kroll, Hanson tackled him. At that point, Kroll identified Mahaffy as the one who damaged the car and assaulted Krueger and himself. The officers made a judgment call which credited Kroll's identification, and arrested Mahaffy.[10] Considering all the available evidence, the Court finds Officers Bennett and Hanson had arguable probable cause to arrest Mahaffy.

The crowd did not agree with the officers' decision in arresting Mahaffy and letting Kroll and Krueger go free. As the melee unfolded, there were wildly conflicting accounts of what had happened prior to the first squad's arrival; for this reason, Officer Campbell took down witnesses' contact information. But an officer's "duty to conduct a reasonably thorough investigation" prior to arrest bows to exigent circumstances when law enforcement may be "unduly hampered if the agents wait to obtain more facts before seeking to arrest." See Kuehl, 173 F.3d at 650 (internal quotation and citation omitted).

Unlike Kuehl, which presented no exigent circumstances

---

[10] Kroll subsequently testified there were too many people for him to be certain Mahaffy was the one who assaulted Krueger, but he "assume[d]" Mahaffy had done it because of where Mahaffy was located. (Ex. B32, Kroll Dep. 24-26, 35, 40,42.) But these are Kroll's later recollections. They do not impact the information available to Officers Bennet and Hanson at the time.

whatsoever, here, a street fight was in progress.  This implicated the safety of the officers and the crowd.  The officers' decision to arrest Mahaffy while leaving Kroll and Krueger at liberty may have escalated tensions, but that does not make the arrest objectively unreasonable.  Even after Mahaffy was placed in the squad car, the crowd continued to scream at the officers and refused to obey commands to get out of the street.  This was not a time when reasonable officers might sit on the curb and interview witnesses one-after-another.  These officers behaved reasonably under fluid and rapidly changing circumstances.  Because Mahaffy's arrest was lawful, the arresting officers are entitled to qualified immunity.

### 2. Excessive Force

No plaintiff alleges the uniformed officers actually used excessive force.  Rather, they claim the uniformed officers did not intervene when they observed Kroll and Krueger using excessive force, thereby establishing a conspiracy.  One seeking to show a § 1983 conspiracy claim must show (1) the defendant conspired with others to deprive the plaintiff of constitutional rights; (2) at least one alleged co-conspirator engaged in an overt act in furtherance of the conspiracy; and (3) the overt act injured the plaintiff.  White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008).

At this point, the Court considers whether plaintiffs' evidence would permit a reasonable jury to infer the existence of

a meeting of the minds.  Plaintiffs believe a meeting of the minds may be inferred if there is evidence the uniformed officers saw Kroll and Krueger assaulting plaintiffs, yet failed to intervene. In support, they advance the case of Hafner v. Brown, 983 F.2d 570, 578 (4th Cir. 1992).

In Hafner, several Baltimore, Maryland, uniformed officers responded to a call of a man with a shotgun.  The events occurred at around 1:00 a.m. near the parking lot of a convenience store. The suspect was ordered to drop his gun, and he did so.  He was then arrested and handcuffed.  Two eyewitnesses, observing the arrest from approximately 100 yards away, saw several of the officers beating the arrestee.  The witnesses described the officers in a manner that would permit the jury to identify them and were able to state what each officer did.  The witnesses testified all officers engaged in the assault, but the officer who delivered the first kick "simply watched" as the other officers continued the beating.  Id. at 577.

The Court instructed the jury:  "if you find two or more of the Defendants witnessed the beating inflicted upon the Plaintiff . . . and did nothing to prevent it, then you must find that the Defendants participated in a civil conspiracy to deprive Plaintiff of his constitutional rights."  Id.  The instruction continued, "The critical element is whether there was a meeting of the minds to accomplish the unlawful act."  Id.

22

The Fourth Circuit found the eyewitness testimony, "combined with the official relationship" the officers shared, sufficed to demonstrate an agreement. Id. "Acquiescence can amount to a conspiracy agreement when, as here, one police officer watches an open breach of the law and does nothing to seek its prevention." Id. at 578. The Court also held that, even if the instruction was in error, the error was harmless because "the challenged sentence was just a small part of an expansive instruction of civil conspiracy." Id. Eighteen years have passed since Hafner. In that time the Fourth Circuit has never cited it for the principle that merely observing a violation amounts to conspiracy; nor has any other Circuit, including the Eighth Circuit.

Plaintiffs' proffered evidence, here, is less substantial than in Hafner. The Court finds no evidence from which a jury could infer a meeting of the minds. In this case, plaintiffs or witnesses claim four assaults occurred: (1) Krueger punched Flora Mahaffy; (2) Krueger punched Von Arx; (3) Kroll kicked Nelson; and (4) Kroll assaulted Mahaffy who was in handcuffs. For purposes of this motion, the Court assumes such actions were unreasonable. The issue is which, if any, uniformed officers saw what happened.

a. Flora Mahaffy

Flora Mahaffy acknowledges running over to Krueger as he hit her brother. She pulled Krueger's shoulders from behind until Krueger turned around and pushed her down. (Ex. B3, Flora Mahaffy

23

Dep. at 21-22.)  She states Krueger sat on her, holding her down, and punched her two or three times in the forehead.  (Id. at 23-24.)  Paul Von Arx also witnessed this incident, but noted no uniformed officers had arrived on the scene at the time.  (Ex. B9, Von Arx CRA Statement at 12.)  There is no testimony whatsoever placing uniformed officers at the scene when Flora Mahaffy was punched.  As such, there is no evidence upon which a conspiracy can be found.

### b.  Paul Von Arx

Paul Von Arx recalls "officers were showing up during and after the physical assaults had subsided" (Ex. B8, Von Arx Dep. at 76), and were arriving as he unlocked his bike.[11]  (Id. at 59-60.) He was then punched in the head, and looked up to see Krueger standing over him.  (Id. at 53, 56-62; Ex. B9, Von Arx CRA Statement at 11-12.)  He cannot state what the uniformed officers saw, nor does he know whether they actually saw the punch.  (Ex. B8, Von Arx Dep. at 59-63, 76.)  No other witness saw Krueger's attack on Von Arx, or can testify that any uniformed officers saw it.  (Ex. B1, Mahaffy Dep. at 22; Ex. B3, Flora Mahaffy Dep. at 57-58; Ex. B8, Nelson Dep. at 39.)  Ultimately, plaintiffs offer absolutely no testimony showing any uniformed officer saw the

---

[11] In a recorded statement in June 2004, Von Arx indicated the officers "had pulled up alongside the curb after this happened," (i.e. after he had been punched), and he returned to the spot intending to tell them what had happened.  (Ex. B10 at 17.)

attack on Von Arx; as a result, there is no evidence from which a reasonable jury could infer a meeting of the minds.

c.  Daniel Nelson

Daniel Nelson states he sat on the curb when someone kicked him in the head.  He did not see the kicker, but Flora Mahaffy states she saw the assault and told Nelson it was Kroll.  (Ex. B5, Nelson Dep. at 36-39; Ex. B3, Flora Mahaffy Dep. at 58.)  When deposed, Nelson could not state whether any of the uniformed officers saw the assault.  (Ex. B5, Nelson Dep. at 40, 73.)  Flora Mahaffy claims "one of the uniformed officers stopped Britta Shernoch from being able to defend Dan Nelson when he got kicked in the face."  (Ex. B3, Flora Mahaffy Dep. 40, 58.)  She does not recall which officer it was (id. at 58.)  Officer Hanson acknowledges tackling a woman who he believed was about to attack Kroll.  (Ex. B42, Hanson Dep. 23-25, 51.)  Hanson does not, however, recall seeing Nelson.  Other witnesses have supplied affidavits to the effect that Kroll had to run past uniformed officers to kick Nelson; however, no witness has identified the uniformed officers.

Even taking all of this evidence most favorably to plaintiffs, it is far too insubstantial to support an inference of a meeting of the minds.  Assuming a jury might infer Hanson tackled Britta Shernoch, Hanson testified he did so simply because she was one of the group that was running after Kroll.  (Ex. B42, Hanson Dep. at

25

24.)  Hanson states he did not see Kroll make physical contact with anyone (id. at 69).  No witness has testified to the contrary. Under these circumstances, "a meeting of the minds" could only be speculative.

### d.  Jackson Mahaffy

Witnesses claim Jackson Mahaffy was beaten after he was in handcuffs.  The testimony on this point is highly contradictory. Plaintiffs' complaint does not allege this beating, and, on deposition, no plaintiff has testified this beating occurred.

Mahaffy could not identify any uniformed officers, and denied they caused plaintiffs any harm.  (Ex. B1, Mahaffy Dep. 23-24.) His sister Flora saw Mahaffy's arrest, but did not see anyone attack him while he was handcuffed.  (Ex. B3, Flora Mahaffy Dep. 33, 58.)  Von Arx also saw the arrest, but did not claim he saw Kroll attack Mahaffy while in custody. (Ex. B8, Von Arx Dep. at 65-68; Ex. B9, Von Arx CRA Statement 12-13.)  Von Arx states he saw Kroll attack Mahaffy, but prior to the arrival of uniformed officers.  (Ex. B8, Von Arx Dep. at 71-72.)  Nelson denies seeing anyone hit or strike Mahaffy.  (Ex. B5, Nelson Dep. at 38.)

In spite of plaintiffs' denials, several bystanders claim they saw Kroll beat and kick a handcuffed person who lay on the ground. These witnesses claim uniformed officers either held the victim down or stood in a circle and watched.  No witness could identify the uniformed officers, even after being shown photo arrays,

including photos of all officers at the scene. (Ex. B18, Johnson Dep. at 21-23; Ex. B14, Holden Dep. at 22-23; Ex. B16, Lennon Dep. 26; Ex. B22, Rolfe Second Dep. at 21.) Each uniformed officer present at the time denies seeing Kroll or Krueger attack anyone. (Ex. B43, Hanson Dep. at 13, 69; Ex. B40, Bennett Dep. at 25-26; Ex. B41, Bennett CRA Statement at 9-10; Ex. B49, Bishop Dep. 38; Ex. B46, Campbell Dep. at 80; Ex. B47, Campbell CRA Statement at 7.)[12] Because plaintiffs' witnesses cannot identify any of the officers allegedly involved in this incident, they cannot rebut or contradict the officers' testimony.

Plaintiffs attempt to knit these bare allegations into a coherent tale, and then ask the Court to assume "the uniformed officers observed and participated in the assaults as alleged." (Pl. Mem. Opp. at 35.) But which assault is being alleged? Plaintiffs are correct: there exists "a record of when each officer arrived on the scene, where he was located, and the total number of officers . . . ." But the Court rejects the theory that, based upon this commonplace record of attendance, "[a] jury could use this information to determine which specific officers were involved in or observing each assault." (Pl. Mem. Opp. 32.) Plaintiffs cite no authority, and this Court is aware of none, to

---

[12] Officers Kurth and Kitzerow arrived after the scene was under control, and did not see any interaction between plaintiffs and the other officers. (Ex. B51, Kitzerow Dep. at 9-10; Ex. B53, Kurth CRA Statement.)

support this proposition.

Plaintiffs must prove "each defendant committed," or in this case conspired to commit, "acts rendering him liable to each plaintiff."  See Jones, 7 F.3d at 1364.  Absent real evidence identifying which officers participated in or facilitated the assault on Mahaffy, plaintiffs cannot carry that burden.

On these facts, the Court simply cannot find any credible evidence from which a reasonable jury could conclude there was a conspiratorial meeting of the minds.  A jury would have to find that an event occurred - the beating of a manacled male - when the only person who could have been a victim of the beating denies it happened.  And nobody can identify any person who watched and was conspiratorially complicit in the incident.

Officers Bennett, Hanson, Bishop, Campbell, Kurth and Kitzerow are entitled to qualified immunity on all § 1983 claims.

C.   Monell Claims Against the City

Plaintiffs' claims against Minneapolis for violation of their Fourth Amendment rights cannot survive summary judgment.  They claim the City of Minneapolis is liable for the constitutional violations under Monell v. Department of Social Services, 436 U.S. 658, 690-91 (1978).  The Supreme Court has held that a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  Id. at 694.  Rather, a municipality is responsible only if an injury is inflicted because of "execution of

a governmental policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Id.

As such, a court's first task in applying Monell is to identify the municipal policy or custom at issue. Dick v. Watonwan County, 738 F.2d 939, 943 (8th Cir. 1984). There is no suggestion that any official policy is involved here. To establish a municipal "custom," plaintiffs must show "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct" by City employees; "(2) deliberate indifference to or tacit authorization of such conduct" by the City's "policymaking officials" after notice of the misconduct; and "(3) the plaintiff's injury by acts pursuant to" the custom, that is, "proof that the custom was the moving force behind the constitutional violation." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999). The pattern of misconduct must be so pervasive that it constitutes "custom or usage" with the force of law. Ware v. Jackson County, 150 F.3d 873, 880 (8th Cir. 1998). Here, plaintiffs baldly allege the City had notice that Kroll's and Krueger's "use of excessive force and inappropriate conduct was chronic, persistent and widespread," yet continued to employ them and even promoted them to supervisory roles. (Pl. Mem. at 43.)

Certainly, this is plaintiffs' allegation. But beyond the allegation, plaintiffs have failed to provide any evidentiary

29

support for their <u>Monell</u> claim.  They have proffered no evidence showing Kroll and Krueger were involved in any prior incidents of excessive force, much less that such incidents were "chronic, persistent and widespread."  Plaintiffs refer to the "volume of complaints against Kroll and Krueger," (Pl. Mem. at 44) – but do not offer even one as evidence.

Plaintiffs' expert on police practices, D.P. Van Blaricom, reports Kroll had 9 CRA complaints of excessive force and 17 complaints of "other inappropriate conduct."  Van Blaricom reports Krueger had 5 complaints of excessive force and 5 of "other inappropriate conduct."  (Ex. B56, Van Blaricom Report, at 5, ¶ 10.)  The report does not attach the complaints.  The Court has no evidence of when the complaints were filed, whether any were sustained, or whether any discipline was imposed.  As of May 14, 2004, Kroll had served 15 years with the Minneapolis Police, and Krueger had 16.  (Ex. B32, Kroll Dep. at 5, B35, Krueger Dep. at 6.)

In his deposition, Krueger went over six CRA complaints in his record.  The only complaint for which discipline was imposed was Nelson's complaint about the incident in this case.  He states that none of the five earlier complaints, ranging from 1992 to 1997, were sustained.  (Ex. B35, Krueger Dep. at 86-90.)  Kroll's deposition offers no evidence as to his prior disciplinary history.  (Ex. B32, Kroll Dep. at 69-79.)

On a motion for summary judgment, plaintiffs bear the burden of producing evidence from which a jury could concluded their <u>Monell</u> claim can be sustained. They have failed to do so. The Court, therefore, concludes the City is entitled to summary judgment on this claim.

III.  <u>Conclusion</u>

For the foregoing reasons, the City and the uniformed officers are entitled to summary judgment [Docket No. 54]. Kroll and Krueger's motion for summary judgment [Docket No. 45] is denied.

IT IS SO ORDERED.

Dated:  August 24, 2010

<div style="margin-left:40%">

<u>s/ James M. Rosenbaum</u>
JAMES M. ROSENBAUM
United States District Judge

</div>